UNITED STATES DISTRICT COURT

DISTRICT OF NORTH DAKOTA

WESTERN DIVISION (BISMARCK)

| | |
|---|---|
| CISSY THUNDERHAWK; WASTE'WIN YOUNG; and REVEREND JOHN FLOBERG on behalf of themselves and all similarly-situated persons,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>COUNTY OF MORTON, NORTH DAKOTA; SHERIFF KYLE KIRCHMEIER; GOVERNOR DOUG BURGUM; FORMER GOVERNOR JACK DALRYMPLE; DIRECTOR GRANT LEVI; SUPERINTENDENT MICHAEL GERHARDT JR; TIGERSWAN LLC; and DOES 1 to 100<br><br>　　　　　Defendants. | Case No.<br><br>**CIVIL RIGHTS CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.　　From April 2016 to February 2017, tens of thousands of individuals, known as "Water Protectors," united in opposition to the construction of the Dakota Access Pipeline (DAPL) at camps located near the intersection of Highway 1806 and the Cannonball River in south-central North Dakota.

1

**COMPLAINT; DEMAND FOR JURY TRIAL**

*Thunderhawk et al. v. County of Morton, North Dakota et al.*; United States District Court, District of North Dakota, Case No. _____

2.      Since the movement first began, Water Protectors relied heavily on Highway 1806.  As the largest and most direct road connecting the Standing Rock Sioux Reservation and the various camps on its northern border to Bismarck and Mandan, Highway 1806—especially the stretch between Cannon Ball and Mandan—served as the primary route by which Water Protectors (and press) traveled to the camps, gathered supplies at Bismarck and Mandan, and sought medical treatment at the nearest major hospital. Moreover, because DAPL crosses Highway 1806 several miles north of the camps, in an area rich with sacred and ceremonial sites, Highway 1806 also served as the primary means by which Water Protectors traveled to assemble, speak, and pray in opposition to the construction of DAPL.

3.      But Highway 1806 was not only important to Water Protectors.  For thousands of local residents, Highway 1806 is their primary means of visiting family, shopping, seeking medical attention, etc.  Highway 1806 is a key north-south public right-of-way for residents of south-central North Dakota, north-central South Dakota, the Standing Rock Reservation, and the Cheyenne River Reservation.

4.      As the "no-DAPL" movement grew, so too did the divide between the predominantly Native American Water Protectors and the predominantly non-indigenous residents of Morton County. By late-summer, racial and political polarization had thoroughly infected the relationship between the Water Protectors and law enforcement Defendants, led by Defendant Morton County Sheriff Kyle Kirchmeier.

5.      On October 24, 2016, Defendants closed Highway 1806 from Fort Rice to Fort Yates. This road closure was directed only at Water Protectors: residents of Fort Rice were allowed to drive southbound on Highway 1806 as were employees of DAPL. In fact, DAPL employees were permitted to use the closed portion of the road for the duration of the closure. The stretch of Highway 1806 from the Cannonball River to Fort Rice remained fully closed—at least to Water Protectors—until March 15, 2017.

6.       From October 28, 2016 until early March, Defendants maintained a reinforced concrete and concertina wire barricade on Highway 1806 immediately north of the Backwater Bridge. This barricade presented a physical boundary to any travel past the bridge on *or around* Highway 1806 (but it did not prevent travel onto the bridge itself). Defendants also enforced an absolute prohibition on Water

Protector travel—including foot, horseback, and ATV travel—on the closed portion of Highway 1806, regularly arresting Water Protectors who approached the barricade on foot.

7.      Defendants' five-month absolute prohibition on any Water Protector travel on an approximately nine-mile stretch of this public right-of-way infringed Plaintiffs' Fifth and Fourteenth Amendment right to interstate and intrastate travel and, as a consequence, substantially burdened Plaintiffs in seeking needed medical care, in purchasing supplies (and in other ways engaging in commerce), in meeting, speaking and being interviewed by media, in gathering and reporting the news, and in visiting family members.

8.      The travel limitations also prevented Plaintiffs from exercising their First Amendment right to assemble, speak, and pray in the area in question, including but not limited to a nearly nine-mile stretch of a public road abutting numerous sacred and ceremonial sites, as well as portions of the public road near to the pipeline's path.   The road closure also unnecessarily burdened the First Amendment rights of journalists or supporters who wished to join or visit the camps and thereby limited the camps' and Standing Rock Reservation's access to the press as well as the press's access to the camps and to the Standing Rock Reservation.

9.      Plaintiffs suffered substantial and irreparable injury as a result of Defendants' actions.

## JURISDICTION & VENUE

10.      This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 (in that they arise under the United States Constitution) and 28 U.S.C. § 1343(a)(3) (in that the action is brought to address deprivations, under color of state authority, of rights, privileges, and immunities secured by the United States Constitution). This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

11.      Venue is properly placed in the United State District Court for the District of North Dakota pursuant to 28 U.S.C. § 1391(b) because the Defendants are located in the District of North Dakota and because many of the acts and/or omissions described herein occurred in the District of North Dakota.

COMPLAINT; DEMAND FOR JURY TRIAL
*Thunderhawk et al. v. County of Morton, North Dakota et al.*; United States District Court, District of North Dakota, Case No. _____

12.     Intradistrict venue is proper in the Western Division of the District of North Dakota pursuant to D.N.D. Civ. L.R. 3.1 and Gen. L.R. 1.1 because the claims asserted herein arise from acts and/or omissions that occurred in County of Morton, North Dakota.

## PARTIES

13.     Plaintiff Cissy Thunderhawk is an enrolled member of the Standing Rock Sioux Tribe and was the owner and primary operator of My Auntie's Place, a business located in Fort Yates, North Dakota, through the duration of the time in question.  During this time period, Cissy Thunderhawk resided in Mandan, North Dakota and worked in Fort Yates, North Dakota.

14.     Plaintiff Waste'Win Young is an enrolled member of the Standing Rock Sioux Tribe who, for the duration of the time in question, resided in Fort Yates North Dakota and at the camps alongside the Cannonball River.

15.      Plaintiff Reverend John Floberg is the Priest for St. James' Episcopal Church in Cannon Ball, South Dakota, where he worked for the duration of the time in question.  Over this same time period, Reverend John Floberg resided in Bismarck, North Dakota.

