UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Cissy Thunderhawk; Wašté Win Young; Reverend John Floberg and José Zhagñay, on behalf of themselves and all similarly-situated persons, | ) ) ) ) ) | **BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| County of Morton, North Dakota; Sheriff Kyle Kirchmeier; Governor Doug Burgum; Former Governor Jack Dalrymple; Director Grant Levi; Superintendent Michael Gerhart Jr; Tigerswan LLC; and Does 1 to 100, | ) ) ) ) ) ) ) | **Case No. 1:18-cv-00212** |
| Defendants. | ) | |

......................................................................................................................................

## INTRODUCTORY STATEMENT

In response to comprehensive dismissal motions filed by the state and county defendants, the plaintiffs filed an amended complaint that acknowledged the meritless nature of some claims and prayers for relief alleged in their first complaint by deleting them,[1] but reasserted some of the claims initially alleged and added new limited allegations in support of those renewed claims.    Among the new allegations are

---

[1] In all, the plaintiffs deleted seventy claims brought against the four state defendants in the original complaint.  Claims for money damages against defendants Burgum, Levi and Gerhart in their official capacities were deleted as to all seven substantive counts of the original complaint for a total of twenty-one claims.  Claims for declaratory and injunctive relief against those same three defendants in their official capacities were deleted as to all seven substantive counts of the original complaint for a total of twenty-one claims. Claims for declaratory and injunctive relief against all four state defendants in their individual capacities were deleted as to all seven substantive counts of the original complaint for another twenty-eight claims.  In addition, the plaintiffs deleted allegations included in the original complaint against state defendant Burgum for alleged conduct that occurred before he became governor, and deleted allegations included in the original complaint against defendant Dalrymple for alleged conduct that occurred after he was no longer governor.  The only remaining claims against the four state defendants are for money damages against them in their individual capacities.  The deletion of these numerous claims and allegations from the amended complaint confirms the "shotgun" approach being utilized by the plaintiffs in this litigation, as contended by the four state defendants in their original motion to dismiss.  See Memorandum in Support of Motion to Dismiss, Doc. ID # 33 at 33-38.

contentions that the lawlessness associated with the DAPL protests was merely "state and local officials' persistent mischaracterization of . . . the NoDAPL movement [u]sing selective, misleading, and false descriptions of Water Protector conduct . . . in a concerted effort to portray the movement as a whole as far more dangerous or criminal or disruptive than was actually the case." Am. Compl. at ¶ 5.  The plaintiffs go so far as to allege that this mischaracterization was perpetuated by the highway closure itself, claiming that the "closure led the local press to rely more significantly on statements made by state and local officials in their reporting [which] in turn, further amplified . . . state and local officials' exaggerated and often false portrayal of Water Protectors as violent and criminal, and of the NoDAPL movement as defined by mayhem." Id. at ¶ 132.

These allegations of deception, exaggeration, mischaracterization, and false portrayals attributed to public officials, including our past and current Governors, should be disregarded in light of the numerous public records, videos, photographs, and other indisputable proof unequivocally demonstrating that a criminal and violent faction accompanied the otherwise peaceful DAPL protests.  The criminal conduct was not a matter of perception.  The trespasses, destruction of private property, and vandalism were real, not false perceptions created by an impliedly gullible local media.  The fires set by protestors on the Backwater and County 134 bridges were real, as were the attempts to kill or injure law enforcement.   The reality of this unlawfulness is documented by the numerous criminal convictions that followed the protests, including convictions for trespass, disorderly conduct, civil disorder, and use of fire to commit federal felony offenses.  The counseled admissions of guilt, the guilty verdicts, and the photos used as evidence in those criminal cases are real, not false perceptions.  The 553 criminal court cases filed in the first months of the protests (as reported by the North Dakota Supreme Court) were real.  The unprecedented deficiency appropriation requested by an overtaxed state court system was real.  The sleeping dragons and other locking devices protestors used to attach themselves to private construction equipment, trespassing on private

property, were real.   The admission by some protestors that removing those devices created a substantial risk of bodily injury to law enforcement was real.  The 21,480,000 pounds of trash, debris, human feces and waste matter the "peaceful environmental" protestors left behind to pollute North Dakota was real.  In the face of these undisputable facts, attempts to vilify responsible public servants for their efforts to restore the rule of law in response to unlawful conduct should be disregarded.

The amended complaint's new allegations do not cure the many deficiencies detailed in the state and county defendants' initial motions to dismiss.  The conclusory allegations in the amended complaint still fall short of well-established pleading requirements to support a claim of personal liability against individual state defendants. The objective and legitimate reasons for the highway and bridge closures are still well-documented in public records and related court filings.  The new allegations still fail to establish legitimate claims of constitutional violations. The state defendants are still entitled to qualified immunity under the unique facts and circumstances of this case even if the plaintiffs had alleged colorable constitutional violations.  And it is still well-settled that "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent . . . is ***obvious***".  Cantwell v. State of Connecticut, 310 U.S. 296, 308 (1940) (emphasis added).

State defendants Burgum, Dalrymple, Levi and Gerhart therefore respectfully request that the Court dismiss the amended complaint brought against them in its entirety.

## FACTUAL BACKGROUND[2]

**I.     The Court can consider matters outside the complaint without converting the motion to dismiss into a motion for summary judgment.**

---

[2] For the Court's convenience in reviewing a single brief when addressing the state defendants' motion to dismiss the amended complaint, still-applicable arguments advanced in support of the original motion to dismiss are repeated in this brief rather than incorporated by reference.  Exhibits previously made a part of the record, however, will be referenced herein rather than resubmitted in support of this new motion.

As a prefatory matter, the state defendants acknowledge the factual background references matters outside the amended complaint.  It is well-settled in this circuit, however, that "Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of . . . the motion."  State v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999) (citing Martin v. Sargent, 780 F.2d 1334, 1336-37 (8th Cir. 1985)); see also Papasan v. Allain, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record[.]").

A robust list of material outside the pleadings can be considered under Rule 12(b)(6) without converting a motion into one brought under Rule 56.  The list includes:

(1) "those materials that are necessarily embraced by the pleadings[;]"[3]

(2) "documents whose contents are alleged in a complaint and whose authenticity no party questions[;]"[4]

(3) "items subject to judicial notice[;]"[5] and

(4) "matters of public record."[6]

Items subject to judicial notice, as well as matters of public record, generally include court records, see Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007) ("In Missouri, *as in other states*, court records are public records.") (emphasis added), and more specifically, court filings from related proceedings. See Amerind Risk Mgmt. Corp. v. Malaterre, 633 F.3d 680, 685 n.6 (8th Cir. 2011) (citing Biomedical Patent Mgmt. Corp. v. Cal., Dep't of Health Servs., 505 F.3d 1328, 1331 n.1 (Fed. Cir. 2007)); see also Freshman v. Atkins, 269 U.S. 121, 124 (1925) (holding that a court may "take judicial notice of, and give effect to, its

---

[3] Meiners v. Wells Fargo & Co., 898 F.3d 820, 822 (8th Cir. 2018).
[4] Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012).
[5] Williams v. Emp'rs Mut. Cas. Co., 845 F.3d 891, 903 (8th Cir. 2017) (internal quotation marks and citation omitted).
[6] Illig v. Union Elec. Co., 652 F.3d 971, 976 (8th Cir. 2011) (internal quotation marks and citation omitted).

own records in another, but interrelated proceeding"); Enter. Bank v. Magna Bank of Missouri, 894 F. Supp. 1337, 1341 (E.D. Mo. 1995) ("A Court may take judicial notice of records of related proceedings before the same Court. Accordingly, the Court will take judicial notice of the records of the two earlier actions in the Eastern District of Missouri for the purpose of establishing the facts leading up to this action. (Most of these facts are not in dispute.) The Court will also take judicial notice of the two orders entered in the bankruptcy proceeding in order to recognize the judicial acts taken and the subject matter of that litigation.") (internal citations omitted), aff'd, 92 F.3d 743 (8th Cir. 1996).

The amended complaint's focus is the temporary closure of the highway and bridge. As a result, materials setting forth basic facts about the closures are embraced by the amended complaint. Significantly, on two prior occasions this Court has examined "the existence of and basic facts surrounding"[7] the protests embraced by the amended complaint, and in the latter case closely examined facts surrounding the highway/bridge closure itself. See Dakota Access, LLC v. Archambault, No. 1:16-cv-296, 2016 WL 5107005 (D.N.D. Sep. 16, 2016) (hereinafter Archambault); Dundon v. Kirchmeier, No. 1:16-cv-406, 2017 WL 5894552 (D.N.D. Feb. 7, 2017) (hereinafter Dundon). Not only may this Court take judicial notice of "the existence of and basic facts surrounding" the highway and bridge closure as demonstrated by matters filed in those two related proceedings, Insulate SB, 797 F.3d at 543 n.4, but it "may take judicial notice of judicial opinions, especially [its] own," and thus may reference those facts and its own opinions "in [its] consideration of this case." Rosemann v. Sigillito, 785 F.3d 1175, 1177 n.3 (8th Cir. 2015).[8]

Should the Court determine, however, that particular matters discussed herein should not be considered, the state defendants request that the Court disregard those

---

[7] Insulate SB, Inc. v. Advanced Finishing Sys., Inc., 797 F.3d 538, 543 n.4 (8th Cir. 2015).
[8] The factual findings made by this Court in Dundon were examined on appeal, with the Eighth Circuit affirming the district court's decision. See Dundon v. Kirchmeier, 701 F. App'x 538 (8th Cir. 2017).

particular materials and address this dismissal motion without converting it into one for summary judgment.

## II.   Evidence of criminal activity and the threat to public safety prior to the highway closure.

Beginning in April 2016, "tens of thousands of individuals, known as 'Water Protectors,' united in support of the Standing Rock Sioux Tribe's opposition to the construction of the Dakota Access Pipeline (DAPL) at camps located near the intersection of Highway 1806 and the Cannonball River in south-central North Dakota."  Am. Compl. at ¶ 1.   "By September 2016, these camps reached a sustained population of approximately 7,000-10,000 individuals."  Id. at ¶ 43.  Highway 1806 served as the primary means by which Water Protectors opposed the construction of DAPL.  Id. at ¶ 2.

The protests against DAPL included civil unrest and criminal acts.  On August 15, 2016, the Morton County Board of Commissioners declared a state of emergency "due to the civil unrest occurring at the location of the [DAPL] construction site" that could "threaten the health, well-being, and safety of responders and the public" and "implement[ed] its emergency plans and processes in response to anticipated ongoing civil unrest."  Morton County Emergency Declaration, Dundon, Doc. ID #61-4.

Four days later, on August 19, 2016, Governor Dalrymple entered an executive order declaring a state of emergency in the protest area and declared "the impact of continuing unlawful activity could threaten the health, safety and well-being of the general public, protesters and first responders who are committed to protecting life and property."  Executive Order 2016-04, Dundon, Doc. ID #58-2.  The executive order stated "a significant public safety concern is present due to illegal protesting activities which cannot be mitigated with resources on hand" and "the rule of law must be enforced to protect the general public, protesters and first responders from those who engage in illegal activity." Id.

The unlawful activities that threatened public safety and prompted the Governor to

declare a state of emergency include several criminal matters that have already reached a final resolution, and others that remain pending.

For example, on August 11, 2016, eleven individuals, including Valerie Dawn Wolfnecklace of Solen, ND, were among those protesting near a road used by the Dakota Access Pipeline Company to access its pipeline construction on private land.  See State of North Dakota v. Wolfnecklace, No. 30-2016-CR-00941, Doc. ID # 7 at 4-5.  Despite police tape dividing the private land from areas where protestors were permitted, and instructions from law enforcement not to cross the yellow tape divider, Wolfnecklace trespassed on private land by crawling through a hole in a barbed wire fence and then fled from law enforcement while on the private property.  Id.  Wolfnecklace was charged with both Disorderly Conduct in violation of N.D. Cent. Code § 12.1-31-01 and Refusal to Halt in violation of N.D. Cent. Code § 12.1-08-11.  Id.  She was found guilty of both offenses.  (Ex. 1 in support of original motion to dismiss, Doc. ID # 33-2).

Clifton Verle Hollow of Fort Yates, ND, was found removing wooden survey stakes that had been placed on private land by DAPL workers for the construction of an access road near milepost 36 on Highway 1806.  See State of North Dakota v. Hollow, No. 30-2016-CR-1179, Doc. ID #2 at 4.  Hollow fled from law enforcement and resisted arrest when caught.  Id.  He was charged with Preventing Arrest in violation of N.D. Cent. Code § 12.1-08-02, Disorderly Conduct in violation of N.D. Cent. Code § 12.1-31-01, Criminal Trespass in violation of N.D. Cent. Code § 12.1-22-03, and Refusal to Halt in violation of N.D. Cent. Code § 12.1-08-11.  Id.  Hollow entered a counseled plea of guilty to Preventing Arrest, Disorderly Conduct, and Refusing to Halt.  Id. at Doc. ID #26.  (Ex. 2 in support of original motion to dismiss, Doc. ID # 33-3).

█████████████ of Upper Marlboro, MD; ███████████████ of Stanardsville, Virginia; Aaron Neyer of Oxford, Ohio; and ███████ of San Diego, California, were others among the eleven individuals charged with disorderly conduct for the events on August 11.  See State of North Dakota v. ██████, No. 30-2016-CR-

00932;[9] State of North Dakota v. ███, No. 30-2016-CR-00934;  State of North Dakota v. Neyer, No. 30-2016-CR-00954; State of North Dakota v. ███, No. 30-2016-CR-00939.  They were all part of a group of 100-150 protestors in the area of the access road.  See, e.g., No. 30-2016-CR-934, Doc. ID #7 at 4-5 (Ex. 3 in support of original motion to dismiss, Doc. ID # 33-4).  Some protestors pushed against law enforcement in attempts to access private land, threw objects such as rocks and bottles at law enforcement, and, when through the police line, sat on the access road to impede DAPL construction.  Id.  Despite the designated protest area, some protestors still "attempt[ed] to disrupt pipeline work in the area by interfering with traffic on Highway 1806 or blocking a field approach that led to private property where work was being completed." No. 30-2016-CR-00939, Doc. ID #8 (Ex. 4 in support of original motion to dismiss, Doc. ID # 33-5).  ███ was "[o]ne of the individuals who laid down on the gravel approach behind the police lines" to disrupt DAPL construction.  Id.  He entered a counseled plea of guilty to the charge of disorderly conduct.  No. 30-2016-CR-00939, Doc. ID #11 (Ex. 5 in support of original motion to dismiss, Doc. ID #33-6).  ███, and Neyer were all found guilty of disorderly conduct. Exs. 6, 7, 8 in support of original motion to dismiss, Doc. ID ## 33-7 through 33-9)  Other criminal matters from the August 11 incidents remain pending, with

---

[9] Many of the misdemeanor charges arising out of the DAPL protests resulted in deferred impositions of sentence under which a defendant is placed on probation for a period of one year and, upon successful completion of the probationary period, the charge is dismissed and the file sealed.  See N.D. R. Crim. P. 32.1.  Prior to the seal order and during the probationary period, however, records of the case are publicly available, including any admissions of guilt.  The state defendants obtained records from some of these deferred sentence cases, as well as cases involving pretrial diversion dispositions, prior to seal orders being entered.  The records were obtained for the purpose of establishing the underlying criminal activity involved in the DAPL protests, which is established notwithstanding the fact that the files may, at some later date, be sealed and irrespective of the identity of the particular individuals involved.  For cases that have been sealed subsequent to the state defendants obtaining the records, and anticipating that some deferred imposition cases that are now still publicly available may become sealed at some point in the future, the state defendants include with this brief the redacted records from the select cases referred to herein that involve deferred impositions or pretrial diversions.

bench warrants issued.  See, e.g., State of North Dakota v. Peterson, No. 30-2016-CR-00937, Doc. ID #117.