16.     Defendant Kyle Kirchmeier is, and at all material times herein was, a law enforcement officer, the Sheriff of Defendant County of Morton, and an authorized policymaker for Defendant County of Morton. Defendant Kyle Kirchmeier is sued in his individual and official capacity.

17.     Defendant County of Morton is a body corporate for civil purposes and subject to suit pursuant to N.D. Cent. Code § 11-10-01.

18.     Defendant Grant Levi was at all material times herein the director of the North Dakota Department of Transportation and an authorized policymaker for the state of North Dakota.  Defendant Levi is sued in his individual capacity and official capacity.

19.     Defendant Doug Burgum is the Governor of the State of North Dakota and is an authorized policymaker for the State, and was an authorized policymaker during much of the time in question. Defendant Burgum is sued in his individual capacity and official capacity.

4

20.     Defendant Michael Gerhardt Jr. was, during the time period in question, the Superintendent of the North Dakota Highway Patrol.  Defendant Gerhardt Jr. is sued in his individual capacity and official capacity.

21.     Defendant Jack Dalrymple was the Governor of the State of North Dakota throughout much of the time period in question, during which he was an authorized policymaker for the State. Defendant Dalrymple is sued in his individual capacity.

22.     Defendant TigerSwan is a limited liability company organized under the laws of the State of North Carolina, and is registered as a foreign limited liability company with the State of North Dakota providing "security services."  Among other things, TigerSwan uses its own trademarked methodologies, "F3EAR" and "NIFE," to provide consulting and security services to corporate interests.  During the time period in question, TigerSwan acted under color of state law and in close cooperation with law enforcement Defendants to implement and enforce the road closure.  TigerSwan lent its investigatory, consulting, and security services to law enforcement officers and agencies, providing, among other things, situation reports to law enforcement and "static and mobile security operations in support of the pipeline construction throughout North Dakota."  TigerSwan's services and cooperation with the law enforcement officers and agencies named herein specifically related to the speech, travel, assembly, and prayer of Plaintiffs on Highway 1806, as well as the closure of Highway 1806.

23.     Plaintiffs do not know the true names and/or capacities of defendants sued herein as Does 1 through 100, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. The Doe defendants include other individuals or entities who supervised and/or participated in the conduct complained of herein. Plaintiffs are informed and believe and therefore allege that each of the Doe defendants is legally responsible and liable for the incident, injuries, and damages hereinafter set forth, and that each of said defendants proximately caused said incidents, injuries, and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by

5

reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control, or upon any other act or omission. Plaintiffs will ask leave to amend this complaint to insert further charging allegations when such facts are ascertained.

24.     In doing the acts alleged herein, Defendants, and each of them, acted within the course and scope of their employment.

25.      In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under color of law.

26.      In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, employee, and/or in concert with each of said other defendants.

## GENERAL ALLEGATIONS

27.     At all times relevant herein, all wrongful acts described were performed under color of state law.

28.     Plaintiffs [Thunderhawk, Young, and Floberg] are at times herein referred to collectively as "Plaintiffs."

29.     Defendants [Grant Levi, Kyle Kirchmeier, Governor Burgum, County of Morton, Jack Dalrymple, Michael Gerhardt Jr., TigerSwan LLC, and DOES 1 to 100] are at times herein referred to collectively as "Defendants."

30.     Defendants [Grant Levi, Kyle Kirchmeier, Governor Burgum, Jack Dalrymple, Michael Gerhardt Jr., TigerSwan LLC, and DOES 1 to 100] are at times herein referred to collectively as "non-municipality Defendants."

31.     At all times relevant herein, Defendants were acting in concert with or as agents on behalf of one another.

## BACKGROUND

32.     The Dakota Access Pipeline is a 30" pipeline designed to transport up to 570,000 barrels a day of crude, fracked oil from the Bakken shale fields in North Dakota to refineries in Pakota, Illinois. The pipeline was originally planned to cross the Missouri River north of Bismarck.  But due to public outcry about the risk of contamination to the water supply, the pipeline company, Dakota Access LLC, rerouted the pipeline to cross the Missouri River less than one mile north of the Standing Rock Reservation boundary.

33.     The area through which DAPL now runs includes a number of sites of significant cultural, historical, and spiritual value to the Lakota people. The Missouri River is also the sole water source for the two neighboring Lakota tribes, the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe, and for many other indigenous and non-indigenous people throughout the region.

34.     The tribes and their supporters opposed the construction of the pipeline through this area, expressing numerous concerns with the risks presented by the pipeline and with the process by which it was approved at its current route.

35.     Moreover, DAPL's route, including the entirety of the Lake Oahe crossing, traverses land over which the tribes still claim ownership. The tribes and their supporters opposed the construction of the pipeline for this reason as well: the 1851 and 1868 treaties both recognize the land in question as being part of the territory of the Oceti Šakowiŋ (otherwise known as the Great Sioux Nation) and guarantee the territory against intrusions by the United States and outsiders. The tribes have alleged that the pipeline— approved by the Federal Government against the express wishes of the tribes of the Oceti Šakowiŋ— therefore violates these treaties.

36.      Starting in April 2016, representatives of more than 300 indigenous nations and numerous other supporters gathered in increasing numbers near the construction route in a spiritually based movement demanding that construction of the pipeline be halted. The locus of this movement was a group of camps located where Highway 1806 intersects the Cannonball River at the current border of the Standing Rock Sioux Reservation.

7

37.     One of the primary functions served by the camps was symbolic, with the very act of staying at or visiting the camps representing the primary means by which numerous individuals expressed their support for the movement.  Central to this symbolism was the resettlement of lands over which the Oceti Šakowiŋ continues to claim ownership, with hundreds of Water Protectors becoming legal residents of the camps located on federally and tribally owned land during the time period in question.  These camps were only accessible via Highway 1806, which is also the principal route between the Standing Rock Sioux Reservation and Bismarck/Mandan—the closest major cities to Standing Rock.

38.     Although, during the period in question, the majority of individuals at these camps were out-of-state visitors to the region, there remained at all times a strong contingent of North Dakota locals.

39.     By September 2016, these camps reached a sustained population of approximately 7,000-10,000 individuals.

40.     From April 2016 through October 2016, one of the primary locations of speech, assembly, and prayer for these individuals was Highway 1806's wide curtilage near where the pipeline was slated to cross the highway, an area that has long been open to the public for, among other things, use as a thoroughfare, and that could be (and routinely was) visited safely without impeding or disrupting traffic. Plaintiffs regularly engaged in a range of expressive and religious conduct on this land, including hanging prayer ties and signs within sight of passing drivers, as well as speaking and praying individually as well as in small, medium, and large groups.