On August 15, 2016, ███████████████ of Kyle, SD, was among seven individuals charged with disorderly conduct arising out of protest activities near milepost 38 on Highway 1806.  See State of North Dakota v. ██████, No. 30-2016-CR-00962, Doc. ID #11 (Ex. 9 in support of original motion to dismiss, Doc ID # 33-10).  Due to "several days of protesters disrupting construction work in the area[] [b]arricades had been set up to allow the work to proceed."  Id. at 3.  ████████ and others nonetheless breached the barricades and did not comply with warnings from uniformed officers to leave the barricaded area.  Id.  He entered a counseled plea of guilty to the charge, admitting "[d]uring a protest DAPL worksite I breached a barricade that had been established between the worksite and protestors.  As a result of breaching the barricade my actions were alarming, harassing and annoying to law enforcement and construction workers."  No. 30-2016-CR-00962, Doc. ID # 25 (Ex. 10 in support of original motion to dismiss, Doc. ID # 33-11).  Other criminal matters from this same August 15 incident remain pending, with bench warrants issued.  See, e.g., State of North Dakota v. Ybarra, No. 30-2016-CR-00966, Doc. ID #24.

The unlawful protest activities were not isolated, but occurred miles apart along Highway 1806.  For example, ███████████ of Porcupine, South Dakota, was charged with disorderly conduct and entered a counseled plea of guilty in which he admitted "[o]n or about August 15, 2016 in Morton County, North Dakota at mile marker 36 on Highway 1806, [he] committed the offense of Disorderly Conduct when he refused to vacate an approach used by the Dakota Access Pipeline Workers."  State of North Dakota v. ██████, No. 30-2016-CR-00972, Doc. ID #22 at 2 (Ex. 11 in support of original motion to dismiss, Doc. ID # 33-12).  Additional criminal matters from August 15 remain pending, with bench warrants issued.  See, e.g., State of North Dakota v. Red Day, No. 30-2016-CR-00957, Doc. ID #3; State of North Dakota v. Dull Knife, No. 30-2016-CR-00964, Doc. ID #16.

9

On August 16, 2016, this Court issued a temporary restraining order to prevent protesters from unlawfully interfering with DAPL operations.  Archambault, Doc. ID #7. On August 10, 2016, protestor Jonathan Edwards had "chained himself to a fence in an effort to halt the construction activities."  Id. at 2.  Another protestor "had a large knife strapped to his hip [and] threatened Dakota Access representatives, stating they would not be able to enter or access the construction site or bury the Pipeline there and that, if they attempted to do so, they would be hurt."  Id.  Protestors made these threats despite the fact that "Dakota Access [had] obtained the necessary easements and rights of way to construct the Pipeline in North Dakota and the necessary federal, state, and local permits for the Oahe Crossing."  Id.  In granting the temporary restraining order, this Court also referred to additional unlawful activity that took place on August 11 and 12.  Id. at 2-4.

Criminal activity continued after this Court's temporary restraining order and the Governor's declaration of a state of emergency. On August 31, 2016, some individuals secured themselves to construction equipment on private property at the DAPL construction site.  Dundon, Doc. ID #61-2 at 9-10.  The individuals arrested included Jeremiah IronRoad of Cannonball, North Dakota; Lisa Elaine Winter of St. Louis, Missouri; ███████████████ of Albuquerque, New Mexico; Maxfield Colbert Estela of Edmunds, Washington; ████████████ of Sisseton, South Dakota; and Wicahpiluta Candelaria of Sanleandro, California. See State of North Dakota v. IronRoad, No. 30-2016-CR-01041; State of North Dakota v. Winter, No. 30-2016-CR-01032; State of North Dakota v. ███████, No. 30-2016-CR-01040; State of North Dakota v. Estela, No. 30-2016-CR-01035; State of North Dakota v.████████, No. 30-2016-CR-01033; State of North Dakota v. Candelaria, No. 30-2016-CR-01034.

"IronRoad was trespassing on private property at a construction site and had restrained himself to a piece of construction equipment with an improvised hand restraint device that required significant and careful and time consuming effort to remove."

IronRoad, Doc. ID #16 at 3.  The evidence against IronRoad includes a picture of him bound to the construction equipment.  Id. at Doc. ID #27 (photo attached as Ex. 12 in support of original motion to dismiss, Doc. ID # 33-13).  IronRoad entered a counseled plea of guilty to a charge of Physical Obstruction of a Government Function in violation of N.D. Cent. Code § 12.1-08-01.  Id. at Doc. ID #32.  Winter was standing on equipment at the DAPL worksite and would not remove herself despite repeated warnings from law enforcement that she would be arrested.  Winter, Doc. ID #18.  The evidence against Winter includes a picture of her standing on top of a piece of equipment.  Id. at Doc. ID #33 (photo attached as Ex. 13 in support of original motion to dismiss, Doc. ID # 33-14).  Winter entered a counseled plea of guilty to a charge of Preventing Arrest or Discharge of Other Duties in violation of N.D. Cent. Code § 12.1-08-02(1) and admitted that "she, with intent to prevent a public servant from effecting an arrest of herself or another for a misdemeanor or infraction, or from discharging any other official duty, created a substantial risk of bodily injury to the public servant or to someone other than herself, or employed means justifying or requiring substantial force to overcome resistance to effecting the arrest or the discharge of the duty."  Id. at Doc. ID #42 at 3.

████████ was at the site where some protestors had "secured themselves to construction equipment and refused to leave.  [She was] given 10/5/2 & 1 minute warnings.  ████████ refused to leave and while being arrested was being pulled back into the easement area by Maxfield Estela." 30-2016-CR-01040, Doc. ID #20 at 3. (Ex. 14 in support of original motion to dismiss, Doc. ID # 33-15).  She entered a counseled plea of guilty to a charge of Disorderly Conduct in violation of N.D. Cent. Code § 12.1-31-01.  Id. at Doc. ID #32 (Ex. 15 in support of original motion to dismiss, Doc. ID # 33-16).  Estela was at the site where some protestors had "secured themselves to construction equipment and refused to leave.  [He was] given a warning at 10/5/2/1 minutes to leave the easement area.  Estela refused to leave and attempted to pull a female [Branham] to him who was being arrested."  Estela, Doc. ID #14 at 3.  Estela entered a counseled plea

of guilty to charges of Obstruction of a Government Function in violation of N.D. Cent. Code § 12.1-08-01, a charge of Disorderly Conduct in violation of N.D. Cent. Code § 12.1-31-01, a charge of Refusal to Halt in violation of N.D. Cent. Code § 12.1-08-11, and a charge of Criminal Trespass in violation of N.D. Cent. Code § 12.1-22-03.  Id. at Doc. ID #22.

███████ "refused to move" while law enforcement were "attempting to move protestors out of the way of pipeline workers."  No. 30-2016-CR-01033, Doc. ID #11 at 4. (Ex. 16 in support of original motion to dismiss, Doc. ID # 33-17).  She was arrested only after being ordered to move multiple times, and she resisted requiring more than one officer to complete the arrest.  Id.  She entered a pretrial diversion agreement to dispose of the charges of Physical Obstruction of a Government Function in violation of N.D. Cent. Code § 12.1-08-01, Disorderly Conduct in violation of N.D. Cent. Code § 12.1-31-01, and Preventing Arrest in violation of N.D. Cent. Code § 12.1-08-02, under which her prosecution was suspended for a period of one year on the condition she not commit any additional criminal offenses.  Id. at Doc. ID #48 (Ex. 17 in support of original motion to dismiss, Doc. ID # 33-18).  Additional criminal matters from the events on August 31 remain pending, with bench warrants issued.  See, e.g., Candelaria, Doc. ID #22.

Criminal activity continued through September and October 2016.  By October 2016, law enforcement had made 269 arrests in relation to the DAPL protests. Dundon, Doc. ID #61-2 at 49.  Some of those arrests have already resulted in criminal convictions, while other matters still remain pending with bench warrants issued.  By way of example only, here is some of the criminal activity that took place before the highway closure on October 24, 2016.

- State of North Dakota v. ████████, No. 30-2016-CR-1120. ████████ ████ of Stephan, South Dakota, was charged with committing the crimes of Reckless Endangerment, Physical Obstruction of a Governmental Function, Disorderly Conduct, and Criminal Trespass for conduct that occurred on September 14, 2016.  She entered a counseled plea of guilty to Reckless Endangerment and Disorderly Conduct, admitting that she "used a locking device to secure [herself] to construction machinery used for constructing the

Dakota Access Pipeline in protest. The device had to be physically cut off by law enforcement to remove me from the machinery after being instructed numerous times to release the locking device. The process of cutting the locking device created a substantial risk of bodily injury to law enforcement." No. 30-2016-CR-1120, Doc. ID #40. (Ex. 18 in support of original motion to dismiss, Doc. ID # 33-19).

- <u>State of North Dakota v. Voliva</u>, No. 30-2016-CR-1187, Steven Voliva of Fort Yates, North Dakota, was charged with committing the crimes of Obstruction of a Highway and Disorderly Conduct for conduct that occurred on September 27, 2016. A jury found him guilty of both crimes.

- <u>State of North Dakota v. Shapiro</u>, No. 30-2016-CR-1190. Benjamin Shapiro of Cleveland, Ohio, was charged with committing the crimes of Obstruction of a Highway and Disorderly Conduct for conduct that occurred on September 27, 2016. A jury found him guilty of both crimes.

- <u>State of North Dakota v. Chabbot</u>, No. 30-2016-CR-1292. Alex Chabbot of Santa Barbara, California, was charged with committing the crimes of Inciting a Riot, Reckless Endangerment, Criminal Trespass, and Disorderly Conduct for conduct that occurred on October 10, 2016. He was convicted of Reckless Endangerment.

The criminal cases arising out of the DAPL protests were so numerous that a petition was filed with the North Dakota Supreme Court by a group of in-state and out-of-state lawyers to "require that North Dakota admit out-of-state lawyers in temporary practice to adequately handle criminal charges stemming from protest activities which they claim overwhelm the North Dakota bar's ability to adequately represent all defendants." <u>Matter of Petition to Permit Temp. Provision of Legal Servs.</u>, 889 N.W.2d 399, 399 (N.D. 2017). In addressing that petition, the North Dakota Supreme Court indicated that "553 court cases were filed in district court in the South Central Judicial District resulting from Dakota Access Pipeline protests as of December 19, 2016." <u>Id.</u> at 401. The number of criminal charges was so extraordinary that North Dakota's judicial branch was required, for the first time in its history, to request a deficiency appropriation from the state legislature:

In addition to reductions in staff and operations, we were also faced with hundreds of additional cases in the South Central Judicial District stemming from the 2016 Dakota Access Pipeline protests. To cover the anticipated costs of these additional cases, the judicial branch requested its first ever deficiency appropriation. These cases continue to populate the court calendars in 2018 and have begun to come to the Supreme Court on

13

appeal.

Annual Report 2017 North Dakota Court System at page 3 available at http://www.ndcourts.gov/_court/news/annualreport2017.pdf (last visited February 11, 2019).

### III.   Evidence of criminal activity and the threat to public safety at the time of the highway closure.

The plaintiffs allege that defendants discriminatorily closed Highway 1806 from Fort Rice to Fort Yates on October 24, 2016. Am. Compl. at ¶ 6. Just a few days earlier, some protestors had exhibited escalated violent behavior by threatening the safety of journalists covering the protests. Dundon, Doc. ID #61-2 at 44-46.

On Saturday, October 22, 2016, law enforcement officers arrested over eighty protestors at the DAPL construction site. See ND Response, http://www.ndresponse.gov /archive/2016/dakota-access-pipeline/press-releases/October-2016/officers-arrest-80- engaging-riot (last visited February 11, 2019). The arrests included some protestors who had parked a vehicle with flat tires on the pipeline right-of-way. Id. "Four individuals were attached to the vehicle; two attached to the outside of the vehicle, one attached to the steering wheel and another whose body was outside the vehicle with his arm fed through a hole in the door and his hand was in a bucket of hardened concrete." Id.

Highway 1806 served as the primary means by which the protestors opposed the construction of DAPL, Amended Complaint at ¶ 2, and would have been the means by which these individuals placed the vehicle on the pipeline right-of-way just days before public officials closed the highway. Lawrence Malcolm, Jr., of McLaughlin, South Dakota, was one of the individuals involved in obstructing the pipeline right-of-way. See State of North Dakota v. Malcolm, No. 30-2016-CR-1389. "Malcolm Jr. was the protestor who had been in a 'sleeping dragon' device on the passenger side of the Pathfinder and had to be removed by the cut team." Id., Doc. ID #10 at 9. "While [Deputy] Selle was standing next to Malcolm Jr. before the cut team arrived, Malcolm Jr. spat on Selle striking Selle in the

left arm and upper chest area." Id. "The Pathfinder contained a barrel filled with concrete in the front passenger side . . . used for a 'sleeping dragon' device to slow the response of law enforcement in removing and arresting the trespassers." Id. at 8. Malcolm, Jr., was charged with several crimes including the felony charge of Contact by Bodily Fluids or Excrement in violation of N.D. Cent. Code § 12.1-17-11. Id. at 5-6. The felony charges against Malcolm, Jr., remain pending, with a bench warrant issued. Id. at Doc. ID #9.