41.     The importance of this specific site for speech, assembly, and prayer increased dramatically in early-September after Tim Menz, the Standing Rock Historic Preservation Officer, identified ancient burial and ceremonial sites, and other significant cultural artifacts, in the area; after Dakota Access LLC immediately subsequently attempted to destroy these sites; and after a resulting confrontation between DAPL-employed security officers and Water Protectors led to the officers unleashing dogs against Water Protectors. These events drew local, national, and international attention to not only the no-DAPL movement but this specific stretch of highway; it is possible that no public right-

8

of-way in North Dakota history has been the topic of international discourse to the extent that this several-hundred-yard tract of Highway 1806 has.

42.     Moreover, in September, local spiritual leaders and tribal elders confirmed the appropriateness and desirability of praying in the public area immediately abutting Highway 1806 and these specific sites.

43.     The substantial majority of the speech, assembly, prayer, and travel in this area was completed in an entirely peaceful and lawful manner.  Thousands of Water Protectors prayed, marched, sang, waved placards, and chanted on thousands of occasions over the course of a nearly year-long period, most of which occurred without any incident.

44.     Nevertheless, Defendants and the law enforcement agencies and individuals operating under their control, engaged in a determined and concerted campaign to suppress the speech, assembly, and prayer of the tens of thousands of individuals who traveled, or who intended to travel, through this area to oppose the construction of DAPL.

45.     One of the primary methods used by Defendants to chill constitutionally protected conduct associated with the no-DAPL movement was by controlling the roads in a manner designed to discourage no-DAPL travel, speech, assembly, and prayer.

46.     Beginning on October 24, 2016, Defendants closed a significant portion of Highway 1806 to all Water Protector travel—including the entire stretch of Highway 1806 abutting the specifically identified sacred and ceremonial sites as well as the DAPL construction that had been the primary center of Plaintiffs' speech, prayer, and assembly for the past several months.  This closure immediately followed the Cheyenne River Sioux Tribe's declaration of eminent domain over a small portion of the land adjacent to Highway 1806 (and the resulting relocation of approximately 100 Water Protectors to this land).  This closure substantially and materially burdened the Plaintiffs' speech, worship, travel, and associative rights.

9

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Thunderhawk et al. v. County of Morton, North Dakota et al.*; United States District Court, District of North Dakota, Case No. _____

47.     Just one week before closing Highway 1806, on October 17, 2016, Sheriff Kirchmeier publicly announced that blocking roads "affects people's rights."

48.     On October 27, following a violent police and private-security-led raid on a camp located on the land declared as eminent domain by the Cheyenne River Sioux Tribe, Defendants used several trucks to block the Backwater Bridge, a small bridge on Highway 1806 crossing Cantapeta Creek less than a mile north of the northern boundary of the Standing Rock Sioux Tribe.

49.     On October 28, Defendants erected a heavily reinforced concrete barricade on and immediately north of the Backwater Bridge.

50.     Defendants have given varying reasons for the need for this barricade but acknowledge that its target was the Water Protectors.  For example, Maxine Herr, a spokesman with the Morton County Sheriff's Department, stated, about this barricade: "We are trying to create a barrier between the protestors and that private property." On the other hand, two press releases on October 28 and October 31, gave a different reason for the barricade: the bridge would remain closed "until all damage to the structure is evaluated by bridge engineers."

51.     The North Dakota Department of Transportation (NDDOT) did not conduct any investigation of the bridge until December 22, 2016—nearly two months after it was closed. Plaintiffs, and the Standing Rock Sioux Tribe, reached out to Defendants on numerous occasions between October 28 and December 22 to arrange the safe inspection of the bridge (and in any other way necessary facilitate its reopening), but were rebuffed.

52.     On January 12, the NDDOT revealed the results of its inspection: the bridge was structurally sound.  Nevertheless, Defendants continued to maintain the closure of the nine-mile stretch of Highway 1806 in question for 68 additional days, stating that the bridge would remain closed until there was an "assurance no criminal activity will take place and federal law enforcement has been introduced into the protest camp to restore law and order."

53.     On February 23, 2017, the last Water Protectors were removed from state or federal land in the area.  On February 27, 2017, the last Water Protectors were removed from *any* of the camps in the area, including those located on the Standing Rock Reservation.

54.     Highway 1806 was partially reopened on March 15, 2017 and the road was fully reopened on March 21, 2017.

55.     The effect of Defendants' closure of Highway 1806 was to prevent travel past the Backwater Bridge from the camps or Reservation, thereby requiring those traveling between the camps/Reservation and Bismarck/Mandan to take a detour on worse-maintained small roads that added significant time, stress, and danger to the trip and imposed additional costs on Plaintiffs in gas, car maintenance, etc.

56.     Ironically, given Defendants' justification regarding the need for the barricade to protect the potentially damaged bridge, the barricade did not actually prevent access onto the bridge from the various camps or the Reservation: it only prevented travel *past* the bridge.

57.     Moreover, Defendants used the bridge itself to maintain its barricade, placing numerous concrete blocks that added substantial sustained concentrated weight to the potentially damaged bridge—far more than an occasional passing car or ambulance would.

58.     Additionally, the barricade extended significantly to each side of Highway 1806, thereby preventing those traveling on foot or horseback or ATV who safely circumvented the bridge from continuing north along Highway 1806.

59.     Given these circumstances, Defendants' expressed concerns about the need to maintain the road closure to protect the structural integrity of the bridge appear to have at all times been a pretext to justify their burdening of the plaintiffs' constitutional interests.

60.     Plaintiffs' expressive and associational rights were not merely burdened because of Defendants' blockade-related restrictions on Highway 1806: at the same time as they closed Highway 1806, Defendants began implementing a de facto cordon of the construction area and of the nearby sacred

11

and ceremonial sites. Defendants enforced this cordon not only with several checkpoints around Fort Rice and, on the southern-most end, with the heavily reinforced barricade immediately north of the Backwater Bridge, but by preventing any travel in the general vicinity.  On November 2, hundreds of Water Protectors, including indigenous elders, held a prayer ceremony across a river located approximately one mile from the pipeline construction site—and apparently on the edge of Defendants' unstated, but strictly enforced, cordon of the area. When a few Water Protectors entered the frigid river, Defendants reacted with significant force.  Such conduct not only chilled expressive and associational rights, but had the effect of barring the symbolic speech of entering the river and crossing on the opposite bank—while demonstrating Defendants' adherence to such a broad cordon.  Defendants have aggressively enforced this cordon, using significant force when necessary to prevent Water Protectors from so much as walking around their barricade by the Backwater Bridge.