By way of additional example only, Brandon Ami of Pinan, Arizona, was among the protestors arrested during the escalated criminal activity that preceded and prompted the highway closure, and subsequently pleaded guilty to a charge of criminal trespass. State of North Dakota v. Ami, No. 30-2016-CR-1525, Doc. ID #23. Emmalyne Garrett of Grants Pass, Oregon, was another. She was found guilty of criminal trespass by a jury. State of North Dakota v. Garrett, No. 30-2016-CR-1435, Doc. ID #56.

Additional criminal cases arising out of the DAPL protests have only recently been resolved. On February 5, 2019, Katrina Silk was found guilty after trial of physical obstruction of a government function for an incident that occurred on October 22, 2016. See State of North Dakota v. Katrina Silk, No. 30-2017-CR-744, Doc. ID #100.

On October 23, 2016, a large group of protestors blocked the north and south bound lanes of Highway 1806 north of the protest camps. Dundon, Doc. ID #61-2 at page 47. "Protestors have escalated their blockade activity by moving hay bales, rocks, tree stumps and other items onto Highway 1806 to fortify a roadblock they created around 2:00 pm today." Id. The protestors justified the illegal roadblock on the grounds that they could unilaterally claim eminent domain over the area of the protests. See Highway 1806 closed indefinitely due of DAPL protest, https://www.kfyrtv.com/content/news/Highway-1806-close-indefinitely-due-to-DAPL-protest-398246651.html (last visited February 11, 2019). Although authorities persuaded protestors to remove the roadblock, the ditches remained full of items that could easily be moved back in the roadway to block it, threatening the safety of the traveling public. Id. Due to the escalated unlawful activities

by some of the protestors, Morton County had to request additional law enforcement assistance from other states.  Dundon, Doc. ID #61-2 at 48-49.  As a result of this illegal activity by protestors, Highway 1806 was closed indefinitely.  Id. at 47.

**IV.    Evidence of criminal activity and the threat to public safety at the time of the bridge closure.**

"On October 27, 2016, law enforcement's efforts to remove the blockades and protestors from private property north of the Backwater Bridge was met with violence." Dundon, 2017 WL 5894552 at * 9.  "The undisputed evidence reveals protesters refused commands by law enforcement and government officials on October 26, 2016, to vacate the private property and remove protester-built road blocks[.]"  Id.  "Protesters burned heavy construction equipment used on the DAPL project, set fire to a vehicle on Highway 1806 near the North Camp, set fire on a bridge on County Road 134, tried to set a vehicle on fire under an electrical transmission tower located along Highway 1806, and set a vehicle and an electronic highway sign on fire near the north end of the Bridge."  Id. "[P]rotesters threw Molotov cocktails (homemade explosives) at law enforcement."  Id. "Protesters on horseback intentionally stampeded several hundred bison toward law enforcement officers and other protesters—twice, which were diverted by the intervention of a nearby helicopter which moved the bison away from people."  Id.

"The Backwater Bridge was deemed unsafe and closed to all access on October 28, 2016, by the DOT due to a large fire the protesters had started on the bridge on October 27, 2016, including the burning of a vehicle on the bridge (in addition to the two burned out dump trucks)[.]"  Id. at *10.  DOT employees visually inspected the bridge on October 31.  See Dundon, Doc. ID #58-1 at 1.  The inspection team determined that vehicle fire – which "can reach 1100 degrees Fahrenheit which is near the threshold where concrete and prestressing strands can be damaged" – "could have affected the prestressing strands that are present at the top of the [bridge's box] beams[.]"  Id.  A "pick hammer was able to pick through existing asphalt very easily indicating oil in asphalt is

burned out." Id.  The lack of security at the bridge site due to ongoing violent protests prevented the inspection team from taking core samples of the box beams.  Id.  "Until the inspection issues outlined above are completed and necessary repairs are made, the Department cannot guarantee the safety [of the bridge] to the traveling public."  Id. at 2.

Any suggestion that the police initiated or caused the violence surrounding the October 27 bridge closure, see Amended Complaint at ¶ 57, is demonstrably false. "The protesters' stated objective is to stop completion of the pipeline project across the Missouri River by any means possible."  Dundon, 2017 WL 5894552 at *10.  Undisputable proof that criminal activity took place to fulfill the stated objective of stopping completion of the pipeline "by any means possible" includes criminal charges that have already reached a final resolution, while others remain pending.

On October 27, 2016, Red Fawn Fallis was one of the individuals participating in the DAPL protests.  She was identified as being an instigator of criminal activity and acting disorderly.  United States v. Fallis, No. 1:17-cr-16, Doc. ID #1-1 at  3.  Fallis fired two gunshots from a Ruger, model LCR, .38 Special revolver, when a law enforcement officer attempted to place her under arrest.  Id.  Fallis admitted "she was trying to pull the gun out of her pocket" and that the law enforcement officers were "lucky she didn't shoot 'all you f***ers.'"  Id.  Fallis ultimately entered counseled pleas of guilty to a felony charge of civil disorder in violation of 18 U.S.C. §§ 231(a)(3) and (2), and a felony charge of possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Id. at Plea Agreement, Doc. ID #217. In pleading guilty, Fallis admitted that "some individuals within the [DAPL protest] camp committed acts of civil disorder as defined in 18 USC § 232(1), in that three or more persons, acting in concert, committed acts of violence that caused an immediate danger of damage to the property of other individuals and, by doing so, their conduct delayed the construction of the pipeline." Id. at 3.  Fallis further admitted that she "knowingly possessed one Ruger model LCR, .38 Special revolver, bearing serial number 543-47899, and Federal brand .38

caliber ammunition" at a time when she had been convicted of a "felony conviction [that] prohibits Defendant from lawfully possessing a firearm and ammunition."  Id.

Michael Arthur Giron was one of the individuals participating in the DAPL protests on October 27.  A federal grand jury indicted him with engaging in civil disorder in violation of 18 U.S.C. §§ 231(a)(3) and (2), and use of a fire to commit a federal felony offense in violation of 18 U.S.C. §§ 844(h) and 2.  United States v. Giron, No. 1:17-cr-31, Doc. ID #6.  Giron ultimately entered a counseled plea of guilty to a felony charge of civil disorder. Id. at Plea Agreement, Doc. ID #95.  In pleading guilty, Giron admitted that on October 27, 2016, "law enforcement officials began an effort to remove individuals at a location where protestors had erected an illegal roadblock on Highway 1806 and who were criminally trespassing on private property east of highway [sic] 1806."  Id. at 2.  "Law enforcement gave advisements over a loud speaker system asking people to voluntarily leave the roadway and to travel back to the protest camps.  Some individuals at this location ignored the orders of law enforcement and placed barricades on the roadway and set them on fire."  Id.  Giron further admitted that "some protestors began throwing projectiles at law enforcement, including bottles and other debris."  Id.  Giron admitted the "conduct by the protestors constituted civil disorder as defined in 18 USC § 231(a)(3), in that it was a public disturbance involving acts of violence by assemblages of three or more persons, which caused an immediate danger of or resulted in damage or injury to the property or person of any other individual."  Giron admitted to "knowingly and intentionally aid[ing] the civil disorder . . . by adding materials to the barricade across Highway 1806 for the intended purpose of obstructing, impeding, or interfering, either by himself or with someone else, in a violent manner, with law enforcement officers."  Id. at 3.

James White was one of the individuals participating in the DAPL protests on October 27.  A federal grand jury also indicted White with engaging in civil disorder and use of fire to commit a federal felony offense.  United States v. White, No. 1:17-cr-30-

DLH-3, Doc. ID #18.  White was one of the individuals involved in the fire set on a bridge on County Road 134, a fire noted by this Court in <u>Dundon</u>.  White ultimately entered a counseled plea of guilty to a felony charge of civil disorder.  <u>Id.</u> at Plea Agreement, Doc. ID # 152.  In pleading guilty, White admitted that "individually, or by aiding and abetting, [he] committed and attempted to commit an[] act to obstruct, impede, and interfere with any law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructed, delayed, and adversely affected commerce and the movement of any article or commodity in commerce, in violation of Title 18, United States Code, Sections 231(a)(3) and 2."  <u>Id.</u> at 2.

One of White's codefendants was Brennan Nastacio.  Federal felony charges remain pending against Nastacio.  <u>See</u> <u>United States v. Nastacio</u>, No. 1:17-cr-30-DLH-2.  A federal grand jury also indicted Nastacio with civil disorder and use of fire to commit a federal felony offense for the bridge fire on County Road 134.  <u>Id.</u> at Doc. ID #18.  The evidence against Nastacio includes a photo of him standing on the bridge deck holding a gasoline can.  <u>Id.</u> at Doc. ID #53-1.  The evidence against Nastacio includes photos of the barricades placed by protestors on the County Road 134 bridge, and vehicles placed on the bridge engaged in flames.  <u>Id.</u> at Doc. ID #53-4.

Another of White's codefendants was Michael Markus.  <u>See</u> <u>United States v. Markus</u>, No. 1:17-cr-30-DLH-1.  Authorities alleged that the fires set on the County 134 bridge "resulted in a significant delay to law enforcement and prohibited the law enforcement group from meeting up with and assisting the law enforcement officers that were moving south down Highway 1806."  <u>Id.</u> at Doc. ID #1-1 at 4.  In an interview, Markus "admitted to pouring the gasoline on the barricades and pouring gasoline in an attempt to connect the barricades once they were ignited."  <u>Id.</u> at 6.  Markus further admitted "the reason they started the fires was to 'slow law enforcement down'" from traveling County Road 134 to assist the officers dealing with the criminal riot occurring on the Highway

1806 bridge.  <u>Id.</u>  Markus ultimately entered a counseled plea of guilty to a felony charge of civil disorder.  <u>Id.</u> at Plea Agreement, Doc. ID # 130.

## V.  Evidence of criminal activity and the continued threat to public safety following the highway and bridge closure.

The threat to public safety resulting from ongoing criminal activity remained after the highway and bridge were closed.  By way of example only, here are some of the criminal matters that have resulted in convictions for criminal activity that occurred after the highway and bridge closures.

- <u>State of North Dakota v. Salt</u>, No. 30-2016-CR-1808.  Joel Salt of St. Helens, Oregon, was charged with Disorderly Conduct and Tampering with a Public Service for conduct that occurred on November 15, 2016.  Salt pled guilty to both charges stating "I knowingly or recklessly tampered (improperly interfered) with the operation of the BNSF railroad service which caused a substantial delay…" <u>Salt</u>, Doc. ID #56 at 1-2.

- <u>State of North Dakota v. Stone</u>, No. 30-2016-CR-1898.  Timothy Stone of Port Townsend, Washington, was charged with Criminal Trespass for conduct that occurred on November 29, 2016.  Stone pled guilty and a criminal judgment was entered on December 13, 2016.  See <u>Stone</u>, Doc. ID #3.

- <u>State of North Dakota v. ███████</u>, No. 30-2017-CR-00039.  ███████ ███████, of Albuquerque, New Mexico , was charged with Criminal Trespass for conduct that occurred on January 9, 2017.  He pled guilty to the charge stating "I admit that on [January 9, 2017], I … entered or remained in a place as to which notice against trespass was given by actual communication to me by the individual in charge of the premises…" No. 30-2017-CR-00039, <u>Doc. ID #19</u> at 2 (Ex. 19 in support of original motion to dismiss, Doc. ID #33-20).  ███████ sentence was deferred for 360 days.

- <u>State of North Dakota v. ███████</u>, No. 30-2017-CR-00123.  ███████ ███████ of Seattle, Washington, was charged with Criminal Trespass, Preventing Arrest or Discharge of Other Duties, Engaging in a Riot, and Possession of Drug Paraphernalia for conduct that occurred on January 16, 2017.  He pled guilty to Criminal Trespass, Preventing Arrest or Discharge of Other Duties, and Engaging in a Riot by stating "I trespassed on [DAPL] property at a time when groups of more than five individuals were accessing DAPL property, nearing the drill pad under violent and/or tumultuous circumstances.  Further, I prevented officers from effectuating my arrest by refusing commands to stand and/or walk, requiring them to carry me to the transport vehicle." No. 30-2017-CR-00123, <u>Doc. ID #27</u> at 3 (Ex. 20 in support of original motion to dismiss, Doc. ID # 33-21).  ███████ sentence was deferred for one year.

- <u>State of North Dakota v. ███████</u>, No. 30-2017-CR-00095.  ███████ of Fort Yates, North Dakota, was charged with Physical Obstruction of Government Function and Criminal Trespass for conduct that occurred on January 18, 2017.  She pled guilty to both charges stating "on or about January 18, 2017, I committed

the offense of Criminal Trespass by entering a posted area without permission; and [t]hat on or about January 18, 2017, I committed the offense of Physical Obstruction of Government Function by refusing to leave the Blackwater Bridge when asked to do so, and by resisting an[d] obstructing law enforcement in their efforts to clear the area of trespassers." No. 30-2017-CR-00095, Doc. ID #29 at 3 (Ex. 21 in support of original motion to dismiss, Doc. ID # 33-22). ████ sentence was deferred for one year.

- State of North Dakota v. ████, No. 30-2017-CR-00209. ████, of Carlsbad, California, was charged with Criminal Trespass and Engaging in a Riot for conduct that occurred on February 1, 2017. A jury found ████ guilty of both charges. The sentences were deferred.

- State of North Dakota v. Benitez, No. 30-2017-CR-00228. Anthony Santos Benitez, of Riverside, California, was charged with Physical Obstruction of a Government Function, Preventing Arrest or Discharge of Other Duties, and Refusing to Halt, for conduct that occurred on February 1, 2017. Benitez pled guilty to Refusing to Halt.

- State of North Dakota v. Bivens, No. 30-2017-CR-00369. Eric Bivens, of Sodd Daisy, Tennessee, was charged with Physical Obstruction of Government Function for conduct that occurred on February 22, 2017. Bivens pled guilty and a criminal judgment was entered on March 24, 2017. See Bivens, Doc. ID #8.

- State of North Dakota v. Lehmann, No. 30-2017-CR-00436. Dennis Lehmann, of Freeman, South Dakota, was charged with Physical Obstruction of Government Function for conduct that occurred on February 23, 2017. A jury found Lehmann guilty and a criminal judgment was entered on September 7, 2018. See Lehmann, Doc. ID #51.

- State of North Dakota v. ████, No. 30-2017-CR-00392. ████ ████ of Seattle, Washington, was charged with Physical Obstruction of Government Function, Preventing Arrest or Discharge of Other Duties, and Carrying Concealed Firearm or Weapon for conduct that occurred on February 23, 2017. He pled guilty to all charges, stating "I knew I was not licensed or privileged to enter/remain on U.S. Army Corp of Engineers land … When officers attempted to arrest me, I pulled away, locked my arms in front of my body and tensed/moved my legs to avoid being cuffed. Three officers had to be involved to use force to effectuate my arrest. I was in possession of an orange flare gun, which had been concealed on my person and was discovered on my arrest." No. 30-2017-CR-00392, Doc. ID #32 at 3. (Ex. 20 in support of original motion to dismiss, Doc. ID # 33-21). ████ sentence was deferred for one year.