61.     The purpose and effect of Defendants' road closure was to keep Plaintiffs *miles* away (well out of line-of-sight or earshot) from the construction workers, security guards, and sites that had for months prior been a primary focus of Plaintiffs' First Amendment activity. This effectively left Plaintiffs without any other means of communicating with one of their principal desired audience (construction workers and security officers) or in one of their most symbolically important forums (Highway 1806's curtilage abutting the identified sacred and ceremonial sites near to where the pipeline would and eventually did cross).

62.     For much of the duration of this road closure, there was no active construction in the area. The construction of DAPL where it intersects with Highway 1806 was completed in early-November.  On December 4, 2016, the Army Corps announced that it would not be granting DAPL the easement necessary for DAPL to drill under the Missouri River at the nearby Lake Oahe crossing.  The decision (and therefore a legal prohibition on the only remaining construction in the area) remained in place until the Army Corps of Engineers reversed this determination on February 8, 2017 (and drilling was completed within two weeks of that date). Throughout this time, Plaintiffs, nevertheless, continued to

desire to speak, assemble, and pray in public areas at or near the sacred and ceremonial sites and the site of DAPL's crossing that they were unable to access given Defendants' absolute prohibition on non-DAPL travel on this stretch of highway.

63.     Given that the decision on the Lake Oahe crossing (and, ultimately, the operation of the pipeline) had an uncertain outcome, Plaintiffs and the tribes had a compelling and vital First Amendment need to be able to speak and assemble on the curtilage of the closed portion of the highway near to the site of completed construction to express their ongoing opposition to the potential construction and operation of the pipeline.

64.     Access to the neighboring sacred sites was also vital to Plaintiffs' First Amendment right to physically pray at their traditional religious lands and to demonstrate by their physical presence both the sacredness of such lands to the Oceti Šakowiŋ and their continuing claim to such lands.

65.     This prohibition on travel on nine miles of Highway 1806 had the effect of preventing Plaintiffs from engaging in constitutionally protected conduct within the proximity of the construction site or the nearby sacred or ceremonial sites, and it deterred others from joining or supporting Plaintiffs.

66.     On the other hand, during the time in question, Defendants maintained a policy, custom, or practice of permitting DAPL and its employees and its contractors to use the otherwise "closed" portion of the road.

67.     The effect and intent of Defendants' conduct was also to severely burden residents of the neighboring Reservation by limiting access to visitors to and from the Reservation.  This region of North Dakota experienced severe winter weather for much of the period of the road closures, including multiple major blizzards and prolonged periods of sub-zero temperatures.  In conjunction with Defendants' closure of the quickest and safest route to the nearest major hospital in Bismarck and to the nearest source of many life-saving supplies, this weather greatly increased the risk of serious bodily injury and death to those gathered by the Cannonball River, as well as those who resided on the nearby Reservation. Altogether, the emotional and financial costs of this closure, measured in, among other things, additional

gas, car wear and tear, time, stress, and lost business revenues, were substantial, and disproportionately impacted the Standing Rock Sioux Tribe and tribal members.

## PLAINTIFFS

### Cissy Thunderhawk

68.     Plaintiff Cissy Thunderhawk, aka Geraldine Dunn, was the owner of My Auntie's Place Restaurant in Fort Yates, and is a resident of Mandan, ND.  Throughout the time period in question, she traveled back and forth between Fort Yates and Bismarck and Mandan regularly for business purposes as well as to shop.  The road closure impacted her personally and in her business, adding time, additional car expenses, danger, and inconvenience to this commute.  The road closure also limited access to her business for her customers, and both Cissy and her business were financially injured as a result of the closure's severe limitation of travel to and from the Reservation. Cissy was forced to close My Auntie's place shortly after the events in question.

### Waste'Win Young

69.     Plaintiff Waste'Win Young is a member of the Standing Rock Sioux Tribe who resides in Fort Yates, North Dakota and, during the period in question, resided also at the camps alongside the Cannonball River.  Waste'Win was a strong supporter of the efforts to oppose the construction of DAPL since before the events in question, and has prayed, assembled, traveled, and spoke in various public locations nears to where DAPL is or was intended to be constructed on numerous occasions. Waste'Win wished to pray, speak, travel, and assemble with others in public locations that she was unable to access because of Defendants' closure of Highway 1806. The road closure therefore substantially impacted her speech, assembly, prayer, and travel, and she suffered significant and tangible emotional distress as a result.

70.     Moreover, Waste'Win has a documented medical condition requiring routine and regular travel to Bismarck.  Waste'Win has children and travels regularly to Bismarck to shop for her children, and she also had to fly out of the Bismarck airport during this time period.  The closure added

14

substantially in time, gas, car wear, and stress to this necessary travel and, consequently, limited where and when Waste'Win could go.

### John Floberg

71.     Plaintiff Father John Floberg is the Episcopalian Priest for the St. James' Episcopal Church in Cannon Ball, North Dakota.  Currently, and throughout the time period in question, Father Floberg resided in Bismarck, North Dakota and commuted between Bismarck and Cannon Ball multiple days each week.  The road closure personally impacted him in his work and in his ministry, adding time, gas money, danger, and inconvenience to his commute, and burdened his ability to minister to his congregation, as well as his congregation's ability to worship.

### MUNICIPAL & SUPERVISORY ALLEGATIONS

72.     Sheriff Kirchmeier is the policy-making authority for Morton County, as it relates to the maintenance of policies, customs, or practices, and training, supervision, or discipline of Sheriff Kirchmeier's and Morton County's law enforcement officers and employees.

73.     Sheriff Kirchmeier, together with state officials [including Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., and other such official policymakers], made and/or implemented and/or maintained Morton County's policy decision to close off the highway and bridge in whole and in part and to undertake or authorize the other acts referred to in this Complaint. Sheriff Kirchmeier [and these other officials] are authorized by law or vested with power under law to make such decisions and did so under color of law.