On January 24, 2017, President Trump issued an executive memorandum entitled "Construction of the Dakota Access Pipeline." (Ex. 22 in support of original motion to dismiss, Doc. ID #33-23). In the memorandum, the President noted that "the DAPL is more than 90 percent complete across its entire route" and that "construction and operation of lawfully permitted pipeline infrastructure serve the national interest." Id.

President Trump directed the Secretary of the Army and the U.S. Army Corps of Engineers to take "all actions necessary and appropriate to" ensure completion of the DAPL project. Id.

By the time the "peaceful" environmental protestors left in late February and early March 2017, they had polluted nearby Cantapeta Creek and Cannonball River with human feces and other waste matter, and left behind 21,480,000 pounds of trash and debris, including abandoned cars, vans, trucks, trailers, buses, campers, motor homes, and generators. See North Dakota FTCA Notice of Claim Attachment A at ¶ 85 (Ex. 23 in support of original motion to dismiss, Doc. ID # 33-24).

## LAW AND ARGUMENT

### I. General standards applicable to reviewing a motion to dismiss under Rule 12(b)(6).

The state defendants move to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion tests the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." Young v. City of St. Charles, 244 F.3d 623, 627 (8th Cir. 2001). Although a court must accept the complaint's allegations as true, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007), and view them in the light most favorable to the nonmoving party, Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 595 (8th Cir. 2009), the complaint must still "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face. Thus . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (internal quotation marks omitted).

To survive dismissal, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that [each] defendant is liable for the misconduct

alleged."   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).   Courts must undertake the "context-specific task" of determining whether the plaintiffs' allegations "nudge" their claims against each defendant "across the line from conceivable to plausible."   Twombly, 550 U.S. at 570 (citation omitted).   A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests[.]"   Id. at 555 (citation omitted).

In the specific context of claims brought against multiple individuals under 42 U.S.C. § 1983, Iqbal and Twombly require specific factual allegations that demonstrate the personal and direct involvement of each defendant.   See, e.g., Martin, 780 F.2d at 1338 ("Appellant does not allege that Baltz was personally involved in or had direct responsibility for incidents that injured him.   His claims, therefore, are not cognizable in § 1983 suits.").

## II.   The claims against all four state defendants in their individual capacities fail to state a claim for relief.

Each of the amended complaint's seven counts are based upon the premise that the highway and bridge closure violated the plaintiffs' constitutional rights.   But the allegations regarding the four named state defendants are conclusory in nature, unaccompanied by the type of specific facts required by Iqbal and Twombly demonstrating how the four named state defendants were directly and personally involved in the highway or bridge closure.   The complaint identifies the state office held by each state defendant with a general allegation that each was an authorized policymaker.   See Am. Compl. at ¶¶ 20-23.   The amended complaint then makes conclusory "Municipal and Supervisory Allegations" that lump together all four state defendants (along with county defendant Kirchmeier) without specific facts to support the conclusory allegations regarding the personal and direct roles, if any, each named defendant took with respect to the highway/bridge closures.   Id. at ¶¶ 102-111.

A state official sued in an individual capacity will only be liable for money damages if a plaintiff shows the official was directly and personally involved in the constitutional

violation.  See, e.g., S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015) ("Government officials are personally liable only for their own misconduct."); Dahl v. Weber, 580 F.3d 730, 733 (8th Cir. 2009) ("Section 1983 liability is personal. To recover § 1983 damages from Weber individually, Dahl must establish that Weber was personally involved in, or directly responsible for, Dahl's prolonged incarceration[.]") (internal citations omitted).")

The conclusory "Supervisory Allegations" set forth in paragraphs 102-111 of the amended complaint are simply insufficient to state a claim for relief against state defendants in their individual capacities.  See Iqbal, 556 U.S. at 677 ("Respondent's conception of 'supervisory liability' is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents.  In a § 1983 suit . . . where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); see also Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006) ("As Mayorga cannot establish personal involvement of the supervisory defendants, they are entitled to judgment as a matter of law under section 1983."); Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001) (affirming a dismissal with prejudice where "[t]he amended complaint fails, however, to identify the specific policies of which he complains or how the defendants were responsible for taking his property for their own personal gain pursuant to those policies"); Wilson v. Cross, 845 F.2d 163, 165 (8th Cir. 1988) (indicating a plaintiff could not prove a roadblock violated his constitutional rights under § 1983 "without proof of individualized intent. It is now axiomatic that vicarious liability has no place in § 1983 lawsuits. Only the person who caused the deprivation can be held liable"); Martin, 780 F.2d at 1338 (affirming a dismissal as to a particular defendant absent specific factual allegations of personal involvement in or direct responsibility for alleged constitutional violations).

The lack of any specific factual allegations against state defendants Dalrymple, Burgum, Levi, and Gerhart does not give them "fair notice" of their alleged personal and

direct involvement in the highway/bridge closures, Twombly, 550 U.S. at 555, or permit them to respond to any specific, factual allegations of their direct and personal involvement.  The amended complaint must therefore be dismissed in its entirety as to all four state defendants.

      **A.**      **Count I (Right to Speak) fails to state a claim for relief.**

Even if the amended complaint adequately alleges specific facts showing each state defendant's direct and personal involvement in the highway/bridge closures, Count I would still fail to state a claim for relief. Count I appears to have two components.  First, the plaintiffs contend they had a right of "access to this public nine-mile stretch of Highway 1806 for purposes of speaking, assembling, or otherwise exercising their First Amendment expressive rights."  Am. Compl. at ¶ 129.  In other words, they claim a constitutional right to use the *highway itself* as a forum for speaking and assembling. See also id. at ¶ 129 ("Part of the closed road included a symbolically crucial and previously active forum for such expression."); ¶ 133 ("Defendants' determination of who could speak, assemble [or] pray . . . *on this* road or its curtilage was impermissibly based on the purported viewpoint of those who wished to speak, assemble [or] pray . . . or of the content of their expressive activities.") (emphasis added).

A second component of Count I appears to be that the highway closure chilled or inhibited plaintiffs' ability to speak and assemble with respect to traveling the highway to their chosen place of protest.  See id. at ¶ 128 ("Plaintiffs were prevented, chilled, or inhibited in engaging in constitutionally protected First Amendment activity when Defendants . . . completely closed an approximately nine-mile portion of Highway 1806 to Plaintiffs' *travel*") (emphasis added); ¶ 130 ( referring to "Defendants' indefinite and absolute restriction of Plaintiffs' *travel* on nine miles of this public right-of-way") (emphasis added).  In other words, they claim a right to access certain locations to exercise First Amendment rights, and the highway closure chilled or inhibited those rights by preventing use of the highway to access those locations.  See id. at ¶ 56.

25

Thus, the plaintiffs appear to challenge the highway/bridge closure both as an unconstitutional time, place, and manner restriction, as well as a prior restraint that chilled the right to speak and assemble at a particular location.

### 1) Count I fails to state a claim for relief under a time, place, and manner analysis.

The plaintiffs cannot state a claim for relief with respect to using the ***highway itself*** as a forum for speaking and assembling because they cannot show they had a constitutional right to use a rural highway (or its curtilage) as a place of speech or assembly.  "To demonstrate a violation of their First Amendment rights, Plaintiffs must first establish that their activities are protected by the First Amendment."  Verlo v. Martinez, 820 F.3d 1113, 1128 (10th Cir. 2016) (citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985)).

> Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.

Cornelius, 473 U.S. at 799–800.  "Instead, the government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." Ball v. City of Lincoln, 870 F.3d 722, 729 (8th Cir. 2017) (internal quotations and citations omitted); see also United States v. Kokinda, 497 U.S. 720, 725 (1990) (noting "the [g]overnment's ownership of property does not automatically open that property to the public").  In fact, "[t]here is little doubt that in some circumstances the Government may ban the entry on to public property that is not a 'public forum' of ***all persons*** except those who have legitimate business on the premises." United States v. Grace, 461 U.S. 171, 178 (1983) (emphasis added).

"The Supreme Court 'has adopted a forum analysis as a means of determining when the [g]overnment's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" Ball, 870

F.2d at 729-30 (quoting Cornelius, 473 U.S. at 800).  Under that analysis, "the extent to which the [g]overnment can control access depends on the nature of the relevant forum." Kokinda, 497 U.S. at 726 (internal quotations and citation omitted).

The alleged forum at issue is a rural highway, intended to permit the public to travel unimpeded at relatively high speeds (65 mph) across North Dakota's rural expanses. North Dakota clearly has the police power, indeed the obligation, to close the highway and bridge when they are deemed unsafe for public use.  See N.D. Cent. Code § 24-01-37 ("In case any bridge on the state highway system is deemed unsafe for public use by [DOT], it forthwith shall take steps to close the same and prevent the use thereof by the public."); N.D. Cent. Code § 39-10-21.1(1) ("The highway patrol or local law enforcement authorities . . . may close a road temporarily due to hazardous conditions for the protection and safety of the public."); see also N.D. Cent. Code § 24-03-05 ("Whenever, during the construction work on any state highway *or at any other time*, it may be necessary to prevent traffic from passing over any portion of such highway, the department may close such portion of the highway to all traffic[.]") (emphasis added).

The highway and bridge were never designed or intended to be places of speech or assembly. Although streets and sidewalks are generally considered "quintessential" examples of traditional public forums, Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983), the same is not true of a rural highway.  In any event, "[t]he dispositive question is not what the forum is *called,* but what *purpose* it serves, either by tradition or specific designation." Boardley v. U.S. Dep't of Interior, 615 F.3d 508, 515 (D.C. Cir. 2010).  Thus, even when a particular location falls within those typically considered "quintessential" traditional public forums, "[t]he protections of the First Amendment do not rise or fall depending on the characterization ascribed to a forum by the government." Id. at 514.  In Boardley, the D.C. Circuit concluded "Mount Rushmore does not become a public forum merely by being called a 'national park' any more than it would be transformed into a nonpublic forum if it were labeled a 'museum.'" Id. at 514-

27

15.  Similarly, a forum's status was not controlled by the fact that it was a sidewalk where the Supreme Court held it was "constructed solely to provide for the passage of individuals engaged in postal business." Kokinda, 497 U.S. at 727.  What makes a street or road a traditional public forum is whether it has "immemorially been held in trust for the use of the public, and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry, 460 U.S. at 45 (citation omitted).

The bridge and highway (and its curtilage) have not been immemorially held in trust for the use of the public as a place of free speech and assembly.  In fact, the state defendants were unable to locate a single case where a plaintiff alleged that a rural highway (or its curtilage) must be considered a traditional public forum, let alone where a court deemed a rural highway to be such a place.

The original complaint failed to allege that Highway 1806 or its curtilage have been immemorially held in trust for the use of the public as places of free speech and assembly, but merely referred to the recent, short-term, temporary speech and assembly associated with the DAPL protest itself.  See Complaint at ¶ 40 ("From April 2016 through October 2016, one of the primary locations of speech, assembly, and prayer . . . was Highway 1806's wide curtilage near where the pipeline was slated to cross the highway").  The amended complaint adds a paragraph that attempts to cure that deficiency, purportedly alleging a "longstanding" and "historical[]" use of Highway 1806 and its curtilage for a "range of expressive activity."  Am. Compl. at ¶ 45.  The plaintiffs give four specific examples attempting to show the immemorial[10] use of Highway 1806 and its curtilage as a place of free speech and assembly:

1) the Bigfoot Ride that crosses South Dakota from Bridger to Pine Ridge;

2) the Dakota 38+2 Ride that travels between the Lower Brule Indian Reservation in

---

[10] Immemorial means "[r]eaching beyond the limits of memory, tradition, or recorded history." The American Heritage Dictionary at 643 (2d College Ed. 1991).

South Dakota to Mankato, Minnesota;

3) a single event alleged to be an indigenous spiritual ride between Cannon Ball and Tioga; and

4) the expressive youth run from Standing Rock to Washington D.C. that took place during the recent DAPL protests.

Id.

Alleged expressive activity that may have occurred hundreds of miles away in different states, on different highways and roads, is wholly irrelevant to determining whether Highway 1806 and the specific curtilage at issue are traditional public forums. These alleged activities that "occur in the broader region" are no more relevant to showing that Highway 1806 itself is a traditional public forum than would be similar indigenous expressive activity at the Washington Mall. Expressive activity along a different rural highway in a different location does not transform all rural highways in every location into traditional public forums.

Similarly, any recent, isolated, expressive activities associated with the DAPL protest itself cannot establish the longstanding use necessary to convert a rural highway intended for travel into a traditional public forum. A protestor's unilateral desire to speak or assemble at a location that is not a traditional public forum cannot be the event that transforms the location into a traditional public forum. Nor does the government's temporary passive tolerance of speech and assembly at a nonpublic forum transform the location into a traditional public forum, or prevent the government from reestablishing the location's intended purpose when the speech or assembly becomes disruptive to that purpose. The "government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Hodge v. Talkin, 799 F.3d 1145, 1162 (D.C. Cir. 2015) (quoting Cornelius, 473 U.S. at 802).

Moreover, all of the deficient examples cited by the plaintiffs still involve *travel* from one place to another, the intended purpose of a rural highway.  Travel from one location to another over a highway intended for travel cannot transform a specific site – "Highway 1806's wide curtilage near where the pipeline was slated to cross the highway"[11] – into a location immemorially held in trust as a fixed place of free speech and assembly.  If that were the case, any travel that happened to include expressive activity, such as praying in your vehicle while driving to work on the Los Angeles freeway or the New Jersey Turnpike, would transform any fixed site on those thoroughfares into traditional public forums despite the obvious disruption of traffic that expressive activity would have on their intended purposes.  "Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will [i.e., travel]."  <u>Grace</u>, 461 U.S. at 177.  Despite the new allegations in the amended complaint, it is clear that Highway 1806 and the specific curtilage at issue have never been locations immemorially held in trust as locations for public discourse, and must be treated as nonpublic forums for First Amendment purposes.