74.     Sheriff Kirchmeier [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials] maintained policies, customs, or practices, including the following:

> a)     Implemented an absolute prohibition on all Water Protector travel on Highway 1806 over an approximately nine-mile stretch running from the Backwater Bridge to Fort Rice;
>
> b)     Maintained this absolute prohibition on all Water Protector travel with a reinforced

concrete and concertina wire barricade located immediately North of the Backwater Bridge;

c)      Defended this absolute prohibition on all Water Protector travel by arresting people who approach the closed portion of the road—even on foot—for trespassing;

d)      Defended this absolute travel prohibition with significant force on several occasions, including on November 20.

75.      Sheriff Kirchmeier [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials] knew, or should have known, that employees under their command, including Defendant DOES 1 to 100, were inadequately trained, supervised, or disciplined resulting from their inadequate policies, customs, or practices carried out by Sheriff Kirchmeier's [and Doug Burgum, Jack Dalrymple, Grant Levi, or other such officials'] law enforcement officers and employees.

76.      Sheriff Kirchmeier [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials] failed to implement or to maintain adequate policies, customs, or practices related to the training, supervision, and discipline of law enforcement officers and employees. Sheriff Defendant [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials] were either aware of the non-existence or inadequacy of such policies, customs, or practices, believing, mistakenly, that they were not necessary, or were deliberately indifferent to the non-existence or inadequacy of these policies, customs, or practices.

77.      Sheriff Kirchmeier [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials] were on notice of the inadequate policies, customs, or practices carried out by their law enforcement officers and employees through multiple sources, including, but not limited to: news/media reports, past incidents of misconduct to others, multiple harms that occurred to the plaintiffs, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, releases from the ACLU about the unconstitutionality of road closures of this nature in this context, and a notice sent from the Water Protector Legal Collective to Defendants noting the existence of serious

16

constitutional violations associated with the exact prohibitions on travel on this portion of Highway 1806 challenged in this lawsuit.

78.     Sheriff Kirchmeier [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials] acquiesced and/or were deliberately indifferent to the need for further training, supervision, or discipline, as reflected by the continued maintenance of the policies, customs, or practices carried out by their law enforcement officers and employees.

79.     Sheriff Kirchmeier's [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials'] acquiescence in or deliberate indifference to the policies, customs, or practices carried out by Morton County and Sheriff Kirchmeier's law enforcement officers and employees contributed to and was the moving force behind Plaintiffs' injuries, described herein. Sheriff Kirchmeier's [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhardt Jr., or other such officials'] law enforcement officers and employees, including Defendant DOES 1 to 100, were not adequately trained, supervised, or disciplined in a manner that made them aware that the policies, customs, and practices were unauthorized, improper, and not tolerated.

80.     That the road closure was a Morton County policy implemented and/or maintained by Defendants is reflected in the fact that each non-Doe individual defendant, at various times, either made or authorized statements expressly claiming or implying a personal role in the implementation or maintenance of the road closure. For example, one Morton County press release noted that Morton County "along with" NDDOT and the North Dakota Highway Patrol "has changed the closure point on ND Highway 1806 south of Mandan to County Road 135." (This change still left the highway closed for "approximately ten miles.")  Moreover, non-Doe Defendants each personally corresponded with or personally directed correspondence to the Standing Rock Sioux Tribe as part of negotiations to re-open the road similarly claiming such a role. Finally, the implementation and maintenance of the road closure was conducted predominantly by Doe Defendants reporting directly to Sheriff Kirchmeier, Doug Burgum, Jack Dalrymple, Grant Levi, and Michael Gerhardt Jr.

## CLASS ALLEGATIONS

81.      The treatments to which Plaintiffs and the class they represent have been subjected—namely, the restrictions on non-DAPL travel, speech, prayer, and assembly, including foot travel, on a multiple-mile stretch of Highway 1806—were all performed pursuant to policies, customs, or practices of Defendants.

82.      Defendants intentionally made travel to and from the Standing Rock Sioux Reservation and the camps near the Cannonball River as unnecessarily unpleasant and dangerous as possible so as to deter Water Protectors, with whom they disagree, from lawfully pursuing their constitutional rights to travel, assemble, pray, and express their viewpoints.

83.      That this was the impermissible purpose of the road closure is highlighted not only by statements to that effect made by Defendants, described herein, but by the Defendants' conduct, which was inconsistent with the any of the reasons that have been publicly offered by Defendants.

84.      Plaintiffs, on behalf of themselves and of a class of similarly situated persons, seek damages related to Defendants' absolute prohibition on their travel on an approximately nine-mile portion of Highway 1806, including the Backwater Bridge, pursuant to unlawful blanket policies, customs, or practices.

85.      Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated, pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek certification of a class defined as follows:

>       All those persons who resided or visited, or who intended to reside or visit, in Morton
>       or Sioux Counties, or in any other areas, and who therefore would have traveled on the
>       closed portion of Highway 1806, including but not limited to any of those persons who
>       wished to speak, assemble, and pray along the closed portions of Highway 1806.
>       Excluded from the class by definition are (a) Defendants; (b) Dakota Access LLC and
>       its affiliates for all relevant times; (c) any officers or employees of Dakota Access LLC

18

and its affiliates for all relevant times; (d) any of the lawyers for Plaintiffs or Defendants; (e) any judge who is, or potentially may be, assigned to this matter; (f) members of the immediate family of any excluded person; or (g) any entity in which any excluded person or entity has, or had for the relevant times, a controlling interest.

86.     The members of the class are so numerous that joinder of all members is impractical. Plaintiffs do not know the exact number of class members. Plaintiffs are informed and believe, and thereupon allege, that there are more than 10,000 persons in the class defined hereinabove.

87.     The following questions are common to the class and predominate over any individual question:

a.     whether Defendants' prolonged and absolute prohibition on Plaintiffs' travel on a nine-mile portion of Highway 1806 from October through March violated Plaintiffs' First Amendment rights;

b.     whether Defendants' prolonged and absolute prohibition on Plaintiffs' travel from October through March violated Plaintiffs' Fifth and Fourteenth Amendment rights to travel, as well as Plaintiffs' right to travel protected under the Privileges and Immunities Clause of the U.S. Constitution;

c.     whether Defendants' restriction on travel, assembly, speech, and religious exercise, enforced with militarized barricades and extreme demonstrations of force, was narrowly tailored to a significant or compelling government interest, or represented the least restrictive means of satisfying that interest;

d.     whether Defendants' restriction of travel on this major and public thoroughfare connecting numerous business interests on the Standing Rock Reservation to the nearest major off-Reservation city improperly burdened commerce among the Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, and various states in violation of the Commerce Clause of the United States Constitution; and

e.      whether the restriction on travel, assembly, speech, commerce, and religious exercise described herein was intended to punish, inconvenience, or endanger those associated with the no-DAPL movement.