Under a First Amendment forum analysis, the government's ability to restrict speech and assembly is at its highest with respect to nonpublic forums.  <u>See, e.g.</u>, <u>Ball</u>, 870 F.3d at 730 (noting "[t]he government 'may reserve [a nonpublic] forum for its intended purposes . . . as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'") (quoting <u>Perry</u>, 460 U.S. at 46); <u>see also</u> <u>Hodge</u>, 799 F.3d at 1153 (indicating the government "enjoys significantly greater latitude to regulate expressive activity" in a nonpublic forum, "including the ability 'in some circumstances' to 'ban the entry . . . of all persons except those who have legitimate business on the premises'") (quoting <u>Grace</u>, 461 U.S. at 178).  "A restriction on expressive activity in a nonpublic forum 'need only be

---

[11] Am. Compl. at ¶ 44.

*reasonable*; it need not be the most reasonable or the only reasonable limitation' to be constitutionally permissible." Ball, 870 F.3d at 730 (quoting  Kokinda, 497 U.S. at 730).

In this case, public records and documents from previous related court filings demonstrate the highway and bridge closures were reasonably required to keep violent criminals from trespassing on private property, and to protect the public from the violence associated with the DAPL protest.  In the days leading up to the closure, it is undisputed that the protests were not peaceful and were not limited to the highway's curtilage, as plaintiffs suggest, but that violent criminals trespassed on private property and committed criminal acts.  As this Court noted in a previous, related case:

> With respect to the assertion the movement has been a peaceful protest, one need only turn on a television set or read any newspaper in North Dakota. There the viewer will find countless videos and photographs of the "peaceful" protestors attaching themselves to construction equipment operated by Dakota Access; vandalizing and defacing construction equipment; trespassing on privately-owned property; obstructing work on the pipeline; and verbally taunting, harassing, and showing disrespect to members of the law enforcement community. The State of North Dakota has estimated the cost for law enforcement services to date at $2 million dollars. The estimated damage to construction equipment and loss of work on the project is far in excess of several million dollars. The Morton County Sheriff reported that 22 protestors were arrested on September 13, 2016, just a few days ago. To suggest that all of the protest activities to date have been "peaceful" and law-abiding defies common sense and reality. Nearly every day the citizens of North Dakota are inundated with images of "peaceful" protestors engaging in mindless and senseless criminal mayhem.
>
> The Court fully recognizes the unlawful and violent protestors arrested to date constitute a very small percentage of the entire entourage. The Court also recognizes that many of the troublesome "peaceful protestors" are from out-of-state who have political interests in the pipeline protest and hidden agendas vastly different and far removed from the legitimate interests of Native Americans of the Standing Rock Sioux Tribe who are actually impacted by the pipeline project. But for anyone to suggest the protests have been entirely peaceful and prayerful is less than forthright and ludicrous at best.

Dakota Access, 2016 WL 5107005 at * 2.

Public officials acted reasonably to protect private property and ensure public safety by closing the highway to all protestors, because of the violent criminals who had infiltrated the protest and turned it from a peaceful protest into a criminal riot.

As this Court noted in another previous, related case:

> The Plaintiffs have essentially asked the Court to find that their interests to protest (and trespass) upon the Backwater Bridge and Highway 1806, near Cannonball, North Dakota, outweigh the public interest in preserving and protecting the peace and rule of law. Based upon a careful consideration of all the evidence presented by the parties to date, the Court finds that the public interest strongly weighs against the issuance of a preliminary injunction. As previously noted, the rights of free speech and assembly do not mean, and have never meant, that everyone who chooses to protest against the Dakota Access pipeline may do so at any time, any place, and under any set of conditions they choose in total disregard of the law. To allow that to occur would result in anarchy and an end to the rule of law in civilized society.

Dundon, 2017 WL 5894552 at * 20.

The plaintiffs claim the highway/bridge closures were improper content-based restrictions because DAPL workers and others were permitted to use the closed highway while protestors were not.  See Am. Compl. at ¶¶ 76-77.[12] This evidence does not show the closure was content based.  The DAPL workers and others were permitted to use the highway for its dedicated purpose, which was travel -- not assembly or speech -- because those workers or others residing in the area had "legitimate business on the premises" to which they were given access.  The government has "the power to preserve the property under its control for the use to which it is lawfully dedicated." Ball, 870 F.3d at 729 (internal quotations and citations omitted).  Here, that dedicated purpose was travel.  The highway closure was aimed at disruptive conduct, not the content or message of speech. Because Highway 1806 is not a public forum, the state "had no 'constitutional obligation per se to let any organization use the [forum]'" for speech and assembly.  Perry, 460 U.S. at 49 (quoting Connecticut St. Fed'n of Teachers v. Bd. of Educ. Members, 538 F.2d 471, 481 (2d Cir. 1976)).

> Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of *subject matter and speaker identity*. These distinctions may be impermissible in a public forum but *are inherent and*

---

[12] The amended complaint also adds a conclusory allegation that DAPL workers and others were permitted to use the highway for expressive purposes, while the protestors were not.  See Amended Complaint at ¶ 76.  This conclusory allegation about others using the highway for expressive purposes is not supported with any facts.

> ***inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property***. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.

Id. at 49 (emphasis added).

Stated another way, "[i]t is thus unnecessary for us to examine [the highway and bridge closures] in the context of a 'time, place, and manner' restriction on the use of traditional 'public forums[.]'" United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 132 (1981). Decisions made by public officials attempting to prevent criminal trespass and other activity disruptive to traffic and public safety did not have to be narrowly tailored to accommodate the protestors' speech or assembly in an area unintended for protest or speech. The decisions made by public officials to prevent trespass and protect public safety under the unique circumstances involved in this case did not have to be perfect, only reasonable, that is, they did not have to perform the impossible task of determining which protestors were going to use the highway for legitimate and lawful reasons and which were going to continue to use the road for the demonstrated illegitimate and unlawful reasons that required the closures.

In fact, public officials did not have a constitutional obligation to protect the right to speak or assemble for anyone in an area intended for travel. The government could rightfully exercise their power to "ban the entry on to public property that is not a 'public forum' of ***all persons*** except those who have legitimate business on the premises." Grace, 461 U.S. at 178 (emphasis added). Here, a certain faction of the protest consisted of violent criminals that engaged in criminal behavior, disrupted legitimate business being conducted on private property, and endangered public safety. Under these circumstances, public officials were permitted to ban all protest activity (and thus all protestors) in order to advance the legitimate goals of preventing trespass and protecting public safety. This type of broader categorical approach is justified in analyzing nonpublic forums. See generally Greenburgh, 453 U.S. at 132-33.

In United States v. Griefen, the Ninth Circuit held a temporary road closure on public property (a national forest) was a reasonable time, place, and manner restriction where the purpose of the closure was "for public health and safety and to protect property." 200 F.3d 1256, 1258 (9th Cir. 2000). There, like here, some protestors had committed criminal acts that prompted the government's need to act in the interest of public safety by closing the road. In a protest against road building and logging in the Nez Perce Forest, a certain criminal faction of the protestors unlawfully placed obstructive trenches near the end of an existing logging road in an attempt to stop new road construction intended to facilitate additional logging. Id. The criminal faction also "removed and plugged culverts, . . . [dug] a pit in the road containing large amounts of human waste . . . [and placed] barriers on the roadbed consisting of piles of slash logs, debris, and large pole and log structures." Id. In response to this criminal activity, the Forest Service entered a closure order that specified "on its face . . . that its purposes were for public health and safety and to protect property." Id. The closure order barred all protestors from the area, but permitted entry to those who had a legitimate right of access, including the contractors performing the construction work. Id.

With respect to the restriction's content neutrality, the Court said:

a restriction on expressive activity is content-neutral if it is justified, i.e., based on a non-pretextual reason divorced from the content of the message attempted to be conveyed. We find this to be the case here. The restriction was for the specific purposes of honoring contractual obligations and permitting the safe construction of the road, not to silence the protestors. It excluded all members of the general public, not just the protestors. Moreover, the protestors had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project, both to other persons as well as to themselves.

Id. at 1260. Similarly, here the highway/bridge closures were based on a non-pretextual reason divorced from the content of the message, for the specific purposes of protecting private property from trespassers and to protect public health and safety. The closures were required to permit safe construction of the DAPL pipeline on private property, under circumstances where some protestors had already shown through destructive conduct

that they presented a clear and present danger to the traveling public as well as to the safe completion of the DAPL project.  In fact, the level of violence and criminal activity that prompted the closures here far exceeded the unlawful behavior that prompted the road closure in <u>Griefen</u>, and included attempts to kill law enforcement personnel.

In addition, <u>Griefen</u> applied the higher level of scrutiny reserved for traditional public forums – requiring a narrowly-tailored restriction that serves a significant government interest -- and still found the road closure satisfied that standard:

> Second, as just explained, the closure order was issued to advance significant government interests [i.e., public health and safety, and protection of property]. It was also narrowly tailored. The closure order was limited to the immediate construction area, and 150 feet on each side of the zone-which we conclude was imminently reasonable. The protestors were not ejected from the forest or even from the vicinity of the construction site, only from 150 feet to each side of the center of the work zone. Moreover, the restriction was not imposed until work was ready to begin, and it lasted for only 45 days, or until the project was completed.

<u>Id.</u> at 1260–61.  Here, the highway/bridge closures involved a nonpublic forum, thus the state defendants need only show the closures were *reasonable*, and need not even show the closures were the most reasonable, or the only reasonable limitations, to be constitutionally permissible.  <u>See</u> <u>Ball</u>, 870 F.3d at 730 (citing <u>Kokinda</u>, 497 U.S. at 730). The state defendants easily satisfy that standard, as the same state interests determined to be significant in <u>Griefen</u> – public safety and protection of property – support the reasonable limitation imposed here.  <u>See also</u> <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 507-08 (1981) (recognizing that traffic safety is a substantial governmental goal).

### 2) Count I fails to state a claim for relief under a prior restraint analysis.

For First Amendment purposes, "a prior restraint is government action forbidding communication before the communication is to occur." <u>Nat'l Fed'n of the Blind of Arkansas, Inc. v. Pryor</u>, 258 F.3d 851, 856 (8th Cir. 2001) (citing <u>Alexander v. United States</u>, 509 U.S. 544, 550 (1993)).  A plaintiff may claim a First Amendment violation

when a government act prevented, or chilled, her from exercising her right to speak before the speech could even take place.  See, e.g., Cross v. Mokwa, 547 F.3d 890, 896 (8th Cir. 2008) ("Plaintiffs claim, in general terms, that their protected right to protest was chilled by defendants' pre-protest prior restraint.").  To the extent that the complaint suggests the plaintiffs had a right to protest at a particular location north of the bridge, and that the highway/bridge closure prevented or chilled that First Amendment activity before it could take place, see Amended Complaint at ¶ 128, Count I also fails to state a claim for relief and must be dismissed.

In Cross v. Mokwa, protests against the World Agricultural Forum (WAF) in other cities "had attracted violent protests instigated by small anarchist groups that infiltrated peaceful protestors" prior to the WAF conference scheduled in St. Louis.  547 F.3d at 892-93.  The St. Louis Police Department had also learned that "tactics violent protestors used in the past [included] stay[ing] illegally in unoccupied or condemned buildings."  Id. at 893.  As a result, St. Louis adopted a "Building Code Violation Enforcement Plan" in advance of the St. Louis WAF conference "to identify vacant and condemned buildings and to prevent their unlawful occupation."  Id.  When five individuals were found to be occupying a condemned building in advance of the WAF conference and arrested, they challenged their arrests in part on the grounds that police officers "violated their First Amendment right to protest because the Building Code Violation Enforcement Plan was devised and executed as a prior restraint on protester activities."  Id. at 896.

In rejecting the plaintiffs' prior restraint claim, the Eighth Circuit made critical distinctions between peaceful protests protected by the First Amendment, and violent protests that are not.

It is undisputed that protesting peaceably is protected speech. Violent protest is not. See, e.g., NAACP v. Claiborne Hardware Co., 458 U.S. 886, 933, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("violent conduct is beyond the pale of constitutional protection"). Plaintiffs were not engaged in protected protest activity on the morning of May 16, 2003. They were unlawfully occupying a condemned building in which they had improperly stored personal property, some of which could have been used in the future

36

to engage in unprotected violent actions. Plaintiffs claim, in general terms, that their protected right to protest was chilled by defendants' pre-protest prior restraint. But plaintiffs carefully avoid the question whether the police actions in question were aimed at deterring, and in fact chilled, only unprotected violent protest activity. This distinction, ignored by the district court, is obviously critical.

Id. at 896.

Those distinctions apply with equal force here.  Here, as in Cross, violent protestors infiltrated otherwise lawful protests.  Here, as in Cross, the protest activity that prompted the government's act (closure of the highway and bridge) was not protected protest activity, but unlawful violent conduct.  Here, as in Cross, the government's conducted was aimed at preventing violent protestors from engaging in future unprotected violent conduct.  Here, similar to Cross, the plaintiffs' selective complaint "carefully avoid[s] the question whether the [government] actions in question were aimed at deterring, and in fact chilled, only unprotected violent protest activity."  Id.  The Constitution did not require public officials to perform the impossible task of determining which protestors might engage in future unlawful conduct and close the highway only to them.  See Ball, 870 F.3d at 730 (indicating a government act with respect to a nonpublic forum need only be *reasonable* to be constitutionally permissible).

Likewise, in Brewer v. Hoxie School District No. 46 of Lawrence County, Arkansas, 238 F.2d 91 (8th Cir. 1956), the Eighth Circuit addressed whether a district court's preliminary injunction was government action aimed at preventing lawful First Amendment activity before it could occur.  Certain citizens intended to protest the recent desegregation of a local high school, but a federal district court enjoined the protest after finding, among other things, that one protestor told school officials "he would not be responsible if some of his clients and associates or those acting in concert with them should throw a rock through a car windshield and put out the eye of a [school official]" and further told school officials "that if they did not rescind their action and restore segregation and notify him of such action by Saturday of the week in question, he would

37

'see to it' that a picket line composed of from 300 to 800 persons would be thrown around the school grounds on the following Monday morning." Hoxie Sch. Dist. No. 46 of Lawrence Cty., Ark. v. Brewer, 137 F. Supp. 364, 371–72 (E.D. Ark. 1956). The district court enjoined the protest to prevent interference with the operation of the schools, stating:

> Some intemperance of speech and act may be tolerated, and the right of peaceful assembly and petition for redress should be respected and protected. In this case, however, the several assemblies or mass meetings were by inflammatory speeches dissolved into a spirit of revolt against the law and acts were committed and words spoken that destroyed or thwarted one of the main objects of government, which is to insure domestic tranquility.

Id. at 368.