88.     Plaintiffs' claims are typical of the class they seek to represent. Plaintiffs all resided in the area during the time period in question and all travel or would have traveled regularly on Highway 1806 for business and pleasure, as did class members—and have all been injured in a like manner by the prohibition on travel on Highway 1806 as a result.  Moreover, Plaintiffs have the same interests and suffered the same type of injuries as the proposed class. Plaintiffs' claims arose because of Defendants' policies, customs, or practices. Plaintiffs' claims are based on the same legal theories as the claims of the proposed class members. Each proposed class member suffered actual damages resulting from the treatment to which they were subjected and from the circumstances surrounding the closed and blockaded right-of-way. The actual damages suffered by Plaintiffs are similar in type and amount to the actual damages suffered by each proposed class member.

89.     Plaintiffs will fairly and adequately protect the class interests. Plaintiffs' interests are consistent with and not antagonistic to the interests of the class.

90.     Prosecutions of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications, with respect to incompatible standards of conduct for the parties opposing the class.

91.     Prosecutions of separate actions by individual members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

92.     Defendants have acted on grounds generally applicable to the proposed class, thereby making appropriate the final injunctive or declaratory relief sought, with respect to the proposed class as a whole.

93.     This class action is superior to other available methods for the fair and equitable adjudication of the controversy between the parties.  Plaintiffs are informed and believe, and thereupon allege, that the interests of members of the class in individually controlling the prosecution of a separate action is low, in that most class members would be unable individually to prosecute any action at all. Plaintiffs are informed and believe, and thereupon allege, that the amounts at stake for individuals are sufficiently small that separate suits would be impracticable. Plaintiffs are informed and believe, and thereupon allege, that most members of the proposed class will not be able to find counsel to represent them.  Plaintiffs are informed and believe, and thereupon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location; e.g., the closed portion of Highway 1806. It will promote judicial efficiency to resolve the common questions of law and fact in one forum, rather than in multiple courts.

94.     In violation of State and Federal Constitutional and Statutory provisions, Defendants, and their agents and employees, including Defendant DOES 1 to 100, have, unnecessarily and illegally, subjected Plaintiffs, and the class of those similarly situated whom they seek to represent, to the unjust and improper closure of local roads, including portions of Highway 1806, associated with Plaintiffs' opposition to DAPL.

95.     As a result of the road closure, named Plaintiffs and class Plaintiffs have experienced economic damages, including increased fuel costs, increased car maintenance, and loss of business, and physical and emotional symptoms including nervousness, anxiety, recurring nightmares, and fear and apprehension of Defendants' conduct, and have been chilled, inhibited or interfered with in the exercise of their constitutional rights as described in these allegations.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF RIGHT TO SPEAK AND ASSEMBLE (FIRST AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; 42 U.S.C. § 1983) (AGAINST ALL DEFENDANTS)

96.     Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

97.     Plaintiffs were prevented, chilled, or inhibited in engaging in constitutionally protected First Amendment activity when Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, or in any other capacities such as Sheriff or similar office as set forth above, completely closed an approximately nine-mile portion of Highway 1806 to Plaintiffs' travel starting on October 24, 2016.

98.     One of the effects of this closure was to deny Plaintiffs access to this public nine-mile stretch of Highway 1806 for purposes of speaking, assembling, or otherwise exercising their First Amendment expressive rights. Part of the closed road included a symbolically crucial and previously active forum for such expression.

99.     Defendants' indefinite and absolute restriction of Plaintiff travel on nine miles of this public right-of-way, lasting ultimately five months, was not a reasonable time place or manner restriction on speech, nor did it fulfill an important government interest.

100.    This road closure also severely hampered the ability of the press—both local and national—in covering this movement, which was of great local and national interest.  The detour added substantial time and stress to the drive from Bismarck/Mandan, where the majority of local and national press were based, to the camps, where a majority of the events being covered related to the no-DAPL movement took place.  Given the unpredictable and fast-developing nature of press-worthy circumstances throughout this time period, the road closure represented a serious impediment on the press's ability to cover the events in question, resulting in materially less and materially worse coverage.

101.    Defendants' determination of who could speak, assemble, pray, or travel on this road was impermissibly based on the purported viewpoint of those who wished to speak, assemble, pray, or travel, or of the content of their expressive activities. This is most clearly revealed through Defendants'

restrictions on who was permitted use of this forum: Water Protectors, but not DAPL workers, were prohibited from accessing the forum in question; expressions of opposition to the pipeline were excluded from the forum while expressions of support were not.

102.    Defendants' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First and Fourteenth Amendment rights secured by the U.S. Constitution, or were wantonly or oppressively done.

103.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against all Defendants, and punitive damages against non-municipality Defendants.

## COUNT II

### VIOLATION OF RIGHT TO FREE EXERCISE (FIRST AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; 42 U.S.C. § 1983)
### (AGAINST ALL DEFENDANTS)

104.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

105.    Plaintiffs' free exercise of religious practices, especially as they relate to sincerely held and meaningful indigenous religious beliefs, were substantially burdened when Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, or in any other capacities such as Governor or Sheriff, completely and indefinitely closed an approximately nine-mile portion of Highway 1806 to Plaintiffs' travel starting on October 24, 2016.  Defendants prevented Plaintiffs from praying at, worshiping by, or even visiting identified sacred and ceremonial areas located alongside this public nine-mile stretch of Highway 1806.  Indigenous religious practices do not treat places of worship as fungible, and so the intent and effect of Defendants actions, therefore, was to severely penalize—fully halting some—conduct prescribed by Plaintiffs' religious beliefs.

106.    Moreover, despite granting numerous exemptions to this road closure—including to employees and associates of DAPL and its affiliates and to certain non-indigenous local residents—

Defendants refused to extend any exemptions to Plaintiffs who sought to exercise their religious beliefs in the closed public areas that had previously been serving as a significant local place of worship.