On appeal, the defendants argued "that the injunction granted is violative of the First Amendment of the Constitution in that it abridges freedom of speech and denies the right peaceably to assemble and petition." Brewer, 238 F.2d at 94. The Eighth Circuit rejected this claim out of hand, stating:

> The terms of the injunction . . . did not go beyond preventing a continuation of the acts defendants were engaging in and the kind of speech in which they indulged as fully set forth in the findings of the court appearing in 137 F.Supp. 364, 368 to 374. Those acts and that type of speech were calculated and intended, at the times and under the circumstances in which they were made, to incite disobedience of the law and the overthrow of law and order and to coerce, intimidate, and compel the school board to cease and desist from the performance of its sworn and lawful duty, and to engage in unlawful conduct. ***They present no legitimate issue of free speech or assembly.***

Id. at 102 (emphasis added).

Similarly, here, public officials closed the highway and bridge to prevent a continuation of previous unlawful acts including trespass on private property, attempts to kill law enforcement officers, setting vehicles on fire, unlawfully blocking a roadway, and much other unlawful conduct as shown in numerous public records and this Court's previous decisions in related cases. As in Brewer, the claim that these government acts violated the First Amendment should be rejected out of hand because the plaintiffs

"present no legitimate issue of free speech or assembly" under these circumstances.

Finally, in <u>Griefen</u>, after concluding the road closure was a permissible time, place, and manner restriction, the Ninth Circuit also addressed the claim that the closure order "violated the First Amendment by operating as a prior restraint on free speech," 200 F.3d at 1259, on the grounds that Forest Service officials had too much discretion to issue a closure order. <u>Id.</u> at 1262. To support their prior restraint claim, the protestors "rel[ied] on cases involving the authorization and issuance of permits by government entities" and argued "as a prior restraint, the permit process 'intimidates[s] parties into censoring their own speech, even if the discretion and power are never actually abused.'" <u>Id.</u> (quoting <u>City of Lakewood v. Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 757 (1988)).

The Ninth Circuit rejected the claim that the road closure was a prior restraint, stating "[i]f a closure of a public forum is for a valid rather than a disguised impermissible purpose, the potential for self-imposed or government censorship discussed in <u>City of Lakewood</u> does not exist." <u>Id.</u>

> We have no doubt that a government entity may close areas of public forests under construction and repair, as it could temporarily close for good reasons a forest during a forest fire, a washed-out road or bridge, a crime scene during an official investigation, a street engulfed in a riot or an unlawful assembly, a terrorist-bombed public square, or the plaza surrounding the Washington Monument while the Monument is undergoing refurbishing. We also have no doubt that areas of a national forest may be closed to the public for reasons pertaining to the normal management requirements of a national forest as well as to honor contracts, the execution of which is temporarily incompatible with expressive behavior. The appellants' arguments amount to a claim that they be allowed to continue their activities during construction in the construction area. To articulate their proposition in this way is to reveal its lack of reason.

<u>Id.</u> at 1263.

Similarly, here, public officials had valid reasons for closing the highway and bridge. Because of the violent activity that took place upon it, the bridge was not only damaged and required repairs but was itself a crime scene, and the highway was a road engulfed in a riot and unlawful assembly. The highway/bridge closures became a necessary means of protecting public safety and preventing trespass of private property,

purposes "the execution of which [was] temporarily incompatible with expressive behavior." Id.  Under these circumstances, the plaintiffs' "arguments amount to a claim that they be allowed to continue their [unlawful] activities during [DAPL] construction . . . To articulate their proposition in this way is to reveal its lack of reason." Id.

**B.    Count II (Right to Free Exercise) fails to state a claim for relief.**

Count II alleges the highway closure violated the First Amendment's Free Exercise Clause by preventing the plaintiffs from praying at, worshiping by, or visiting identified sacred sites located alongside the closed section of Highway 1806.  Am. Compl. at ¶ 137. Even if the amended complaint had alleged specific facts showing some direct and personal involvement of the four state defendants in the highway/bridge closures, Count II would still fail to state a claim for relief because undisputed facts show there were legitimate, objective reasons for the highway/bridge closures completely unrelated to any animus towards the plaintiffs' religious practices.

A government action, unmotivated by religious animus, does not violate the Free Exercise Clause even though it has the incidental effect of burdening religion.  See Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 878-79 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."); Reynolds v. United States, 98 U.S. 145, 166-67 (1878) ("Can a man excuse his practices to the contrary [of the law] because of his religious belief?  To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.").

Plaintiffs contend they should be excused from complying with the highway and bridge closure so they can pray at a particular location.  But the highway and bridge were closed for legitimate reasons -- the bridge was a crime scene, the bridge was damaged and required repair, criminals were using the highway to trespass on private property and commit criminal acts, and it was unsafe for the public to continue to use the highway and

bridge.  The highway was not closed to prevent plaintiffs from exercising their religion, but rather, the plaintiffs' inability to pray at a particular location was merely an incidental effect of a need to close the highway for legitimate, religious-neutral reasons.

To state a viable claim under the factual circumstances of this case, plaintiffs must show the Free Exercise Clause prevents the government from closing a crime scene, or that a damaged bridge cannot be closed for repairs, or that the government cannot act in the public's safety by attempting to quell a riot, if those legitimate actions may incidentally affect someone's religious practices.  But that has never been the law.  The Free Exercise Clause does not trump all state conduct.  The act of entering a crime scene does not become constitutionally required simply because an individual claims her exclusion from it interferes with her religious practices, any more than the Constitution would require the government to give a person unlimited access to the Oval Office in the White House simply because he declared that to be his chosen place of worship. Cf. Smith, 494 U.S. at 882 ("Respondents urge us to hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation.  We have never held that, and decline to do so now.").

In Lyng v. Northwest Indian Cemetery Protective Ass'n, certain Native American groups challenged, as a violation of the Free Exercise Clause, the construction of a timber road through an area "that has traditionally been used for religious purposes by members of three American Indian tribes."  485 U.S. 439, 441-42 (1988).  The Supreme Court held that building the road did not violate the Free Exercise Clause even though it was "undisputed . . . that the Government's proposed actions will have severe adverse effects on the practice of [Native Americans'] religion."  Id. at 447.

> "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. . . . The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it

> does not afford an individual a right to dictate the conduct of the Government's internal procedures."
>
> The building of a road or the harvesting of timber on publicly owned land cannot meaningfully be distinguished from the use of a Social Security number in Roy. In both cases, the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs. In neither case, however, would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens.

Id. at 448–49 (quoting Bowen v. Roy, 476 U.S. 693, 699-700 (1986)).  The act of *closing* the highway here does not violate the Free Exercise Clause for the same reasons that the act of *building* the road in Lyng did not.  The closure is alleged to have interfered significantly with the plaintiffs' ability to pursue spiritual fulfillment by visiting a certain location, but did not coerce the plaintiffs into violating their religious beliefs.  The government must remain free to close bridges for repairs, to close crime scenes, and to act in the interests of public safety even if those legitimate acts may adversely affect – indeed, even have severe adverse effects – on an individual's practice of their religion.

### C.     Count III (Right to Travel) fails to state a claim for relief.

Count III alleges that a temporary intrastate closure of a single local highway for a nine-mile stretch substantially burdened the plaintiffs' fundamental constitutional right to travel.  See Am. Compl. at ¶ 146.  Although all four named plaintiffs admit to being residents of North Dakota during the time in question, id. at ¶¶ 14-17, 86-91[13] they nonetheless further allege this intrastate closure of a single local highway substantially burdened travel between North Dakota and South Dakota, and incorporate a reference to the Privileges and Immunities Clause.  See id. at ¶ 147 & Count III Caption.  The amended complaint adds allegations that plaintiff John Floberg "suffered significant and tangible emotional distress" in part because the highway closure allegedly made it

---

[13] The original complaint was brought by three plaintiffs.  The amended complaint added a fourth plaintiff, José Zhagñay.

"materially more difficult" for out-of-state clergy to attend a gathering he organized.  Id. at ¶ 90.  The new plaintiff, José Zhagñay, also allegedly suffered "significant and tangible emotional distress" as a result of the alleged burdens on travel caused by the highway closure.  Id. at 91-92.  Even if the amended complaint had alleged specific facts showing some direct and personal involvement of the four state defendants in the highway or bridge closure, Count III of the amended complaint would still fail to state a claim for relief as to them.

A temporary intrastate closure of a local highway does not substantially burden the fundamental constitutional right to travel.  The purpose of the constitutional right to travel is "to protect[] interstate travelers against two sets of burdens: 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers."  Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 277 (1993) (quoting Zobel v. Williams, 457 U.S. 55, 60 n.6 (1982)).  The individual plaintiffs' allegations are strictly limited to alleged burdens on *intrastate* travel between locations in North Dakota. See Am. Compl. at ¶ 86 (alleging plaintiff Cissy Thunderhawk was burdened by commuting intrastate between Bismarck/Mandan, North Dakota, and Fort Yates, North Dakota); ¶¶ 87-88 (alleging plaintiff Wašté Win Young was burdened by traveling intrastate between the Fort Yates area and Bismarck); ¶ 89 (alleging plaintiff Jon Floberg was burdened by traveling intrastate between Bismarck and Cannon Ball, North Dakota); ¶ 91 (alleging plaintiff José Zhagñay was burdened by traveling intrastate between Bismarck and the protest camps located in North Dakota).  The individual and personal injuries they allege do not establish any barriers to interstate movement, or that interstate travelers are being treated differently than intrastate travelers.  Nor can the alleged emotional distress suffered by a North Dakota resident substitute for a claim brought by a non-resident who has suffered a concrete and particularized injury.

Although some circuits have recognized the constitutional right to travel encompasses both interstate and intrastate travel, see, e.g., Selevan v. New York

Thruway Auth., 584 F.3d 82, 100 (2d Cir. 2009), the Supreme Court itself has never recognized a protection for purely intrastate travel, particularly where a claim does not implicate barriers to interstate movement or the different treatment of interstate and intrastate travelers.[14]  Nor has the Eighth Circuit recognized such a right.

What is universally recognized by the courts, however, is that the constitutional right to travel is not implicated by *minor* restrictions.  See Selevan, 584 F.3d at 101 ("Our observation that minor restrictions on travel simply do not amount to the denial of a fundamental right is consistent with the Supreme Court's jurisprudence") (internal quotation marks and citation omitted); Miller v. Reed, 176 F.3d 1202, 1205 (9th Cir. 1999) ("[M]inor burdens impacting interstate travel, such as toll roads, do not constitute a violation [of the right to travel]"); State of Kansas v. United States, 16 F.3d 436, 442 (D.C. Cir. 1994) ("[A]s Justice O'Connor observed in her dissenting opinion in Soto-Lopez, the plurality 'implicitly recognize[d] ... [that] something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied.'" (quoting Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 921 (1986) (O'Connor, J., dissenting)); Pollack v. Duff, 793 F.3d 34, 46 (D.C. Cir. 2015) ("[M]inor restrictions on travel simply do not amount to the denial of a fundamental right") (internal quotation marks and citation omitted); Town of Southold v. Town of E. Hampton, 477 F.3d 38, 54 (2d Cir. 2007) (same); Cramer v. Skinner, 931 F.2d 1020, 1031 (5th Cir. 1991) ("[T]ravelers do not have a

---

[14]  In Saenz v. Roe, the Supreme Court stated the constitutional right to travel encompasses three components: "the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." 526 U.S. 489, 500 (1999). Notably absent from that list, for purposes here, is any suggestion that the constitutional right to travel includes the right to be free from purely intrastate burdens on travel.  The highway was not closed for the purpose of treating North Dakota citizens different from citizens of other states (or those travelers who may elect to become permanent residents) but for the purpose of preventing criminal activity and protecting public safety.  Indeed, some state residents supported and participated in the protest. They, like nonresidents (or allegedly new state residents) were not permitted to use the highway as a place of protest after the protests became unlawful and disruptive.

constitutional right to the most convenient form of travel.  . . . Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification.") (citing City of Houston v. F.A.A., 679 F.2d 1184, 1198 (5th Cir. 1982)); Mountain States Legal Found. v. Espy, 833 F. Supp. 808, 816 (D. Idaho 1993) ("[T]he court is not persuaded by the plaintiffs' claim that because they cannot use the most convenient means of access to their homes at all times and without restriction, they are being denied their fundamental constitutional right to travel.").

In addition, multiple alternate routes existed between Bismarck/Mandan and Fort Yates, as well as between Bismarck/Mandan and Cannon Ball.

For example, Highway 1806 and Highway 6 run parallel to one another for substantial portions of the distance between Bismarck/Mandan and Fort Yates, as well as the distance between Bismarck/Mandan and Cannon Ball.  The route between Mandan and Fort Yates using Highway 1806 is 63.5 miles, while the route between the Mandan and Fort Yates using Highway 6 is 68.7 miles, a difference of just 5.2 miles.  See Google Maps, available at https://www.google.com/maps/dir/Fort+Yates,+North+Dakota+58538 /Mandan,+ND+58554/@46.4569634,101.0482455,10z/data=!3m1!4b1!4m13!4m12!1m5 !1m1!1s0x52d65cb05cc832cb:0x716a57ba7a89180!2m2!1d100.6301271!2d46.086940 8!1m5!1m1!1s0x52d785bdd22238e5:0xb814d0547f6979c0!2m2!1d-100.8895761!2d46 .8266603?hl=en  (last visited February 12, 2019).

Similarly, the route between Bismarck and Cannon Ball using Highway 1806 is 45.4 miles, while the route between the two locations using Highway 6 is 56.5 miles, a difference of just 11.1 miles. See id. at https://www.google.com/maps/dir/Bismarck, +North+Dakota/Cannon+Ball,+North+Dakota/@46.5961124,01.0419594,10z/data=!3m1 !4b1!4m13!4m12!1m5!1m1!1s0x52d7831257d8e963:0xccaabd12f9bbca93!2m2!1d100. 7837392!2d46.8083268!1m5!1m1!1s0x52d6535654daee41:0x29fdaeaaafc6a871!2m2!1

d-100.5940114!2d46.3894387?hl=en (last visited February 12, 2019).[15]

Although Count III alleges in conclusory fashion that the burdens suffered by the plaintiffs were "substantial," the factual allegations contained within the complaint establish, as a matter of law, that any restrictions on travel resulting from the temporary highway closure were minor, and clearly did not rise to the level of violating a fundamental constitutional right.  To hold otherwise would result in countless claims that temporary highway closures and their attendant detours implicate fundamental constitutional rights.