107.    For the reasons described throughout these allegations, the road closure impacting Plaintiffs was neither neutral nor generally applicable.

108.    Much of the religious exercise that was substantially burdened by the road closure also had an accompanying significant expressive purpose or assembly component, as described in Count I and elsewhere in these allegations. Prayer flags or prayer ties, for example, are inherently symbolic and expressive in addition to playing a central role in indigenous land-based religious exercise.

109.    The effect and intent of Defendants' actions was to fully prevent Plaintiffs from in any manner exercising their religious beliefs at these public sites, which had been the location of daily prayer in the months leading up to their closure.

110.    Defendants' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First and Fourteenth Amendment rights secured by the U.S. Constitution, or were wantonly or oppressively done.

111.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against all Defendants, and punitive damages against non-municipality Defendants.

## <u>COUNT III</u>

**VIOLATION OF RIGHT TO TRAVEL (FIFTH AND FOURTEENTH AMENDMENTS TO THE, AND PRIVILEGES AND IMMUNITIES CLAUSE OF THE, U.S. CONSTITUTION; 42 U.S.C. § 1983; 42 U.S.C. § 1985(3))**
**(AGAINST ALL DEFENDANTS)**

112.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

113.    Plaintiffs' fundamental right to travel was significantly burdened when Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, and as state

officials, or in cooperation with law enforcement officers and state officials, completely closed a nine-mile portion of Highway 1806 to all Water Protector traffic.  In this closure, Defendants prevented Plaintiffs from traveling—whether by car, by bike, by foot, or by any other means—on a public right-of-way during all hours of the day and all days of the week, for approximately five months straight. Defendants did not have a compelling interest in limiting travel in this manner on this public right-of-way and Defendants' approximately five-month duration, nine-mile long absolute prohibition on non-DAPL travel is not narrowly tailored.  Plaintiffs also have a right to travel along said highway for the purpose of reaching places of religious sanctity for prayer and to engage in speech or expressive conduct along the highway near to the site of continuing or completed construction of the pipeline.

114.    Given the location of this closure, travel was substantially burdened within North Dakota, between North Dakota and the Standing Rock Reservation, and between North Dakota and South Dakota.

115.    The road closure, given the lack of other roads in the area, poor condition of the other roads in the area, and economic hardship experienced by many people in this area, regularly rendered traveling for cultural, political, and social activities, to obtain needed medical services or treatment, to shop, to get gas, to go to restaurants, or for other such reasons, prohibitively difficult for Plaintiffs.

116.    The effect and purpose of this closure was to render substantial portions of Morton County entirely inaccessible to Plaintiffs.

117.    Moreover, one of the effects and one of the purposes of this road closure was to burden Plaintiffs in their attempts to relocate to and become permanent residents of the camps located alongside Highway 1806, including Sacred Stone Camp (which was located entirely on privately and tribally owned land on the Standing Rock Reservation).

118.    This effect of the closure was substantial: by making it more difficult to, for example, travel to, resupply, or seek medical care from these camps, the road closure deterred numerous Plaintiffs from making such an interstate or intrastate relocation.

119.    This purpose of the closure is revealed through the statements and actions of Defendants

described throughout these allegations and by a number of other tactics used or threatened by Defendants—such as when Defendants, in the midst of harsh winter conditions, threatened to fine any individuals bringing food, building materials, or portable bathrooms to the main camp.

120.    Given the location of the camps in relation to the road closure and to the nearest major shopping centers, hospital, airport, etc., the burdens of this road closure were intended by Defendants to and, in fact, did disproportionately and discriminatorily fall on residents of these camps.

121.    Defendants' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' Fifth and Fourteenth Amendment and Privileges and Immunities Clause rights secured by the U.S. Constitution, or were wantonly or oppressively done.

122.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against all Defendants, and punitive damages against non-municipality Defendants.

## COUNT IV

**IMPROPER RESTRICTION ON COMMERCE (COMMERCE CLAUSE OF THE U.S. CONSTITUTION; 42 U.S.C. § 1983) (AGAINST ALL DEFENDANTS)**

123.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

124.    Defendants' five-month absolute prohibition on any Plaintiff travel on Highway 1806 was not rationally related to Defendants' purported interest in protecting the integrity of the bridge (or any other reasonable state interests).

125.    The intent and effect of Defendants' restriction on travel was to sanction and substantially burden travel to/from the Standing Rock Reservation, as well as travel to/from South Dakota.  The intent and effect of this sanction was to substantially burden commerce to/from the Standing Rock Reservation.

126.    Specifically, the intent and effect of this economic sanction was to punish the Standing Rock Sioux Tribe for its support of the no-DAPL movement and to improve the State's negotiating

position with tribal leaders and elders vis-à-vis this movement.  Moreover, the economic force of the road closure was intended to, and did, have a substantial and material impact on the Standing Rock Sioux Tribe's ultimate decisions around the no-DAPL movement, in part due to the significant economic losses experienced by the Tribe's casino as a direct result of this closure.

127.    The substantial burden on commerce between North Dakota, South Dakota, and the Standing Rock Reservation outweighs any permissible benefits of the action.

128.    Given its location, this travel restriction disproportionately impacted travel (and therefore commerce) to/from the Standing Rock Reservation, as well as travel (and therefore commerce) to/from other states—South Dakota in particular.

129.    Defendants' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' Commerce Clause rights secured by the U.S. Constitution, or were wantonly or oppressively done.

130.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against all Defendants, and punitive damages against non-municipality Defendants.

## COUNT V

**RETALIATION (FIRST, FIFTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, PRIVILEGES AND IMMUNITIES CLAUSE, COMMERCE CLAUSE; 42 U.S.C. § 1983)**
**(AGAINST ALL DEFENDANTS)**

131.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

132.    Plaintiffs were prevented from engaging in constitutionally protected activity, including First, Fifth, and Fourteenth Amendment activity, and Commerce between the states and tribes, when Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers and state officials, completely closed a closed a nine-mile portion of Highway 1806 to Plaintiffs.

27

Defendants prevented Plaintiffs from speaking, assembling, praying, or traveling anywhere on this public nine-mile stretch of Highway 1806—an area that includes known and identified sites sacred and ceremonial to Plaintiffs, and which serves as an important thoroughfare for business and safety. Defendants' adverse actions were substantially motivated as a response to Plaintiffs' exercise of constitutionally protected conduct.