To the extent that Count III refers to the Privileges and Immunities Clause, it also fails to state a claim for relief as to the four state defendants.  The Privileges and Immunities Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." Toomer v. Witsell, 334 U.S. 385, 395 (1948).  None of the allegations in the amended complaint establish the highway closure deprived citizens of one state from enjoying privileges held by another state's citizens, including South Dakota citizens.  Moreover, even if the highway closure somehow implicated the Privileges and Immunities Clause, none of the four named plaintiffs are citizens of South Dakota and thus lack standing to bring suit to remedy an alleged injury allegedly suffered by a non-party.  See, e.g., Gill v. Whitford,  138 S.Ct. 1916, 1933  (2018) (indicating courts have a "constitutionally proscribed role . . . to vindicate [only] the individual rights of the people appearing before it").

### D.     Count IV (Restriction on Commerce) fails to state a claim for relief.

Count IV alleges that a temporary intrastate closure of a single local highway for a

---

[15] Although it may not be appropriate to judicially notice Google maps for some purposes, such as estimating drive times, see Jackson v. Allstate Ins. Co., 785 F.3d 1193, 1204 (8th Cir. 2015), for purposes of actual distance calculations, courts have recognized online distance calculators as sources whose accuracy cannot reasonably be questioned under Rule 201 of the Federal Rules of Evidence.  See Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007); Minnihan v. Mediacom Commc'ns Corp., 987 F. Supp. 2d 918, 936 n.6 (S.D. Iowa 2013), aff'd, 779 F.3d 803 (8th Cir. 2015); Glob. Control Sys., Inc. v. Luebbert, No. 4:14-CV-657-DGK, 2015 WL 753124, at *1 (W.D. Mo. Feb. 23, 2015).

nine-mile stretch imposed a substantial burden on interstate commerce in violation of the Commerce Clause.   More specifically, the plaintiffs allege the "intent and effect of [this] sanction [i.e., the highway closure] was to substantially burden travel and therefore commerce to/from the Standing Rock Reservation."  Am. Compl. at ¶ 158.  The plaintiffs further allege the highway closure impacted the Standing Rock Sioux Tribe's decisions regarding the DAPL protests "in part due to the significant economic losses experienced by businesses on the Reservation, including the Tribe's casino and Plaintiff Cissy Thunderhawk's restaurant, as a direct result of this closure."  Id. at ¶ 159.  And, like the deficient travel claim made in Count III, the plaintiffs claim the highway closure imposed a substantial burden on commerce between North Dakota and South Dakota (and other states) despite the fact that all four named plaintiffs admit to being residents of North Dakota during the time in question. Id. at ¶¶ 14-17, 158-160.  Even if the amended complaint had alleged specific facts showing some direct and personal involvement of the four state defendants in the highway/bridge closure, Count IV would still fail to state a claim for relief because a temporary intrastate closure of a local highway, through the State exercising its police powers, simply does not implicate the Commerce Clause.

Although the Commerce Clause on its face grants an affirmative power to Congress to regulate commerce among the states, it has long been recognized as additionally containing "negative implications that restrict states' power to regulate interstate commerce" under jurisprudence referred to as the "dormant Commerce Clause." Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty., 115 F.3d. 1372, 1383 (8th Cir. 1997).  As a general matter, "[w]hen the regulation of matters of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has been generally held to be within state authority." S. Pac. Co. v. State of Ariz. ex rel. Sullivan, 325 U.S. 761, 767 (1945).   Unless a state action "impede[s] substantially the free flow of commerce from state to state," id., the dormant

Commerce Clause is not implicated because there has been "left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce, provided it does not materially restrict the free flow of commerce across state lines[.]" Id. at 770.

Courts engage in a two-step inquiry to determine whether a particular state action violates the dormant Commerce Clause. Under the first step, a court must determine whether the state action has *discriminated* against interstate commerce, which means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Or. Waste Sys. Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994). Under this first step, a particular state action can allegedly be discriminatory against out-of-state interests in its purpose or its effect. SDDS, Inc. v. South Dakota, 47 F.3d 263, 267 (8th Cir. 1995).[16] Under the second step, courts "apply the appropriate level of scrutiny" depending on whether out-of-state discrimination has been identified under the first step. Id. at 268. If the state action is found to be discriminatory in purpose or effect, "it is subjected to the 'strictest scrutiny.'" Id. (quoting Oregon Waste, 511 U.S. at 101). But if state action is determined to be nondiscriminatory, courts engage in a balancing test to determine whether the incidental burden imposed on interstate commerce "is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). State action that does not directly discriminate against interstate commerce violates the dormant Commerce Clause only if "the burden it places on interstate commerce outweighs the local interests promoted by the law." Pioneer Military Lending, Inc. v. Manning, 2 F.3d 280, 283 (8th Cir. 1993) (citing Pike, 397 U.S. at 142).

---

[16] Discrimination can take a third form with respect to state action undertaken pursuant to statutory measures, which can be discriminatory on their face. See SDDS, 47 F.3d at 267. The state discrimination against out-of-state interests alleged to have been taken here was pursuant to a particular act, i.e., the closure of the highway, not pursuant to a state statute, and thus this third form of discrimination is not implicated here.

The plaintiffs claim the highway closure was discriminatory in purpose and effect by alleging it was intended to burden commerce to and from the Standing Rock Reservation, as demonstrated by the alleged impact the closure had on a tribal casino and a private business located in North Dakota. These allegations, however, cannot form the basis of a dormant Commerce Clause violation because, as a threshold matter, none of the four plaintiffs are out-of-state enterprises alleged to have been disadvantaged by a state action (the highway closure) that benefited an in-state competitor. In-state and out-of-state competitors in the same market must be identified as a threshold matter before a viable dormant Commerce Clause claim has been alleged. See Gen. Motors Corp. v. Tracy, 519 U.S. 278, 298 (1997) ("[A]ny notion of discrimination assumes a comparison of substantially similar [in-state and out-of-state] entities"); see also Freedom Holdings Inc. v. Spitzer, 357 F.3d 205, 219 (2d Cir. 2004) (applying Oregon Waste and holding that "[t]o be prohibited, a [state action] still must favor an in-state commercial interest over a corresponding out-of-state commercial interest"); Town of Southhold v. Town of E. Hampton, 477 F.3d 38, 49 (2d Cir. 2007) (applying Tracy and holding that without an apples-to-apples comparison between "local business vis-à-vis out-of-state competitors" there is no constitutional violation because "laws that draw distinctions between entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce Clause"); Mason & Dixon Lines, Inc. v. Steudle, 761 F. Supp. 2d 611, 626–27 (E.D. Mich. 2011), aff'd, 683 F.3d 289 (6th Cir. 2012) (rejecting the claim that a bridge closure violated the dormant Commerce Clause where there was "no allegation that the defendants' actions discriminate in favor of a *private* [in-state] enterprise" and where the bridge closure "affect[ed] all motorists the same, regardless of state citizenship, and there is no allegation of economic protectionism to support a dormant Commerce Clause challenge").[17]

---

[17] Tracy instructs that a challenge to state action under the dormant Commerce Clause must include a preliminary showing that the challenged state action impacts competition

Nor do the allegations of an alleged burden on commerce to and from the Standing Rock Tribal Reservation set forth a viable dormant Commerce Clause claim.  First of all, neither the Standing Rock Sioux Tribe nor the tribal casino are parties to this lawsuit, and none of the four individually-named plaintiffs have standing to pursue an injury that allegedly affects those entities. See, e.g., Gill v. Whitford, 138 S.Ct. at 1933.

Secondly, the dormant Commerce Clause only pertains to commerce between the states; there is no corresponding dormant limitation on state action as it pertains to commerce between a state and a tribe, or to and from a tribal reservation:

> It is also well established that the Interstate Commerce and Indian Commerce Clauses have very different applications. In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs. The extensive [dormant Commerce Clause] case law that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause. . . . . [Thus], the fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce "among" States with mutually exclusive territorial jurisdiction to trade "with" Indian tribes.

Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989) (internal citations omitted); see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105, 117 n.9 (2d Cir. 2014) ("Although the Interstate Commerce Clause contains a 'dormant' protection that prohibits states from discriminating against interstate commerce, courts have never inferred that the Indian Commerce Clause contains a

---

within a particular common market. 519 U.S. at 298 n.12, 300; see also Alliance of Auto. Mfrs., Inc. v. Currey, 984 F. Supp. 2d 32, 57-58 (D. Conn. 2013), aff'd, 610 F. App'x 10 (2d Cir. 2015), cert denied,136 S.Ct. 1374 (2016) (holding a "[c]omplaint fails to plausibly state a claim of clear discrimination or, in the alternative, of undue burden on interstate commerce under Pike balancing" because the statute at issue regulated entities who are not competitors in the same market). The one exception to this threshold requirement is where a state action "undermine[s] a compelling need for national uniformity in regulation." Tracy, 519 U.S. at 298 n.12.  The limited exception is inapplicable here.  A temporary intrastate highway closure does not implicate any compelling need for national uniformity in regulation.

similar unspoken shield."); <u>Ward v. New York</u>, 291 F. Supp. 2d 188, 199 (W.D.N.Y. 2003) (applying <u>Cotton Petroleum</u> to conclude that "[a]lthough another provision of the Constitution, the Interstate Commerce Clause, has a dormant or negative aspect, the Indian Commerce Clause does not").  Thus, the fact that the plaintiffs added an allegation that the Standing Rock Reservation straddles the North Dakota/South Dakota border does not cure the deficiencies of the original complaint.

The only allegations of economic harm in the amended complaint are to in-state interests, that is, a tribal casino located within North Dakota, as well as a business owned by one of the four individually-named plaintiffs that is also located within North Dakota. Those allegations fail to describe how any alleged impact on interstate commerce has a quantitative or qualitative discriminatory impact on interstate versus intrastate commerce. If there is no difference, there is no unconstitutional burden on commerce.  Any alleged impact on commerce due to the highway closure occurred within North Dakota, not within the interstate market.  Neither the tribe itself nor the casino are plaintiffs, and none of the four named plaintiffs are out-of-state enterprises allegedly disadvantaged by a highway closure that favored in-state entities. The allegations of harm in this case, to these four named plaintiffs, simply do not support a viable Commerce Clause violation because they do not establish that the highway closure favored in-state interests over out-of-state interests.

The amended complaint also adds allegations claiming the purpose of the highway closure was "to extort political concessions from the Standing Rock Sioux Tribe," Amended Complaint at ¶ 79, by disrupting the flow of commerce to and from the Standing Rock Reservation.  <u>Id.</u> at ¶¶ 79-85.  It is unclear what purpose is served by these allegations.  As stated above, and in the motion to dismiss the original complaint, there is no dormant limitation on state action as it pertains to commerce between a state and a tribe.

In addition, the Tribe is not a party to this lawsuit.  Article III standing principles

limit this Court to addressing the alleged injuries of the four individual plaintiffs who brought this lawsuit.  Gill v. Whitford, 138 S.Ct. at 1933.  The constitutional rights and alleged injuries of Cissy Thunderhawk, Wašté Win Young, Reverend John Floberg, and José Zhagñay are the issues before the Court, not any alleged political negotiations between two sovereigns, one of whom is not a party to the lawsuit.

Moreover, the new allegations contained in ¶¶ 79-85 of the amended complaint establish the objective and legitimate reasons for the highway closure.  Paragraph 83 references a statement made by Sheriff Kirchmeier on January 12, 2017, acknowledging the connection between the highway closure and the restoration of law and order.  The same paragraph references a January 30, 2017, release from the North Dakota Joint Information Center establishing the connection between the ongoing discussions with the Tribe and the desire to reopen Highway 1806  that indicated "[t]he reestablishment of rule of law is the key condition."  The same paragraph notes the Tribe also condemned the actions of the rogue protestors who disrupted the otherwise peaceful protests, and noted again that restoration of the rule of law was the key to reopening the highway.

### E.      Count V (Retaliation) fails to state a claim for relief.

Count V alleges the highway and bridge closure were state action taken in retaliation for the plaintiffs' exercise of constitutionally protected conduct.  Am. Compl. at ¶ 167.  Even if the amended complaint had alleged specific facts showing some direct and personal involvement of the four state defendants in the highway or bridge closure, Count V would still fail to state a claim for relief.  The plaintiffs cannot establish that the highway and bridge would have been closed "but for" the exercise of constitutional rights, where the undisputed facts show the highway and bridge closure was necessitated by legitimate, non-retaliatory reasons.

Among other elements, a "plaintiff must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action[.]" Hartman v. Moore, 547 U.S. 250, 259 (2006).  This required causal connection means

"the plaintiffs must show that the retaliatory motive was a 'but-for' cause of the [injury] – i.e., that the plaintiffs were 'singled out' because of their exercise of constitutional rights." Baribeau v. City of Minneapolis, 596 F.3d 465, 481 (8th Cir. 2010). Although this causal connection is generally for the jury, the question can be "so free from doubt as to justify taking it from the jury." Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012) (internal quotation marks and citation omitted). Under "but for" causation, "[c]onduct is the cause in fact of a particular result if the result would not have occurred but for the conduct. Similarly, if the result would have occurred without the conduct complained of, such conduct cannot be a cause in fact of that particular result." Butler v. Dowd, 979 F.2d 661, 669-70 (8th Cir. 1992) (citing Carey v. Piphus, 435 U.S. 247, 263 (1978)).

In the context of this case, therefore, plaintiffs have to prove the state defendants' alleged unconstitutional motive, i.e., retaliation, was the cause in fact of their alleged constitutional injuries. If, however, the result (the highway/bridge closures) would have occurred notwithstanding the state defendants' alleged retaliatory motive, the plaintiffs cannot establish the "but for" causation required to proceed with their retaliation claim.

It is undisputed trespass and numerous other criminal acts took place prior to the closures. It is undisputed that violent criminals set fire to three vehicles on the bridge. It is undisputed the bridge was damaged and needed to be inspected and repaired. It is undisputed the bridge was a crime scene. It is undisputed the closed stretch of highway corresponds with the detour required by the bridge closure. These undisputed facts show that legitimate, non-retaliatory reasons were the actual "but for" causes of the highway and bridge closures. Stated another way, the plaintiffs cannot prove the highway and bridge should have remained open just because the plaintiffs were exercising constitutional rights, or that state officials closed the highway and bridge just because the plaintiffs were exercising lawful constitutional rights. As the plaintiffs themselves admit, the lawful exercise of constitutional rights took place for several months before the highway and bridge closures became necessary. See Am. Compl. at ¶ 44 (indicating

protests took place without a highway or road closure from April 2016 through October 2016).  It was only after violent criminals trespassed on private property and committed other violent acts, set fire to vehicles on the bridge, and unlawfully placed a road block on the highway, that the highway and bridge were closed to prevent future crime and to protect the public from harm.  These undisputed facts establish that a retaliatory motive against the lawful exercise of constitutional rights was not the "but for" reason for the closures, but rather that there were legitimate, non-retaliatory reasons that justified -- indeed required -- the closure of the highway and bridge.