133.   Defendants' retaliation was motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First, Fifth, and Fourteenth Amendment rights, as well as Plaintiffs' rights under the Commerce Clause, secured by the U.S. Constitution, or was wantonly or oppressively done.

134.   As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages against all Defendants, and punitive damages against non-municipality Defendants.

## COUNT VI

**UNCONSTITUTIONAL POLICIES, CUSTOMS, OR PRACTICES (FIRST, FIFTH, & FOURTEENTH AMENDMENTS TO AND THE COMMERCE CLAUSE AND PRIVILEGES AND IMMUNITIES CLAUSE OF THE U.S. CONSTITUTION; 42 U.S.C. § 1983; 42 U.S.C. § 1985(3))**
**(AGAINST ALL DEFENDANTS)**

135.   Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

136.   Defendants, acting under color of state law, promulgated and/or maintained policies, customs, or practices permitting, implementing, carrying out or deliberately indifferent to, and the moving force behind, the violation of, Plaintiffs' First, Fifth, and Fourteenth Amendment, and Commerce and Privileges and Immunities Clause rights, secured by the U.S. Constitution.

137.   Defendants, acting under color of state law, promulgated and/or maintained inadequate policies, customs, or practices, in reckless disregard or deliberate indifference to Plaintiffs' First, Fifth, and Fourteenth Amendment, and Commerce and Privileges and Immunities Clause rights, secured by the U.S. Constitution. The inadequacy of the policies, customs, or practices, and the need for such policies,

28

customs, or practices to be adequate, is patently obvious—and has been repeatedly brought to Defendants' attention.

138.    The actions and inactions of Defendants were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First, Fifth, and Fourteenth Amendment and Commerce and Privileges and Immunities Clause rights, or were wantonly or oppressively done.

139.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages against all Defendants, and punitive damages against non-municipality Defendants.

## COUNT VII

**VIOLATIONS RESULTING FROM TRAINING, SUPERVISION, OR DISCIPLINE (FIRST, FIFTH, & FOURTEENTH AMENDMENTS TO AND THE COMMERCE CLAUSE AND PRIVILEGES AND IMMUNITIES CLAUSE OF THE U.S. CONSTITUTION; 42 U.S.C. § 1983) (AGAINST ALL DEFENDANTS)**

140.    Plaintiffs restate each and every allegation in the foregoing paragraphs as if fully set forth herein.

141.    Defendants, acting under color of state law, maintain inadequate training, supervision, or discipline permitting or deliberately indifferent to the policies, practices, or customs and were the moving force behind the violation of Plaintiffs' First, Fifth, and Fourteenth Amendment, and Commerce Clause rights, secured by the U.S. Constitution.

142.    Defendants, acting under color of state law, maintain inadequate training, supervision, or discipline permitting or acquiescing to the policies, practices, or customs in reckless disregard or deliberate indifference to Plaintiffs' First, Fifth, and Fourteenth Amendment, and Commerce Clause rights, secured by the U.S. Constitution. The inadequacy of the training, supervision, or discipline, and the need for such adequate training, supervision, or discipline, was patently obvious and likely to result in the violation of persons' First, Fifth, and Fourteenth Amendment, and Commerce and Privileges and Immunities Clause rights, secured by the U.S. Constitution.

143.    Defendants' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First, Fifth, and Fourteenth Amendment, and Commerce and Privileges and Immunities Clause rights, secured by the U.S. Constitution, or were wantonly or oppressively done.

144.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against Defendants, and punitive damages against non-municipality Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, those they represent, and all others similarly situated, seek Judgment as follows:

1.    For compensatory, general, and special damages for Plaintiffs, and for each proposed member of the class, according to proof at trial;

2.    For an award of exemplary/punitive damages against non-municipality Defendants in an amount sufficient to deter and to make an example, because their actions and/or inactions, as alleged, were motivated by evil motive or intent, involved reckless or callous indifference to the federally protected rights, or were wantonly or oppressively done;

3.    For declaratory and injunctive relief against Defendants, as follows: to (1) require Defendants to justify in writing, supported by detailed affidavits of engineers and other relevant experts, any additional need to temporarily or permanently close roads in a manner that disproportionately impacts the Standing Rock Sioux Tribe (or other federally or state- recognized tribal body in North Dakota) or those seeking to speak, assemble, or pray in support of indigenous rights or environmental justice; (2) require Defendants to obtain approval, in writing, from an official designated by the impacted tribe before temporarily or permanently closing a right-of-way in a manner that disproportionately impacts, economically or otherwise, a Reservation in or near the State of North Dakota; (3) require that any temporary or permanent limitation on travel on a public right-of-way in

North Dakota that is in any way related to ongoing or expected speech, assembly, or prayer, not be conducted without the prior written authorization of the supervising officer on duty; (4) require that any such written authorizations or approvals include the specific and articulable facts and circumstances—and not mere conclusory statements—showing that the temporary restriction on travel on this public right-of-way is no greater than is necessary to satisfy a compelling government purpose; (5) require that any temporary limitation on travel on a public right-of-way in North Dakota be no greater than is necessary to accomplish its goals and not restrict foot, horseback, or ATV travel unless specifically necessary; (6) declare that the State cannot chill First Amendment gatherings on the basis that, in the past, some alleged illegal conduct was associated with similar gatherings; and (7) prohibit any restriction of any public right-of-way in North Dakota, temporary or otherwise, in such a way that travel by pipeline companies or any similar entities is permitted while those gathered in opposition to those companies or similar entities is not.

      4.      For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, and any other statute as may be applicable; and

      5.      For an award of any other further relief, as the Court deems fair, just, and equitable.

Dated: October 18, 2018             Respectfully Submitted

By: _____

      Noah Smith-Drelich
        *Counsel of Record*
      Bernard E. Harcourt
      Columbia Law School
      435 W. 116th St.
      New York, NY 10027
      (605) 863 0707

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Thunderhawk et al. v. County of Morton, North Dakota et al.*; United States District Court, District of North Dakota, Case No. _____

## JURY TRIAL DEMAND

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs.

Dated: October 18, 2018                     Respectfully Submitted,

By: _____

Noah Smith-Drelich
*Counsel of Record*
Bernard E. Harcourt
Columbia Law School
435 W. 116th St.
New York, NY 10027
(605) 863 0707

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Thunderhawk et al. v. County of Morton, North Dakota et al.*; United States District Court, District of North Dakota, Case No. _____