In Bernini v. City of St. Paul, protestors arrested by St. Paul police officers claimed the arrests were made in retaliation for their exercise of First Amendment rights during the 2008 Republican National Convention.  665 F.3d 997, 1006-07 (8th Cir. 2012).  Similar to this case, the protest included some individuals who were engaged in protected activity, and others who were engaged in criminal behavior, i.e., threatening behavior that "began to block traffic along a major roadway" and from which "[a] reasonable officer could conclude that this conduct violated Minnesota law and was not protected speech."  Id. at 1007.   The arrests took place "only after the unlawful conduct."  Id.  The Eighth Circuit held the protestors could not establish the required causal connection between an alleged retaliatory motive and the arrests because "the only reasonable inference supported by the record is that the group's unlawful conduct, not the protected speech, motivated the officers' actions."  Id.   Under those circumstances, the Eighth Circuit concluded the "plaintiffs have not made a submissible First Amendment retaliation claim."  Id.  Similarly, here, the highway closure only took place after some protestors engaged in multiple criminal offenses, including unlawfully blocking the highway itself.  The bridge closure resulted from criminal acts taking place on the bridge itself.  The only reasonable inference to draw from these facts is that the unlawful conduct, not the protected speech, motivated the closure of the highway and bridge.  Consequently, the plaintiffs here have not made a submissible retaliation claim, and it should be dismissed.

### F.   Count VI (Policy, Custom, or Practice) fails to state a claim for relief against the individual state defendants.

Count VI is brought against all defendants, including the state defendants in their individual capacities, and generally alleges that all defendants promulgated or maintained policies, customs, or practices that violated the plaintiffs' constitutional rights. See Am. Compl. at ¶¶ 173-74.  Renewing this count in the amended complaint against the state defendants in their individual capacities perpetuates the "shotgun" approach utilized in the original complaint.  Count VI fails to state a claim for relief against the four state defendants in their individual capacities because any such alleged policy, custom, or practice would be a governmental policy, custom, or practice of the state itself, and the state is not a person subject to suit under 42 U.S.C. § 1983.  See Kruger, 820 F.3d at 301.

In Monell v. Department of Social Services, the Supreme Court held that *local* governmental entities – as opposed to states – are persons under § 1983 and thus can be sued directly if a plaintiff can show that a governmental policy, custom or practice caused the deprivation of a constitutional right. 436 U.S. 659, 690-91 (1978).  As a consequence, a plethora of cases are brought directly against cities and counties (or other local governmental entities) – as opposed to states -- under a policy/custom/practice theory of liability.  See, e.g., Whitney v. City of St. Louis, 887 F.3d 857, 860 (8th Cir. 2018) ("Whitney Sr. alleges that the City violated Whitney's rights by failing to have a policy of constant surveillance in place at the Justice Center."); Malone v. Hinman, 847 F.3d 949, 952 (8th Cir. 2017) (alleging the "maintenance of a widespread custom of permitting excessive force against . . . the City of Little Rock"); Marsh v. Phelps Cty., 902 F.3d 745, 752 (8th Cir. 2018) (alleging that Phelps County had a policy of allowing a corrections officer to have unfettered access to female inmates); Johnson v. Douglas Cty. Med. Dep't, 725 F.3d 825, 828-29 (8th Cir. 2013) (addressing whether Douglas County had a policy of denying medication to inmates).

In contrast to local government entities, a state is not a person under § 1983 and cannot be sued directly for the implementation of a governmental policy, custom, or practice.  Rather, to challenge the implementation of an alleged unconstitutional state policy or custom, the plaintiffs must fit their challenge within the narrow limitation allowed under Ex parte Young against a state defendant in an *official* capacity for future prospective relief, not for money damages against a state defendant in an *individual* capacity.   See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) ("Thus, implementation of state policy or custom may be reached in federal court only because official-capacity actions for prospective relief are not treated as actions against the State.") (citing Ex parte Young, 209 U.S. 123 (1908)).

It is incongruous to sue a state official in an individual capacity under a policy/custom/practice theory of liability because a state official sued in an individual capacity will only be liable for money damages if a plaintiff shows the individual was directly and personally involved in the constitutional violation – irrespective of whether the official's action was taken pursuant to a governmental policy, custom, or practice.  See, e.g., S.M. v. Krigbaum, 808 F.3d at 340; Dahl v. Weber, 580 F.3d at 733.  Thus, while a suit alleging an unconstitutional policy, custom, or practice against a *local government* may state a viable claim under Monell, there is no analogous Monell claim against a *state* itself, or against state officials sued in their individual capacities.

### G.   Count VII (Training, Supervision, or Discipline) fails to state a claim for relief against the individual state defendants.

Count VII is brought against all defendants, including the state defendants in their individual capacities, and generally alleges that all defendants maintained inadequate training, supervision or discipline and that such failure was the cause of the plaintiffs' alleged constitutional violations.  See Am. Compl. at ¶¶ 177-79.  This count fails against the state defendants in their individual capacities for the same reasons discussed above, that is, such allegations of supervisory liability are not cognizable under § 1983 without

specific factual allegations indicating an individual defendant's direct or personal involvement in alleged unconstitutional behavior.

As already stated, in order to prevail on a § 1983 claim "the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014) (quoting Ashcroft v. Iqbal, 556 U.S. at 676).  "In a § 1983 case an official 'is only liable for his … own misconduct' and is not 'accountable for the misdeeds of [his] agents' under a theory such as respondeat superior or supervisor liability."  Nelson v. Corr. Med. Servs., 583 F.3d 522, 534-35 (8th Cir. 2009) (quoting Iqbal, 556 U.S. at 677).  "While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue."  Jackson, 747 F.3d at 543 (quoting Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001)); see also Brockinton v. City of Sherwood, 503 F.3d 667, 673 (8th Cir. 2007) ("A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation.").

Even assuming the four state defendants have general supervisory authority over the official conduct of all state executive and ministerial officers of the state, or over the official conduct of their particular state agency, a plaintiff cannot simply rely upon that general supervisory authority to state a viable claim under § 1983, but must allege facts showing some direct and personal involvement.  To be actionable, a claim against an individual based upon a failure to train, supervise or control a subordinate must show the particular defendant:

   (1) Received notice of a pattern of unconstitutional acts committed by subordinates;

   (2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;

   (3) Failed to take sufficient remedial action; and

(4) That such failure proximately caused injury to the [plaintiffs].

Jane Doe A. v. Special Sch. Dist. of St. Louis Cty., 901 F.2d 642, 645 (8th Cir. 1990).

The conclusory allegations in the amended complaint fail to set forth any facts to satisfy the basic elements of a failure to supervise claim, and establish nothing more than the supervisory capacity of the four state defendants.   The amended complaint is therefore insufficient to state a valid claim for relief.   See, e.g., Zutz, 601 F.3d at 848 (indicating a "formulaic recitation of the elements of a cause of action will not do").

### III.   The four state defendants are entitled to qualified immunity as to all claims brought against them in their individual capacities.

Finally, even assuming any of the seven counts stated a claim for relief as to any individual state defendant, all four would still be entitled to qualified immunity in any event.

"To overcome the defendants' qualified immunity claims, the plaintiffs must show that (1) the facts, viewed in the light most favorable to the plaintiffs, demonstrate the deprivation of a constitutional right; and (2) the right was clearly established at the time of the deprivation."   Baribeau, 596 F.3d at 474 (internal quotation marks and citation omitted).

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. While this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.

White v. Pauly, 137 S. Ct. 548, 551 (2017) (internal quotation marks and citations omitted).

Furthermore, the "longstanding principle" requiring the law to be clearly established "should not be defined at a high level of generality [but rather] must be particularized to the facts of the case."   Id. at 552 (internal quotation marks and citations omitted). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtual unqualified liability simply by alleging violation of extremely abstract rights."

Anderson v. Creighton, 483 U.S. 635, 639 (1987).  Qualified immunity applies when a plaintiff has "failed to identify a case where an [official] acting under similar circumstances . . . was held to have violated the [Constitution]."  White, 137 S.Ct. at 552.  Cases that "present[] a unique set of facts and circumstances . . . alone should [be] an important indication . . . that [an official's] conduct did not violate a clearly established right."  Id. (internal quotation marks omitted).

Here, the facts alleged in the amended complaint do not demonstrate the deprivation of constitutional rights for all the reasons stated above.  In addition, no clearly established case law put the state officials on notice that the highway and bridge closure would have violated constitutional rights even if the amended complaint had successfully alleged such a violation.  The facts in this case are unique.  As plaintiffs admit, the number of protestors that gathered in a remote area of North Dakota had "reached a sustained population of approximately 7,000-10,000 individuals" by September 2016.  Am. Compl. at ¶ 43.  The protest presented a unique mixture of environmental, tribal, racial, political, economic, and spiritual issues (and despite the lack of acknowledgment in the selective amended complaint, the mix of issues included numerous criminal acts and violence as well).  Id. at ¶¶ 2-4, 8-9, 36-85.  The uniqueness of this event is evidenced by plaintiffs' acknowledgement that it "drew local, national, and international attention to not only the NoDAPL movement but this specific stretch of highway; it is possible that no public right-of-way in North Dakota history has been the topic of international discourse to the extent that this several-hundred-yard tract of Highway 1806 has."  Id. at ¶ 47.

The unique facts involved in this case include peaceful protests infiltrated by violent criminals, multiple attempts by criminals to injure or kill law enforcement personnel (including the use of stampeding bison), a highway used by protestors to access private property to commit criminal trespass and other crimes there, a bridge that became a crime scene when protestors set fire to several vehicles on the bridge, a damaged bridge that required inspection and repair before it could be safely used by the public for travel,

declarations of states of emergency, interstate requests for law enforcement resources, a request for a presidential major disaster declaration, and an executive memorandum issued by the President indicating construction of the DAPL pipeline was in the national interest.

To survive the defendants' qualified immunity defense, therefore, the plaintiffs must "identify a case where an [official] acting under similar circumstances . . . was held to have violated the [Constitution]." White, 137 S.Ct. at 552.  The plaintiffs must identify cases where officials were held to have violated the First Amendment or other constitutional rights by closing a location even though it was a crime scene, closing a damaged bridge for inspection and repair, closing a highway to prevent violent crimes from occurring on private property, or attempting to quell a riot.  They must show officials were "plainly incompetent" for closing the highway and bridge under the unique circumstances involved in this case.  This they cannot do.

In fact, to the extent there are any cases similar to the unique facts of this case, they establish that the state defendants are entitled to qualified immunity.  For example, in Wood v. Moss, the Supreme Court held that secret service agents were entitled to qualified immunity for closing one side of a public street to President Bush protestors, but still permitting President Bush supporters to remain on the opposite side of the street. 572 U.S. 744, 759-64 (2014).   The Court held the action was required for legitimate security reasons despite the impact it had on the anti-Bush protestors' right to express their views, stating "[n]o decision of which we are aware, however, would alert Secret Service agents engaged in crowd control that they bear a First Amendment obligation to ensure that groups with different viewpoints are at comparable locations [from the President] at all times."  Id. at 759-60 (internal quotation marks omitted).  In determining that the defendants' motion to dismiss should have been granted, the Court focused on an exhibit embraced by the pleadings (a map of the area) to reject the protestors' contentions that the legitimate security reasons advanced by the defendants to support

the closure were merely a pretext for viewpoint discrimination:

> It may be, the agents acknowledged, that clearly established law proscribed the Secret Service from disadvantaging one group of speakers in comparison to another if the agents had no objectively reasonable security rationale for their conduct, but acted solely to inhibit the expression of disfavored views. . . . We agree with the agents, however, that the map itself, . . . undermines the protesters' allegations of viewpoint discrimination as the sole reason for the agents' directions. The map corroborates that, because of their location, the protesters posed a potential security risk to the President, while the supporters, because of their location, did not.

Id. at 761–62 (internal quotation marks and citations omitted).

Similarly, here, matters embraced by the pleadings establish that the highway and bridge were closed for legitimate reasons – public safety and crime prevention.  No decision would have alerted the state officials that they bore a First Amendment obligation to keep nonpublic forums (the highway and a damaged/crime scene bridge) open to ensure that peaceful protestors continued to have access to the highway's curtilage, despite the threats of trespass and other criminal activity presented by a violent faction of the protest.

In Cross v. Mokwa, as was the case here, peaceful protests were infiltrated by violent anarchist groups.  Police officers arrested certain protestors, barred their access to condemned buildings, and confiscated personal property that "could have been used in the future to engage in unprotected violent actions."  547 F.3d at 896.  The Eighth Circuit held that, under those circumstances, "[a]t a minimum, it was not clearly established . . . that a police officer could be liable on a 'prior restraint' theory for making arrests that were supported by probable cause and then conducting a reasonable search and seizure of a condemned building" and thus reversed the district court's denial of qualified immunity.  Id. at 897.

Finally, in Bernini, another case where unlawful conduct was intermixed with lawful conduct, the Eighth Circuit held that the police officers who arrested more than just the unlawful protestors were nevertheless entitled to qualified immunity, stating "the officers in this case reasonably could have concluded that the group [of protestors] at the

61

Shepard-Jackson intersection had committed a crime and that the group was acting as a unit." 665 F.3d at 1003. There was evidence "that the individuals at the intersection were acting together and that they intended to break through the police line in an attempt to access downtown St. Paul." Id. at 1004. "Given the situation at the intersection, the officers' allegedly mistaken belief at the park that 160 people were part of a unit that had gathered to enter downtown at the Shepard-Jackson intersection was objectively reasonable. We therefore affirm the district court's conclusion that the officers are entitled to qualified immunity for the seizures." Id. at 1005. Similarly, here, to the extent the plaintiffs suggest their rights to protest lawfully should have handcuffed public officials from taking reasonable measures to curb the criminal conduct intermixed with lawful protests, at a minimum the public officials are entitled to qualified immunity. See also Brewer, 238 F.2d at 102 (rejecting, out of hand, a claim that government officials could not take precautionary measures to prevent a public riot).

## CONCLUSION

For the reasons stated, state defendants Burgum, Dalrymple, Levi, and Gerhart respectfully request that the complaint against them be dismissed in its entirety.

Dated this 15th day of February, 2019.

State of North Dakota
Wayne Stenehjem
Attorney General

By:    /s/ James E. Nicolai
      James E. Nicolai
      Deputy Solicitor General
      State Bar ID No. 04789
      Office of Attorney General
      500 North 9th Street
      Bismarck, ND 58501-4509
      Telephone (701) 328-3640
      Facsimile (701) 328-4300
      Email jnicolai@nd.gov

Attorneys for State Defendants.