IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| CISSY THUNDERHAWK; WAŠTÉ WIN YOUNG; REVEREND JOHN FLOBERG; and JOSÉ ZHAGÑAY on behalf of themselves and all similarly-situated persons, | | |
| Plaintiffs, | | |
| vs. | | Civil No.: 1:18-cv-00212 |
| COUNTY OF MORTON, NORTH DAKOTA; SHERIFF KYLE KIRCHMEIER; GOVERNOR DOUG BURGUM; FORMER GOVERNOR JACK DALRYMPLE; DIRECTOR GRANT LEVI; SUPERINTENDENT MICHAEL GERHART JR; TIGERSWAN LLC; and DOES 1 to 100, | | |
| Defendants. | | |

ORDER DENYING, IN PART, AND GRANTING, IN PART,
STATE AND COUNTY DEFENDANTS' MOTIONS TO DISMISS
AND DENYING TIGERSWAN'S MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, MOTION TO DISMISS

[¶1]    THIS MATTER comes before the Court on separate Motions to Dismiss the Plaintiffs' Amended Complaint[1] filed by the State Defendants (Governor Doug Burgum, Former Governor Jack Dalrymple, Director of North Dakota Department of Transportation Grant Levi, and Superintendent of the North Dakota Highway Patrol Michael Gerhart, Jr.) ("State Defendants")

---

[1] On October 18, 2018, the Plaintiffs filed a Complaint in this matter, which they later amended on February 1, 2019. Doc. Nos. 1, 44.

and County Defendants (Morton County, North Dakota and Sheriff Kyle Kirchmeier) ("County Defendants"). The Court also addresses Defendant TigerSwan, LLC's ("TigerSwan") Motion for Summary Judgment, or in the alternative, Motion to Dismiss filed on July 10, 2019. Doc. No. 81.

[¶2]    On February 15, 2019, the State and County Defendants[2] moved to Dismiss the Plaintiffs' Amended Complaint. Doc. Nos. 48, 51. The Plaintiffs, Cissy Thunderhawk, Wašté Win Young, Reverend John Floberg, and José Zhagñay ("Plaintiffs") filed Response Memorandums in Opposition to the State and County Defendants' Motions on March 8, 2019.  See Doc. Nos. 61, 62. The State Defendants filed a Reply in Support of the Motion to Dismiss on March 22, 2019, and the County Defendants filed a Reply in Support on April 5, 2019. See Doc. Nos. 71, 76.

[¶3]    Plaintiffs filed a Response Memorandum in Opposition to TigerSwan's Motion for Summary Judgment, or in the alternative, Motion to Dismiss on July 31, 2019. Doc. No. 84. TigerSwan filed its Reply in Support on August 13, 2019. Doc. No. 85.

[¶4]    For the reasons explained below, the State and County Defendants' Motions to Dismiss are **DENIED, IN PART, AND, GRANTED, IN PART,** and TigerSwan's Motion for Summary Judgment, or in the alternative, Motion to Dismiss, which the Court will construe as a Rule 12(c) Motion for Judgment on the Pleadings, is **DENIED**.

---

[2] Throughout much of the Amended Complaint, the Plaintiffs refer to all Defendants collectively, noting the exclusion of particular Defendants when applicable. For purposes of this Order, the Court will similarly refer to the County and State Defendants collectively as "Defendants," as they rely upon many of the same arguments for dismissal. When the State and County Defendants make additional or differing arguments from each other, the Court will address them separately. The Court will also identify Defendant TigerSwan separately for purposes of this Order, as it makes differing arguments for dismissal. However, the Court will note where TigerSwan joins the State and County Defendants' arguments.

A.     **FACTUAL BACKGROUND**

[¶5]     The Court accepts as true the allegations contained in the Amended Complaint for purposes of ruling on the present Motions. See Strand v. Diversified Collection Service, Inc., 380 F.3d 316, 317 (8th Cir. 2004); Mattes v. ABC Plastics, Inc., 323 F.3d 695, 698 (8th Cir. 2003). The following facts are provided by the Plaintiffs in the Amended Complaint.

[¶6]     From April 2016 to February 2017, the Standing Rock Sioux Tribe was joined by tens of thousands of individuals who identified themselves as "Water Protectors," to protest the construction of the Dakota Access Pipeline ("DAPL"). Doc. No. 44, ¶1. These individuals gathered at camps set up in South-Central, North Dakota, specifically near the intersection of Highway 1806 and the Cannonball River. Id.

[¶7]     The Dakota Access Pipeline is a 30-inch diameter pipeline designated to transport up to 570,000 barrels a day of crude oil from the Bakken shale field in North Dakota to refineries in Pakota, Illinois. Doc. No. 44, ¶36. While the pipeline was originally going to cross the Missouri River north of Bismarck,[3] it was later rerouted to cross the Missouri River less than one mile north of the Standing Rock Reservation boundary. Id. The Missouri River is the sole water source for the Standing Rock Sioux Tribe, the Cheyenne River Sioux Tribe, and many other communities throughout the region. Id. at ¶37. The Plaintiffs assert the area where the pipeline now exists runs through a number of sites that have significant cultural, historical, and spiritual value to the Lakota people. Doc. No. 44, ¶37. In addition, the Plaintiffs assert "DAPL's route, including the entirety of the Lake Oahe crossing traverse land over which the tribes still claim ownership." Doc. No. 44, ¶39.

---

[3] The Plaintiffs assert the pipeline was rerouted from its original path north of Bismarck because of concerns to contamination to the water supply. Doc. No. 44, ¶36.

[¶8]     The Tribes and their supporters, which included representatives of more than 300 indigenous nations, among many other supporters, gathered near the construction site starting in April of 2016 demanding the halt of construction of the pipeline. Doc. No. 44, ¶40. While a majority of these individuals were out-of-state visitors, the Plaintiffs claim "there remained at all times a strong contingent of North Dakota locals." Doc. No. 44, ¶42. Hundreds of protestors residing on federally and tribally-owned lands became legal residents of the camps. Id. To the Plaintiffs, "[o]ne of the primary functions served by the camps was symbolic, with the very act of staying at or visiting the camps representing the primary means by which numerous individuals expressed their support for the movement." Doc. No. 44, ¶41. By September of 2016, approximately 7,000 – 10,000 individuals made up the population of these camps. Doc. No. 44, ¶43.

[¶9]     Plaintiffs assert the "only accessible" route to the camps was by Highway 1806, which is a main route used between Bismarck/Mandan and the Standing Rock Sioux Reservation. Doc. No. 44, ¶41. In addition, according to the North Dakota State and Local Intelligence Center, the Backwater Bridge, which crosses Highway 1806 is "imperative to the flow of commerce and emergency responders to and from the Standing Rock Reservation." Doc. No. 44, ¶81.

[¶10]    Protestors utilized Highway 1806 to travel to Bismarck/Mandan to gather supplies and seek medical treatment. Doc. No. 44, ¶3. For example, Plaintiff Wašté Win Young, who has a documented medical condition, utilized Highway 1806 to make routine trips to Bismarck for appointments. Doc. No. 44, ¶88. Plaintiff José Zhagñay, a New Yorker who was a resident of North Dakota with a domicile at the camps for a brief time, also used Highway 1806 to gather supplies for the camps' homeschool resource center. Doc. No. 44, ¶91. Plaintiff Cissy Thunderhawk utilized Highway 1806 to travel back and forth between Bismarck and Fort Yates,

where she owned the restaurant "My Auntie's Place," which was ultimately closed after the events in question. Doc. No. 44, ¶86. Additionally, Father John Floberg, the Episcopal Priest for the St. James' Episcopal Church in Cannonball, North Dakota, travelled to Cannonball multiple times a week for his congregation. Doc. No. 44, ¶89. In addition to protestors, thousands of other local individuals utilize Highway 1806 to visit family, seek medical attention, and conduct other routine and necessary life activities.[4] Doc. No. 44, ¶3.

[¶11]    Because DAPL crossed Highway 1806, at a location that the Plaintiffs' claim is rich in ceremonial and scared sites north of where the camps were located, the protestors also used Highway 1806 to assemble, pray, and speak in opposition to the construction of DAPL. Doc. No. 44, ¶2. The protestors also utilized Highway 1806's wide curtilage[5] near where DAPL was to cross the highway as a main location for speech, prayer, and assembly. Doc. No. 44, ¶44. This area "has long been open to the public for, among other things, use as a thoroughfare, and that could be (and routinely was) visited safely without impeding or disrupting traffic." Doc. No. 44, ¶44. Plaintiffs utilized this area to hang prayer ties and signs for passing drivers to see. Id. They also used this area to gather in small, medium, and large groups to speak and pray. Id. A "vast majority of the speech, assembly, prayer, and travel in this area was completed in a peaceful and lawful manner."

---

[4] The Plaintiffs group those who used Highway 1806 into the following categories:
> (1) the Tribe and its supporters; (2) non-tribal residents of the area; and (3) DAPL and its associates. These groups were clearly divided along racial, religious, and viewpoint-based lines: on the one hand, the Tribe and its supporters were predominantly indigenous, practitioners of indigenous religious beliefs, and anti-DAPL; on the other hand, the non-tribal residents of the area and DAPL and its associates were almost exclusively non-indigenous, not practitioners of indigenous religious beliefs, and supporters of DAPL.

Doc. No. 44, ¶55.

[5] The Plaintiffs explain Highway 1806's wide curtilage slopes "gradually from the paved road surface and are flanked by the fence lines delineating the private property that buts the public thoroughfare." Doc. No. 44, ¶46. The wide curtilage has historically been used to control runoff during the spring melt and for highway repairs. Doc. No. 44, ¶46.

Doc. No. 44, ¶49. According to the Amended Complaint, "[t]housands of Water Protectors prayed, marched, sang, waved placards, and chanted on thousands of occasions over the course of a nearly year-long period without any incident." Doc. No. 44, ¶50.

[¶12]    The Plaintiffs assert "the longstanding use of this road and other similar roads in the region" including "the road and curtilage in question have historically been used not only for travel by cars, trucks, horseback, ATVs, and pedestrians but also, as the only public space throughout much of this area, for a range of expressive activity." Doc. No. 44, ¶45. Traditional indigenous practices utilizing this area included hanging prayer ties, "undertaking horseback "rides" (like the Bigfoot Ride and the Dakota 30+8 Ride, which each occur in the broader region)," and prior to the road closure, "this specific right-of-way hosted a spiritual ride from Cannon Ball to Tioga, ND, additionally facilitating an expressive "youth 'run' from Standing Rock to Washington D.C." Doc. No. 44, ¶45.

[¶13]    The Plaintiffs assert this specific stretch of road and curtilage became dramatically important for speech, assembly, and prayer in early September after:

> Tim Mentz Sr., the Standing Rock Historic Preservation Officer, identified ancient burial and ceremonial sites and other significant cultural artifacts in the area: and after Dakota Access LLC immediately subsequently attempted to destroy these sites; and after a resulting confrontation between DAPL-employed security officers and Water Protectors led to the officers unleashing dogs against Water Protectors.

Doc. No. 44, ¶47. At this time in September, "local spiritual leaders and tribal elders confirmed the appropriateness and desirability of praying in the public area immediately abutting Highway 1806 and these specific sites." Doc. No. 44, ¶48.

[¶14]    Plaintiffs assert that despite their speech and the like being peaceful and lawful, "the Defendants, and the agencies and individuals operating under their control, engaged in a determined and concerted campaign to suppress the speech, assembly, and prayer of the tens of

thousands of individuals who traveled, or who intended to travel, through this area to oppose the construction of DAPL." Doc. No. 44, ¶51. Specifically, the Plaintiffs allege one of the primary means the Defendants did this was by "controlling the roads in a manner designed to discourage NoDAPL travel, speech, assembly, and prayer." Doc. No. 44, ¶52. Despite Sheriff Kirchmeier publicly announcing on October 17, 2016 that "blocking roads affects people's rights," one week later on October 24, 2016, Morton County and the NDDOT, in consultation with Highway Superintendent Gerhart and Governor Dalrymple, "closed a significant portion of Highway 1806 to the Tribe and its supporters," including from Fort Rice to Fort Yates. Doc. No. 44, ¶54. This included the "entire stretch of Highway 1806 abutting the specifically identified sacred and ceremonial sites as well as the DAPL construction that had been the primary center of Plaintiffs' speech, prayer, and assembly for the past several months." Doc. No. 44, ¶54.

[¶15]    Immediately prior to the closure, the "Cheyenne River Sioux Tribe [declared] eminent domain over a small portion of the land adjacent to Highway 1806 (and the resulting relocation of approximately 100 Water Protectors to this land)." Doc. No. 44, ¶56. The Plaintiffs assert the "effect of the closure was to freeze travel throughout much of the region for the Tribe and its supporters[.]" Doc. No. 44, ¶56.

[¶16]    The Plaintiffs' Complaint further describes a "violent police and private-security-led raid" that occurred on October 27, 2016 on a portion of this land to which the Cheyenne River Sioux Tribe declared eminent domain. Doc. No. 44, ¶57. The "Defendants used several trucks to block the Backwater Bridge, a small bridge on Highway 1806 crossing Cantapeta Creek less than a mile north of the northern boundary of the Standing Rock Sioux Tribe." Doc. No. 44, ¶57. The next day Defendants put up a "heavily reinforced concrete barricade on and immediately north of the Backwater Bridge." Doc. No. 44, ¶58. The barricade "extended significantly to each side of

Highway 1806, thereby preventing those traveling on foot, horseback, or ATV to safely circumvent the bridge from continuing north along Highway 1806." Doc. No. 44, ¶68. Ironically, the Plaintiffs assert, the barricade only prevented travel past the bridge not onto the bridge from the Reservation or the camps. Doc. No. 44, ¶66. In fact, "the Defendants used the bridge itself to maintain its barricade, placing numerous concrete blocks that added substantial sustained concentrated weight to the bridge that they claimed might be damaged—imposing more stress than an occasional passing car or ambulance would." Doc. No. 44, ¶67.

[¶17]    Differing reasons were given for the barricade, but the Plaintiffs assert the Defendants "consistently acknowledged that its target was the Tribe and its supporters." Doc. No. 44, ¶59.  In describing the barricades, Morton County Sheriff's Department Spokeswoman Maxine Herr stated: "We are trying to create a barrier between the protestors and that private property." Id. Two additional press releases issued on October 28 and 31 stated "the bridge would remain closed 'until all damage to the structure is evaluated by bridge engineers.'" Id.

[¶18]    The Plaintiffs assert the North Dakota Department of Transportation (NDDOT) could have conducted this evaluation as early as October 28, 2016, however the full investigation of the bridge was not completed until December 22, 2016. Doc. No. 44, ¶60. Between October 28 and December 22, the Plaintiffs and the Standing Rock Sioux Tribe reached out numerous times to state and local Defendants "to arrange a safe inspection of the bridge (and in any other way necessary to facilitate its reopening), but were rebuffed." Id.

[¶19]    Before the results of the inspection were released and while the area remained closed, the Plaintiffs allege the Defendants implemented a "de facto cordon of the construction area and of the nearby sacred and ceremonial sites," preventing "any travel in the general vicinity." Doc. No. 44, ¶70. The Plaintiffs contend that on November 2, hundreds of protestors, including indigenous

elders, "held a prayer ceremony across a river located approximately one mile from the pipeline construction site and apparently on the edge of Defendants' unstated, but strictly enforced, cordon of the area." Doc. No. 44, ¶70. After a few protestors entered the frigid river, the Plaintiffs assert "the Defendants reacted with significant force." Doc. No. 44, ¶70.

[¶20]    In early November, construction of DAPL was completed where it intersects with Highway 1806. Doc. No. 44, ¶72. Plaintiffs contend "[f]or a vast majority of the duration of the discriminatory road closure, there was no active construction in the area." Doc. No. 44, ¶72. From December 4, 2016, when the Army Corps issued its decision not to grant the easement DAPL needed to drill under the Missouri River near the Lake Oahe crossing, until February 8, 2017 when the Army Corps reversed its decision, the only remaining construction in the area could not be drilled. Doc. No. 44, ¶72. The uncertainty of these decisions by the Army Corps, the Plaintiffs argue, gave the "Plaintiffs and the tribes [] a compelling and vital First Amendment need to be able to speak and assemble on the curtilage of the closed portion of the highway near the site of completed construction to express their ongoing opposition to the potential construction and operation of the pipeline." Doc. No. 44, ¶73.

[¶21]    The results of the inspection of the bridge were released on January 12 by the NDDOT, which stated "the bridge was and had been structurally sound." Doc. No. 44, ¶61. Despite the inspection results, Defendants "continued to maintain the closure of the nine-mile stretch of Highway 1806 in question for 68 additional days, stating that the bridge would remain closed "[u]nder the authority of the North Dakota Governor and the Morton County Sheriff's Department" until there was an "assurance no criminal activity will take place and federal law enforcement has been introduced into the protest camp to restore law and order." Doc. No. 44, ¶61. "On January 30, 2017, a North Dakota Joint Information Center release described "ongoing

9

talks between the state, Morton County and the Standing Rock Sioux Tribe" for purposes of, among other things, 'potentially reopening State Highway 1806 in a conditions-based, phased approach. . . . The reestablishment of rule of law is the key condition.'" Doc. No. 44, ¶83. In the same document, Sheriff Kirchmeier noted "Highway 1806 will not be completely re-opened until rule of law in the area is restored." Id.

[¶22]    The Plaintiffs allege State and Local Defendants adopted and applied the label of their indigenous speech and prayer as riotous due to TigerSwan's persistently and misleading labels. Doc. No. 44, ¶99. The Plaintiffs allege TigerSwan was hired by Energy Transfer Partners and "coordinated and implemented all security and intelligence operations" for it. Doc. No. 44, ¶93. TigerSwan, the Plaintiffs allege, was tasked with delegating out security tasks to at minimum four other security companies working for ETP. Doc. No. 44, ¶93.

[¶23]    The Plaintiffs allege, however, that TigerSwan did not just work for ETP, but also engaged in a joint participation with law enforcement officials. Doc. No. 44, ¶94. They assert this "intertwinement with North Dakota law enforcement officials" began in September of 2016 when a TigerSwan Liaison Officer was installed "directly into the law enforcement Joint Operations Center." Doc. No. 44, ¶95. This cooperation, the Plaintiffs allege, allowed TigerSwan to "act[] under color of state law and in close cooperation with law enforcement Defendants to implement and enforce the discriminatory road closure." Doc. No. 44, ¶24. The Plaintiffs assert TigerSwan engaged in evidence collection and intelligence activities that are traditionally reserved for law enforcement, such as:

> a) Conducting flights over water protector camps with forward-looking infrared cameras to gather "[s]ignals intelligence;" b) Constructing "person of interest" folders on Water Protectors;; c) Directing the infiltration of Water Protector camps by individuals using false names and identities; d) In at least once instance, connecting law enforcement's intelligence unit to the live feed of a company's helicopter video surveillance; e) Presenting video and photo evidence to the North

Dakota Bureau of Criminal Investigation in support of prosecuting Water
Protectors; f) Using "coding techniques" to surface Water Protector profiles and
groups on social media; g) Supplying intelligence and surveillance information,
upon request, to federal authorities.

Doc. No. 44, ¶97(a)-(g).

[¶24]     The Plaintiffs also allege TigerSwan provided other support to law enforcement by

preparing a building for law enforcement use on private property in the days leading up to the

closure and purchasing and shipping a computer on law enforcement's behalf. Doc. No. 44, ¶96.

The Plaintiffs allege "the intelligence, logistical support, personnel, and equipment that TigerSwan

provided to State and Local Defendants made possible State and Local Defendants' decision to

discriminatorily close the road, as well as the implementation and maintenance of the

discriminatory road closure." Doc. No. 44, ¶100.

[¶25]     The Complaint alleges TigerSwan shared intelligence with law enforcement officials in

the weeks preceding the closure which mischaracterized the protestors and allowed the State and

Local Defendants to attain a distorted perception of the movement. Doc. No. 44, ¶101. The

Plaintiffs assert TigerSwan spread allegations that protestors harbored weapons, were violent,

dangerous, and criminal. Doc. No. 44, ¶101. These "mischaracterizations" the Plaintiffs assert

intended to and did "encourage the implementation and continued maintenance of excessive

measures against the Tribe and its supporters, primarily including the road closure in question."

Doc. No. 44, ¶101.

[¶26]     The Plaintiffs asserts during the time of the closure, DAPL, its employees, its contractors,

and individuals not affiliated with the Tribe or its supporters who resided in the area, were

permitted by State and Local Defendants to use the road for local traffic. The Plaintiffs contend

the use included purposes related to expression. Doc. No. 44, ¶76. "This policy was either

controlled by guidelines that were specifically tailored to exclude the Tribe and its supporters,

while impacting as few others as possible; or, in the alternative, it was controlled by guidelines or a system of exemptions that were so vague as to give officers nearly unlimited discretion in determining who was permitted use of this forum." Doc. No. 44, ¶76. "[A]lthough the overwhelming majority of the impacted population (the Tribe and its supporters) had legitimate and lawful reasons to use the road—including, for many, business reasons—during the time in question, the effect of any guidelines or exemptions here was to only exclude those who Defendants associated with the Tribe and its supporters; any broader impacts were incidental and marginal." Doc. No. 44, ¶77. In addition, a formal report completed by the North Dakota State and Local Intelligence Center prior to the road closure outlined that Highway 1806 was the primary route for those travelling between the Standing Rock Reservation and Bismarck, so "the potential for barricades to be setup on or near the [Backwater or Cannonball] bridges to prevent travel of . . . protestors (by law enforcement)." Doc. No. 44, ¶81.

[¶27]     The Plaintiffs claim they were forced to "take a detour on worse-maintained small roads that added significant time, stress, and danger to the trip and imposed additional costs on Plaintiffs in gas, car maintenance, etc." Doc. No. 44, ¶65. The closure of the area in question spanned months where North Dakota experienced severe winter weather, which greatly increased the risk of serious bodily injury and death to those gathered by the Cannonball River." Doc. No. 44, ¶78. The Plaintiffs assert "[i]n icy or snowy conditions (which persisted throughout most of the duration of the discriminatory closure), the detour added substantially more in travel time—often an hour or more—and, on numerous occasions, the detour was impassable even when Highway 1806 would not have been." Doc. No. 44, ¶65.

[¶28]     A January 31, 2017 press release from the Morton County Sheriff's Department notes the NDDOT "removed the top layer of jersey barriers from the Backwater Bridge in a good faith

12

effort in response to work done by the protest camp to clean up and clear out." Doc. No. 44, ¶83. "In a February 2, 2017 statement, Sheriff Kirchmeier noted that because "[t]he actions of [a] rogue group of protestors have been condemned by the Standing Rock Sioux Tribe and cleanup efforts seem to be progressing in order to clear the main camp before spring flooding, [] I am willing to take the next steps to open the Backwater Bridge . . . However, rule of law in the area must be restored prior to a full re-open." Id.

[¶29]    Non-structural repairs to the bridge were completed on February 10 and 13, 2017. Doc. No. 44, ¶62. The Bridge was opened thereafter, and by February 23, 2017, remaining protestors were removed from federal and state land. Doc. No. 44, ¶63. The last protestors were removed from the Standing Rock Reservation on February 23, 2017. Id.

[¶30]    On March 15, 2017, Sheriff Kirchmeier stated that "[t]he conditions were met to continue our phased approach to reopening Highway 1806 . . . We understand that opening this road is important to facilitate the routine business and commutes that take place along the 1806 corridor." Doc. No. 44, ¶83. "Governor Doug Burgum added: 'With the camps and roadway cleared, we can now move toward re-establishing traffic on Highway 1806.'" Doc. No. 44, ¶83. While Highway 1806 was partially opened by pilot car-led travel to the Tribe and its supporters on March 17, 2017, they were prohibited from "speaking or worshipping on the curtilage of the road [] until it was fully reopened on March 21, 2017." Doc. No. 44, ¶64.

[¶31]    The Plaintiffs assert "[t]he purpose and effect of Defendants' discriminatory road closure was to keep Plaintiffs miles away (well out of line-of-sight or earshot) from the construction workers, security guards, and sites that had for months prior been a primary focus of Plaintiffs' First Amendment activity." Doc. No. 44, ¶71. "This effectively left Plaintiffs without any other means of communicating with one of their principal desired audience (construction workers and

security officers) or in one of their most symbolically important forums (Highway 1806's curtilage abutting the identified sacred and ceremonial sites near to where the pipeline would and eventually did cross)." Doc. No. 44, ¶71.

[¶32]    To the Plaintiffs, "[t]his prohibition on travel on nine miles of Highway 1806 had the effect of preventing Plaintiffs from engaging in constitutionally protected conduct within the proximity of the construction site or the nearby sacred or ceremonial sites, and it deterred others from joining or supporting Plaintiffs." Doc. No. 44, ¶75. For example, Father John Floberg organized a gathering of five hundred clergy members, "who traveled to Standing Rock, mostly from out-of-state, to participate in peaceful prayers and demonstrations of solidarity with the Tribe and its supporters south of the Backwater Bridge." Doc. No. 44, ¶90. When the road was closed, it made it difficult for clergy to attend the gathering due to the location. In addition, Plaintiff José Zhagñay, who established legal residency in North Dakota with a domicile at the camps in October of 2016, was burdened by the closure of the highway, which ultimately led to him leaving the camps and North Dakota in December of 2016. Doc. No. 44, ¶91.

[¶33]    In addition, the Plaintiffs assert aside from hindering their ability to exercise their constitutional rights, "the Defendants' true purpose for discriminatorily closing the road in question [was] to extort political concessions from the Standing Rock Sioux Tribe." Doc. No. 44, ¶79. Specially, weeks before the closure of Highway 1806 by use of the barricade, a strategic plan was circulated "to obtain political concessions from the Tribe." Doc. No. 44, ¶82. This included "the Standing Rock Tribal Council would "[f]ormally request[] law enforcement assistance from the federal and state government to aid in restricting access to the camps" and "publicly decree[] that all camps must be vacated by January 31, 2017, and no new occupation can be attempted." Doc. No. 44, ¶82. This plan was circulated among, at the least, the State Highway Patrol as it bears

the official insignia of North Dakota, North Dakota Department of Emergency Services, North

Dakota State Patrol, and Morton County." Doc. No. 44, ¶83. These same demands, including

Morton County would only reopen if the Tribe complied with their demands, were made in private

meetings on a number of occasions. Doc. No. 44, ¶84. According to the Plaintiffs' Amended

Complaint, a non-exclusive list of these meetings included:

> a December 19, 2016 meeting between Governor Burgum and various tribal
> officials; a January 25, 2017 meeting between Governor Burgum, Michael Gerhart
> Jr, and various state and tribal officials (where, among other things, Governor
> Burgum explicitly made clear his, Michael Gerhart Jr.'s, Sheriff Kirchmeier's, and
> Morton County's responsibility for maintaining the discriminatory road closure);
> and a February 16, 2017 meeting between representatives from Governor Burgum's
> office, including Scott Davis, a representative from Morton County, and several
> Water Protectors.

Doc. No. 44, ¶84.

[¶34]    Alternative strategies for ensuring public safety and traffic were contemplated by the

State and Local Defendants throughout the time period in question. Doc. No. 44, ¶85. Again,

according to the Plaintiffs' Amended Complaint, some of these strategies included:

> [M]aintaining a non-militarized police presence near demonstrators in public areas,
> arresting and detaining lawbreakers (but not those peacefully and lawfully
> gathered), maintaining slower speed limits on the roadways, implementing
> cautionary road signage and traffic safety checkpoints, implementing speed bumps
> and other similar traffic mitigation measures, and even non-discriminatorily closing
> short—several-hundred feet— stretches of the road to traffic for only the minutes
> or hours during which a large demonstration was occurring.

Doc. No. 44, ¶85.

[¶35]    The Plaintiffs assert that if these alternatives had been used it would have decreased the

cost of policing, substantially improved public safety, left open public forms for speech and free

exercise, decreased burdens on intrastate and interstate travel, and decreased the burdens on

commerce. Doc. No. 44, ¶85.

B.    **STANDARDS OF REVIEW**

   I.    **TigerSwan's Motion for Summary Judgment, or in the Alternative, Motion to Dismiss**

[¶36]    Because the Plaintiffs make a procedural attack on TigerSwan's ability to bring a Motion to Dismiss, the Court must address it first. TigerSwan has made a Motion for Summary Judgment under Federal Rule of Civil Procedure 56, or in the alternative, a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. No. 81. The Plaintiffs, however, argue TigerSwan is procedurally barred from making a Motion to Dismiss. The Court must first consider if TigerSwan is permitted procedurally to move for dismissal under Rule 12(b)(6).

[¶37]    The Plaintiffs filed their Original Complaint in this matter on October 18, 2018. Doc. No. 1. TigerSwan filed an Answer and Counterclaim on January 11, 2019. The Plaintiffs then filed an Amended Complaint on February 1, 2019, and TigerSwan filed an Answer to the Amended Complaint on February 21, 2019.[6] Doc. Nos. 44, 56. TigerSwan filed this Motion for Summary Judgment, or in the alternative, Rule 12(b)(6) Motion to Dismiss on July 10, 2019.

[¶38]    The Plaintiffs argue TigerSwan is barred from bringing a Motion to Dismiss under Rule 12(b)(6) because it filed Answers in this matter. Doc. No. 84 at p. 5. Federal Rule of Civil Procedure 12(b) mandates "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required." However, it also states a party may raise the defense of a failure to state a claim upon which relief can be granted by motion. Id. The motion asserting such a defense "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). The Eighth Circuit has interpreted this to mean, "a Rule 12(b)(6) motion cannot be filed after an answer has been submitted." Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir.

---

[6] The Court has found TigerSwan's Answer to the Amended Complaint and Second Counterclaim as timely filed due to excusable neglect. See Doc. No. 87.

1990). However, Rule 12(h)(2) may provide TigerSwan with an alternative avenue of moving forward with its motion for dismissal under 12(b)(6).

[¶39]    Rule 12(h)(2) mandates that a request for dismissal based upon a failure to state a claim upon which relief can be granted under Rule 12(b)(6) may also be raised by a motion under Rule 12(c), motion for judgment on the pleadings. Fed. R. Civ. P. 12(h)(2) see also Westcott, 901 F.2d at 1488 ("But since Rule 12(h)(2) provides that '[a] defense of failure to state a claim upon which relief can be granted" may be advanced in a motion for judgment on the pleadings under Rule 12(c), we will treat the City's motion as if it had been styled a 12(c) motion.'").

[¶40]    Rule 12(c) allows a party to move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial. Fed. R. Civ. P. 12(c). "The pleadings are 'closed' after the complaint and answer are filed, along with any reply to additional claims asserted in the answer." Foster Cable Servs., Inc. v. Deville, 368 F. Supp. 3d 1265, 1271 (W.D. Ark. 2019) (citing Charles Alan Wright & Arthur R. Miller, Federal *Practice and Procedure* § 1367 (3d ed. 2018)). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006). A court reviews a "12(c) motion under the standard that governs 12(b)(6) motions." Westcott, 901 F.2d at 1488.

[¶41]    In this instance, the Court will allow TigerSwan to advance its argument for failure to state a claim upon which relief can be granted through a 12(c) motion for judgment on the pleadings under the lens of the 12(b)(6) standard of review.

## II.    Rule 12(b)(6)

[¶42]    Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ.

P. 8(a)(2).  Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted.  In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A plaintiff must show that success on the merits is more than a "sheer possibility." Id.  A complaint does not need detailed factual allegations, but it must contain more than labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

[¶43]    The Court must accept all factual allegations of the complaint as true, except for legal conclusions or "formulaic recitation of the elements of a cause of action." Iqbal, 556 U.S. at 678. A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id.  However, the determination of whether a complaint states a claim upon which relief can be granted is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.  Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling him to relief. Ulrich v. Pope Cty., 715 F.3d 1054, 1058 (8th Cir. 2013).  The burden is on the moving party to prove that no legally cognizable claim for relief exists.  5B Wright & Miller, Federal Practice and Procedure § 1357 (3d ed. 2004); Mediacom Se. LLC v. BellSouth Telecomms., Inc., 672 F.3d 396, 399 (6th Cir. 2012) (the moving party bears the burden on a Rule 12(b)(6) motion).

### III.    Documents the Court will consider for purposes of this Motion

[¶44]    Before addressing the Defendants' arguments for dismissal, the Court must determine whether it will consider extrinsic evidence offered by the Defendants, including a robust number of documents filed by the State and County Defendants' original Motions to Dismiss and other

factual assertions in their memorandum in support which reference extrinsic evidence.[7] The Defendants ask the Court to consider this extrinsic evidence without converting their Motions to Dismiss into a Motion for Summary Judgment under Federal Rule of Civil Procedure 56. "When considering . . . a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 (8th Cir. 2012). Those materials include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." Hughes v. City of Cedar Rapids, Iowa, 840 F.3d 987, 998 (8th Cir. 2016). Courts additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting the motion into one for summary judgment." Miller, 688 F.3d at 931.

[¶45]     Here, the Defendants' attached documents include over 1500 pages of numerous press releases from different entities, declarations, executive orders, deeds, memorandums, voluminous criminal judgments, plea agreements, and notices, among other documents. They also make numerous other factual assertions in their Memorandum in Support that can only be supported by extrinsic evidence.[8] Even though some of these documents could be considered public records,

---

[7] Defendants filed Motions to Dismiss prior to the Plaintiffs' filing of their Amended Complaint. State Defendants indicate that for the Court's convenience they would not be refiling the exhibits but would instead reference them.

[8] For example, the County Defendants argue the Court should find the government officials' acts were authorized by law. Doc. No. 52, pp. 28-33. However, the specific authorizations are reliant upon extrinsic evidence of criminal activity and "civil unrest," which the Court will not entertain at this stage.

they may contradict the facts as stated in the Amended Complaint. At this early stage in the litigation, the Court is not tasked with considering whether there are disputes of material fact; that is reserved for motions for summary judgment. The Court looks only to the Amended Complaint for purposes of this Motion to Dismiss and will not consider any extrinsic evidence offered by the Defendants.

## C.   TIGERSWAN'S STATUS AS PRIVATE OR STATE ACTOR

[¶46]   "Section 1983 creates a cause of action against "every person, who under color of any statute, ordinance, regulation, custom, or usage" subjects any person to deprivation of immunities secured by the Constitution or federal laws." Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588, 590 (8th Cir. 2004). "Section 1983 secures most constitutional rights from infringement by governments, not private parties." Id. "Where a private party acts under color of state law, however, it can be held liable under § 1983." Id. (citing Dennis v. Sparks, 449 U.S. 24, 27–28 (1980) (holding private party acts under color of state law if it is "willful participant in joint action with State or its agents"); Adickes v. S.H. Kress & Co., 398 U.S. 144, 150–52, (1970) (holding proof of conspiracy between restaurant and police established restaurant acted under color of law)).

[¶47]   "Private actors may incur section 1983 liability only if they are willing participants in a joint action with public servants acting under color of state law." Johnson v. Outboard Marine Corp., 172 F.3d 531, 536 (8th Cir. 1999). "The plaintiffs must establish, at the very least, an agreement or meeting of the minds between the private and state actors, and a corresponding violation of the plaintiffs' rights under the Constitution or laws of the United States." Id.

[¶48]   The crux of TigerSwan's basis for dismissal is that it did not have control or decision-making authority to close the road and bridge, so it cannot be held liable for alleged violations of the Plaintiffs' constitutional rights. Doc. No. 82, p. 8. It argues it was hired as a consultant by

20

Energy Transfer Partners, and it did not make any decisions related to the closure of the road and bridge. Id. At this juncture, however, the Plaintiffs need only allege facts showing TigerSwan was a "willing participant in a joint action" with the state and local officials. The Plaintiffs have met that burden here.

[¶49]    The Plaintiffs allege that starting in September of 2016, "TigerSwan initiated a course of joint participation with law enforcement officials in operations, including, eventually, as they respected the challenged discriminatory road closure." Doc. No. 44, ¶94. The Plaintiffs allege in September of 2016, TigerSwan stationed a Liaison Officer in law enforcement's Joint Operations Center, which allowed TigerSwan to coordinate with law enforcement in planning operations. Doc. No. 44, ¶95. The Plaintiffs assert throughout the time period in question TigerSwan provided state and local officials with intelligence, logistical support, personnel, and equipment. Doc. No. 44, ¶100.

[¶50]    The Plaintiffs allege the intelligence TigerSwan provided to state and local officials was persistently misleading and distorted the state and local officials' perception of the movement. Doc. No. 44, ¶101. For example, the Plaintiffs maintain that TigerSwan labeled their prayer and speech as riotous, TigerSwan spread allegations that protestors possessed weapons, and TigerSwan mischaracterized protestors as dangerous and violent criminals. Doc. No. 44, ¶101. These mischaracterizations, the Plaintiffs assert, aided in the state and local officials' decision implement and maintain "excessive measures against the Tribe and its supporters, primarily including the road closure in question." Doc. No. 44, ¶101.

[¶51]    The Plaintiffs also assert the means by which TigerSwan gathered its intelligence point to a joint operation with state and local officials. For instance, they assert that during a "no-fly order" in the region, TigerSwan continued to fly over the area to conduct surveillance, which the

Plaintiffs maintain would have only been legal by FAA standards if TigerSwan was participating in law enforcement action. Doc. No. 98. Footage from these flights during the no-fly period, the Plaintiffs allege, was then used later by prosecutors in cases brought against protestors. Doc. No. 44, ¶99. The Plaintiffs provide other examples to suggest TigerSwan "performed tasks in intelligence and evidence collection traditionally reserved for law enforcement officials," which included:

> a) Conducting flights over water protector camps with forward-looking infrared cameras to gather "[s]ignals intelligence;" b) Constructing "person of interest" folders on Water Protectors; c) Directing the infiltration of Water Protector camps by individuals using false names and identities; d) In at least once instance, connecting law enforcement's intelligence unit to the live feed of a company's helicopter video surveillance; e) Presenting video and photo evidence to the North Dakota Bureau of Criminal Investigation in support of prosecuting Water Protectors; f) Using "coding techniques" to surface Water Protector profiles and groups on social media; g) Supplying intelligence and surveillance information, upon request, to federal authorities.

Doc. No. 44, ¶97(a)-(g).

[¶52]     Citing <u>Manhattan Cmty. Access Corp. v. Halleck</u>, ⸺ U.S. ⸺, 139 S. Ct. 1921 (2019), the Eighth Circuit recently reiterated the notion that "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State.'" <u>Doe v. Washington Univ.</u>, 434 F. Supp. 3d 735, 747 (E.D. Mo. 2020), <u>reconsideration denied,</u> No. 4:19 CV 300 (JMB), 2020 WL 1308209 (E.D. Mo. Mar. 19, 2020). However, the Eighth Circuit explained the constraints on this rule to include that:

> It is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way. Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally and exclusively performed the function. Very few functions fall into that category; for example, running elections and operating a company town. Among the functions that do not fall into that category are running sports associations and leagues, administering insurance payments, operating nursing

homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity.

Id.

[¶53]    The facts as alleged by the Plaintiffs could show TigerSwan was engaging in traditional, exclusive government functions so as to transform them into a state actor for purposes of §1983. The Plaintiffs have alleged facts, which taken as true, could plausibly show TigerSwan and state and local officials had a "meeting of the minds" as to a joint operation in which TigerSwan was a willing participant to close the area in question in alleged violation of the Plaintiffs' constitutional rights.

**D.    PLAINTIFFS' AMENDED COMPLAINT**

**I.    Count I – Violation of Right to Speak and Assemble (First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983) (Against All Defendants)**

[¶54]    The Plaintiffs allege in the Amended Complaint they were "prevented, chilled, or inhibited in engaging in constitutionally protected First Amendment activity when Defendants . . . completely closed an approximately nine-mile portion of Highway 1806 to Plaintiffs' travel starting on October 24, 2016." Doc. No. 44, ¶128. Plaintiffs allege "Defendants' indefinite and absolute restriction of Plaintiffs' travel on nine miles of this public right-of-way, lasting ultimately five months, was not a reasonable time, place, or manner restriction on speech, nor did it fulfill an important government interest." Doc. No. 44, ¶130. Instead, the Plaintiffs allege "Defendants' determination of who could speak, assemble, pray, or travel on this road or its curtilage was impermissibly based on the purported viewpoint of those who wished to speak, assemble, pray, or travel, or of the content of their expressive activities." Doc. No. 44, ¶133. To Plaintiffs, "[t]his is most clearly revealed through Defendants' restrictions on who was permitted use of this forum: Water Protectors, but not DAPL workers, were prohibited from accessing the forum in question;

23

expression of opposition to the pipeline were excluded from the forum while expressions of support were not." Id. Plaintiffs' Complaint therefore asserts the closure of the road and its curtilage was a (1) viewpoint based and/or content-based restriction, and (2) a prior restraint on speech. On this basis, the Plaintiffs' assert strict scrutiny is the applicable standard for both, with the Defendants' actions failing to meet this standard. Doc. No. 62, p. 6.

[¶55]   In contrast, the Defendants first assert Highway 1806 is not a traditional public forum, but is rather a nonpublic forum, so under the reasonableness standard, the closure was a proper time, place, and manner restriction. Doc. No 49, pp. 26-35. Additionally, the Defendants assert the Plaintiffs' claim for prior restraint must fail because "public officials had valid reasons for closing the highway and bridge." Doc. No. 49, p. 39. Each claim must be discussed in detail.

### (1).   *TIME, PLACE, MANNER RESTRICTION*

[¶56]   The First Amendment provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." It has long been made applicable to the states, and "its protections are at the core of our democratic society." Phelps-Roper v. City of Manchester, Mo., 697 F.3d 678, 686 (8th Cir. 2012) (citing Gitlow v. New York, 268 U.S. 652, 666, (1925)). "Our nation has a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).

[¶57]   "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Bowman v. White, 444 F.3d 967, 974 (8th Cir. 2006) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983) (internal quotations omitted)). "To this end, the

Supreme Court uses a forum analysis for evaluating restrictions of speech on government property." Id. (citing Perry, 460 at 45-46. "The forum analysis initially requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum." Id. (citing Families Achieving Independence & Respect v. Neb. Dep't of Soc. Servs., 111 F.3d 1408, 1418 (8th Cir.1997)). "Once a court makes a determination on the nature of the forum, it then applies the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster." Id. Thus, the extent to which access to, and the character of speech upon, government property may be limited depends upon the nature of the forum in which the speech takes place. Burnham v. Ianni, 119 F.3d 668, 675 (8th Cir.1997).

[¶58]   "First Amendment questions . . . present mixed questions of law and fact, requiring [courts] to apply principles of First Amendment jurisprudence to the specific facts of the case." Gerritsen v. City of Los Angeles, 994 F.2d 570, 575 (9th Cir. 1993). First Amendment challenges involve "both factual and legal determinations about the speech that is being regulated, the nature of the forum, the government's interests, and the tailoring of the imposition on protected speech." Brown v. Government of District of Columbia, 390 F.Supp.3d 114 (2019). "Thus, courts typically do not reach the *merits* of a First Amendment challenge at the motion-to-dismiss stage." Id. The Court begins its analysis with determining if the Plaintiffs have provided sufficient facts, which taken as true, state a plausible claim that Highway 1806, its curtilage, and the Backwater Bridge are traditional public forums which subject the Defendants actions to strict scrutiny.

(i)   Forum status of Highway 1806, its curtilage, and the Backwater Bridge.

[¶59]   The Plaintiffs have alleged Highway 1806 and its curtilage are traditional public forums. See Doc. No. 44, ¶45 ("[T]he road and curtilage in question have historically been used not only for travel by cars, trucks, horseback, ATVs, and pedestrians but also, as the only public space

25

throughout much of this area, for a range of expressive activities."). The Defendants[9] disagree, asserting Highway 1806 and its curtilage were never meant to be traditional public forums, instead asserting they are "nonpublic forums."

[¶60]    "The government's ability to restrict speech is most circumscribed in a traditional public forum." Bowman v. White, 444 F.3d 967, 974 (8th Cir. 2006) (citing Perry, 460 U.S. at 45 ("In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed.")). "A traditional public forum is a type of property that 'has the physical characteristics of a public thoroughfare, ... the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, [and] historical[ly] and traditional[ly] has been used for expressive conduct . . . ." Id. (citing Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir.1999) (citations omitted). "'[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'" Id. (citing United States v. Grace, 461 U.S. 171, 177 (1983)).

[¶61]    "In determining whether government property constitutes a traditional public forum, however, the physical appearance of the property is only one of the factors [the Court] must consider." Ball v. City of Lincoln, Nebraska, 870 F.3d 722, 731 (8th Cir. 2017) (citing See Kokinda, 497 U.S. at 727, 110 S.Ct. 3115 ("The mere physical characteristics of the property cannot dictate forum analysis.")); "[The Court] must also take into account "the traditional use of the property, the objective use and purposes of the space, and the government intent and policy with respect to the property, not merely its physical characteristics and location." Id. "In addition,

---

[9] TigerSwan has moved for dismissal of Count I on a reasonable time, place, and manner theory, so it will be included within the term "Defendants" for this discussion.

[the Court] must consider "the presence of any special characteristics regarding the environment in which" the area in question exists." Id. "No single factor is dispositive." Id. The Plaintiffs' Complaint alleges sufficient facts which could allow a fact-finder to find the areas in question are traditional public forums under the Ball factors.

### a. *Traditional Use of the Property*

[¶62]    "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 954, 74 L. Ed. 2d 794 (1983). "Streets and parks" are quintessential examples of places that fit in this category because they "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 954–55, 74 L. Ed. 2d 794 (1983). Citing Perry, the Defendants argue Highway 1806, its curtilage, and the Backwater Bridge do not fit into this category because they have not been "immemorially held in trust for the use of the public as a place of free speech and assembly" and therefore have not been traditionally used as a place of expressive ideas. Doc. No. 49, p. 28.

[¶63]    In fact, the State Defendants note they "were unable to locate a single case where a plaintiff alleged that a rural highway (or its curtilage) must be considered a traditional public forum, let alone where a court deemed a rural highway to be such a place." Doc. No. 49, p. 28. On this basis, they argue that the highway just simply cannot be a traditional public forum. It is tempting to agree with the State Defendants. Public protest on a rural highway exposes the protestors and the traveling public to safety concerns because it involves high speed travel. The rural nature of the roadway also makes the rural highway a less-than ideal location for a protestor

to express their viewpoint. However, courts have explicitly found "the highway, as the equivalent in this day of the streets of a former time, is an appropriate public forum for the dissemination of speech activity." State ex rel. Dep't of Transp. v. Pile, 1979 OK 152, 603 P.2d 337, 341. Plaintiffs' Complaint has alleged facts that could lead a fact-finder to conclude the area in question has traditionally been used for expressive ideas.

[¶64]     The Plaintiffs' Amended Complaint asserts the road and curtilage have historically been used for open public access to both travel, including cars, trucks, horseback, ATVs, and pedestrians, and for the use of expressive activities. See Doc. No. 44, ¶45. Some of the expressive activities the Plaintiffs allege have occurred in this specific area in question include individuals hanging prayer ties, signs within sight of passing drivers, a spiritual ride from Cannon Ball to Tioga, North Dakota, and an expressive youth 'run' from Standing Rock to Washington D.C. Doc. No. 44, ¶¶44-45. The Plaintiffs also give examples of how similar roads in the broader region have been used for expressive activities, including individuals undertaking horseback rides such as the "Bigfoot Ride" and the "Dakota 30+8 Ride." Doc. No. 44, ¶45. While the Defendants assert the horseback rides did not occur in this specific area in question and any expressive activities that occurred in conjunction with the DAPL movement, including the expressive youth run, are too recent and isolated to show this area in question has been traditionally used for expressive ideas, that conclusion is not for the Defendants to make, it is for a fact-finder. Additionally, the County Defendants' assertion that the spiritual ride from Cannon Ball to Tioga was a single event that only included travelling on or along Highway 1806, ignores the realization that a fact-finder could make the ultimate determination that this single event shows the area in question was traditionally used for expressive purposes.

b. *Objective Use and Purposes of the Space; Government intent and policy with respect to the property*

[¶65]     At the outset, the Court notes that the <u>Ball</u> factors considering the objective use and purpose of the property and the government's intent and policy with respect to the property raise inherently factual issues that cannot be fully ascertained at this juncture of proceedings. In fact, the parties disagree over the intent of the government in respect to expressive activities in the area in question.

[¶66]     Defendants argue North Dakota state highway system is relatively new, first mentioned in state law in 1943, and "[t]he North Dakota Legislature has never indicated the state highway system has as its 'principle purpose . . . the free exchange of ideas." Doc. No. 71, p. 6. On this basis, the Defendants argue Highway 1806 could not have been "immemorially held in the public trust and used for purposes of expressive activity." <u>Id.</u> Instead, the Defendants argue the express purpose of the North Dakota State Highway System is for "free flow of traffic," "low cost of motor vehicle operation," "protecting[ing] the health and safety of the citizens of the state," "increase[ing] property value," and "generally promot[ing] economic and social progress." Doc. No. 71, p. 7, n. 2. (citing the legislative intent for the state highway system in N.D.C.C. § 24-01-01). The Defendants also assert N.D.C.C. § 39-01-01.1 "recognizes that the development of a modern and integrated highway system . . . is so essential to safe and efficient highway transportation." Doc. No. 71, p. 7.  While it is true that a highway system primarily involves the movement of traffic, the disruption of the public highway brings inconveniences to the public, disruption to everyday life, and attention to the cause of the protestors. It is this very harassment of the public that a protest may attempt to procure.

[¶67]     The Plaintiffs' Complaint alleges sufficient facts to show the government intended to allow individuals to use the highway and curtilage for expressive purposes. Doc. No. 44, ¶9 ("From

April 2016 through October 2016, one of the primary locations of speech, assembly, and prayer for these individuals was Highway 1806's wide curtilage near where the pipeline was slated to cross the highway, an area that has long been open to the public for, among other things, use as a thoroughfare, and that could be (and routinely was) visited safely without impeding or disrupting traffic.") see also id. ("Plaintiffs regularly engaged in a range of expressive and religious conduct on this land, including hanging prayer ties and signs within sight of passing drivers, as well as speaking and praying individually and in small, medium, and large groups.").

[¶68]    While the Defendants have asserted the governments' purpose was not to open this space to the public, pointing to North Dakota Legislative History, that argument contradicts the Plaintiffs' Amended Complaint, creating a factual dispute which the Court will not resolve at this stage. See  Stewart v. D.C. Armory Bd., 863 F.2d 1013, 1017–18 (D.C. Cir. 1988) (citing City of Los Angeles v. Preferred Communications, 476 U.S. 488, (1986)) ("Where government action is challenged on first amendment grounds, a court should be especially 'unwilling to decide the legal questions posed by the parties without a more thoroughly developed record of proceedings in which the parties have an opportunity to prove those disputed factual assertions upon which they rely.'").

### c.  *Physical and Special Characteristics*

[¶69]    To Defendants, the physical and special characteristics of Highway 1806, "a high-speed highway" make it a nonpublic forum. See Doc. No. 49, p. 7 ("Permitting people to assemble and discuss the environment in the midst of cars, trucks and semis traveling at high speeds is a recipe for personal injury and death, which neither advances First Amendment principles or is consistent with the express purposes of the state highway system.").

[¶70]     In addition, the Plaintiffs' Complaint asserts facts which could show the physical characteristics of the area in question could lend support to a fact-finder deeming it a traditional public forum. For instance, the Plaintiffs allege the location of the public space make it so that traffic and expressive activities could co-exist. Doc. No. 44, ¶9 ("From April 2016 through October 2016, one of the primary locations of speech, assembly, and prayer for these individuals was Highway 1806's wide curtilage near where the pipeline was slated to cross the highway, an area that has long been open to the public for, among other things, use as a thoroughfare, and that could be (and routinely was) visited safely without impeding or disrupting traffic."). see also id. ("Plaintiffs regularly engaged in a range of expressive and religious conduct on this land, including hanging prayer ties and signs within sight of passing drivers, as well as speaking and praying individually and in small, medium, and large groups."). The Plaintiffs also assert, "[t]he wide shoulders in question slope gradually from the paved road surface and are flanked by fence lines delineating the private property that abuts the public thoroughfare." Id. The Plaintiffs assert this fact provides "little indication that by stepping off of the road, a person has entered some special type of enclave." Doc. No. 62, p. 10. See United States v. Grace, 461 U.S. 171, 180, 103 S. Ct. 1702, 1708, 75 L. Ed. 2d 736 (1983) ("There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave.").

[¶71]     Additionally, Plaintiffs' Complaint alleges the possible presence of "special characteristics regarding the environment in which the area in question exists."[10] Ball, 870 F.3d at

---

[10] While the United States Supreme Court and other courts have routinely found schools and military bases are "special environments" (See Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S. Ct. 733, 736, 21 L. Ed. 2d 731 (1969) ("First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom

731. For example, the Plaintiffs' Complaint asserts "[t]he area through which DAPL now runs includes a number of sites of significant cultural, historical, and spiritual value to the Lakota people," and "[t]he Missouri River is also the sole water source for the two neighboring Lakota tribes, the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe." Doc. No. 44, ¶¶36, 37. Additionally, the Plaintiffs allege "DAPL's route, including the entirety of the Lake Oahe crossing, traverses land over which the tribes still claim ownership," and on this basis, "violates treaty rights." Doc. No. 44, ¶39.

[¶72]    Additionally, Highway 1806's location in relation to other notable places could be considered a special characteristic. For example, the Plaintiffs allege they "united in support of the Standing Rock Sioux Tribe's opposition to the construction of the Dakota Access Pipeline at camps located near the intersection of Highway 1806 and the Cannonball River in south-central North Dakota." Doc. No. 44, ¶1. Plaintiffs assert on this basis "because DAPL crosses Highway 1806 several miles north of the camps, in an area rich with sacred and ceremonial sites, Highway 1806 also served as the primary means by which Water Protectors traveled to assemble, speak, and pray in opposition to the construction of DAPL." Doc. No. 44, ¶2. They also allege because Highway 1806 is the "largest and most direct road connecting the Standing Rock Sioux Reservation and the various camps on its northern border to Bismarck and Mandan," it "served as

---

of speech or expression at the schoolhouse gate."); Greer v. Spock, 424 U.S. 828, 838, 96 S. Ct. 1211, 1217, 47 L. Ed. 2d 505 (1976) ("A necessary concomitant of the basic function of a military installation has been "the historically unquestioned power of (its) commanding officer summarily to exclude civilians from the area of his command."), there is nothing to preclude the possibility that a fact-finder could find Highway 1806, its curtilage, and the Backwater Bridge to possess certain special characteristics that would entitle them to traditional public forum status. In fact, this analysis is inherently fact-driven. For example, in Ball, when analyzing whether an area of the Pinnacle Bank Arena (Plaza area) in Lincoln, Nebraska, was a traditional public forum, the Court, through photographs and other documents, considered special characteristics of the Plaza including its location, size, and comparability to its adjoining public sidewalks.

the primary route by which Water Protectors (and press) traveled to the camps, gathered supplies at Bismarck and Mandan, and sought medical treatment at the nearest major hospital." Doc. No. 44, ¶2. In addition, they assert the camps located on federally and tribally owned land "were only accessible via Highway 1806, which is also the principal route between the Standing Rock Sioux Reservation and Bismarck/Mandan." Doc. No. 44, ¶41. These factual assertions plausibly could show the highway's location embodied special characteristics which a fact-finder could depend upon in determining if it is a traditional public forum.

[¶73]     In sum, while the Defendants offer a multitude of factual reasons, as to why Highway 1806, its curtilage, and the Backwater Bridge are not "traditional public forums" the Court is not tasked at this point in the litigation with resolving factual disputes. In fact, "the decision as to whether a forum is public usually invokes a factual inquiry." Stewart v. D.C. Armory Bd., 863 F.2d 1013, 1018 (D.C. Cir. 1988) ("The forum doctrine itself is not a taxonomy of ideal types; it is virtually impossible in most cases to identify a public forum by legal inquiry alone, confined to the intrinsic nature of government actions or purposes.").[11] A dispute as to the status of a forum includes both questions of fact and law which must await resolution at a later stage. Id.

[¶74]     At this stage of the litigation, the Court must accept the Plaintiffs' factual allegations as true, and the Plaintiffs' "contentions regarding the character of the fora . . . are not clearly precluded as a matter of law such that the complaint's 'public forum' assertions cannot support a plausible claim upon which relief can be granted[.]" See Brown v. Gov't of D.C., 390 F. Supp. 3d

---

[11] The Stewart Court highlighted the importance of a case-by-case factual examination of the forum in question, noting the mere label of a forum cannot dictate its status. ("In particular, we do not find it possible to resolve the public forum issue in this case on the basis of the bare fact that the property in question is a football stadium. In this connection we observe that stadiums may not have the same public forum status in all places at all times. The fact that other stadiums have been found to be nonpublic fora, while indicative, is not dispositive.") Stewart, 863 F.2d at 1018, n.8.

114, 124 (D.D.C. 2019). Therefore, "the only question before the district court on the motion to dismiss for failure to state a claim [is] whether it was plausible, based on the allegations made in the complaint, that [Plaintiffs'] could prove" that Highway 1806, its curtilage, and the Backwater Bridge are traditional public forums. Stewart, 863 F.2d at 1018.The Court finds the Plaintiffs have met this burden.

[¶75]    Additionally, while neither side has provided authority directly addressing whether a *rural highway* is a traditional public forum, as noted above in Ball, this is a fact-intensive inquiry and there is nothing to preclude the possibility that a fact-finder in this case may deem these a rural highway in this case a traditional public forum. Nonetheless, authority exists showing it is at least plausible that a fact-finder could find Highway 1806 and its curtilage to be traditional public forums. See. e.g. Jacobson v. United States Dep't of Homeland Sec., 882 F.3d 878, 882 (9th Cir. 2018) (two-lane road running through rural Arizona); United States v. Griefen, 200 F.3d 1256, 1260 (9th Cir. 2000) (road running through rural forest preserve); Pineoros Y Campesinos Unidos del Noroeste v. Goldschmidt, 790 F.Supp. 215, 221 (D. Or. 1990) (roads running adjacent to farms, ranches or orchards). The Plaintiffs also make the argument that the United States Supreme Court foreclosed this argument in Schultz v. Frisby, 807 F.2d 1339, 1361 (1988), when it noted "no particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora."

[¶76]    Because this is the motion-to-dismiss stage, the Court need only consider if the Plaintiffs' Complaint alleges facts sufficient to show Highway 1806 and its curtilage and the Backwater Bridge are traditional public forums. The Court finds the Plaintiffs have set forth sufficient facts. Therefore, the Court must consider if the Plaintiffs have asserted facts showing the closure of the area was content-based or content-neutral.

(ii)   <u>View-point/Content-based</u>

[¶77]    The Plaintiffs have alleged the closure of the road was both view-point based and content-based, and therefore, strict scrutiny applies. <u>See</u> Doc. No. 44, ¶ 133 ("Defendants' determination of who could speak, assemble, pray, or travel on this road and its curtilage was impermissibly based on the purported viewpoint of those who wished to speak, assemble, pray or travel, or of the content of their expressive wishes").

[¶78]    "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." <u>Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks</u>, 864 F.3d 905, 913–14 (8th Cir. 2017). "[C]ourts will apply a strict scrutiny analysis when the regulation discriminates on the basis of content, and a more lenient analysis to content-neutral regulations." <u>Id.</u> (citing <u>Bery v. City of N.Y.</u>, 97 F.3d 689, 696 (2d Cir. 1996)). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." <u>Id.</u> (citing <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." <u>Id.</u>

[¶79]    The State Defendants argue that despite its allowance of DAPL employees and others to use Highway 1806 and not the Tribe and its supporters, the closure was not content-based. They argue DAPL workers and others who were permitted to use the highway were using it "for its dedicated purpose, which was travel – not assembly or speech – because those workers or others residing in the area had 'legitimate business on the premises' to which they were given access." Doc. No. 49, p.32. The Defendants also assert the government had the ability to ban all *protest*

35

*activity* because "a certain faction of the protest consisted of violent criminals that engaged in criminal behavior, disrupted legitimate business being conducted on private property, and endangered public safety." Doc. No. 49, p. 32.

[¶80]     In making these assertions, however, the Defendants rely upon precedent pertaining to *non*-public forums and the government's ability to regulate speech based on content or speaker identity in these forums. For instance, while it is true the government can restrict access to all individuals except those with "legitimate business on the premises" this applies in non-public forums. United States v. Grace, 461 U.S. 171, 178 (1983) ("There is little doubt that in some circumstances the Government may ban the entry on to public property that is not a "public forum" of all persons except those who have legitimate business on the premises."); see also Perry, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.").

[¶81]     The Defendants also rely upon United States v. Griefen, 200 F.3d 1256 (9th Cir. 2000), in an attempt to show that a temporary road closure due to protestor activity can deem the restriction on expressive activity content-neutral if it is "justified, i.e. based on a non-pretextual reason divorced from the content of the message attempted to convey." Griefen, 200 F.3d at 1260. Griefen dealt with a group of individuals protesting the road building and logging in the Nez Perce Forest. Id. at 1258. However, in Griefen, in procuring a "closure order" banning protesting activity from a certain limited construction area and for a certain limited time, the Forest Service relied upon evidence that protestors had placed barriers on the roads, dug trenches that diverted water onto roadways, and damaged roadbeds. Id.

36

[¶82]    In this case, and for purposes of this Motion, the Plaintiffs have not alleged in their Complaint that they damaged the area in question. Those assertions, in contrast, are made by the Defendants' reliance upon facts outside of the Complaint. Additionally, even if <u>Griefen</u> did apply, the Defendants' restriction must be based on a "non-pretextual reason divorced from the content of the message." The Plaintiffs have alleged facts showing there could have been a pretextual reason or discriminatory purpose for the road closure. <u>See</u> <u>Crawford v. Bd. of Educ. of City of Los Angeles</u>, 458 U.S. 527, 544 (1982) (finding a restriction could still be deemed "unconstitutional if motivated by a discriminatory purpose."); <u>see</u> <u>also</u> <u>Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.</u>, 473 U.S. 788, 811-12 (1985) (The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination."). The Plaintiffs here allege facts which a fact-finder could depend upon to find the closure was viewpoint-based, or in the alternative, even if it was neutral on its face, motivated by a discriminatory purpose or pretextual reason.

[¶83]    For example, the Plaintiffs' Complaint alleges Highway 1806 was overwhelming used by three groups (1) the Tribe and its supporters, (2) non-tribal local residents, and (3) DAPL and its associates. Doc. No. 44, ¶55. The Plaintiffs further allege the groups were "clearly divided along racial, religious, and viewpoint-based lines." <u>Id.</u> The Plaintiffs allege "during the time in question, State and Local Defendants permitted DAPL and its employees and its contractors, as well as others residing in the area not affiliated with the Tribe and its supporters, to use the road-including, if they wished, for purposes related to expression." Doc. No. 44, ¶76. The Plaintiffs assert the "purpose and effect of Defendants' discriminatory road closure was to keep Plaintiffs *miles* away (well out of line-of-sight or earshot) from the construction workers, security guards,

and sites that had for months prior been the primary focus of Plaintiffs' First Amendment activity." Doc. No. 44, ¶71.

[¶84]    Additionally, Plaintiffs assert that despite the Defendants purported reasons for closing the area, specifically the Backwater Bridge, ("until all damage to the structure is evaluated by bridge engineers"), the Defendants "consistently acknowledged that its target was the Tribe and its supporters." Doc. No. 44, ¶59 ("For example, Maxine Herr, a spokesman with the Morton County Sheriff's Department, stated about this barricade: 'We are trying to create a barrier between the protestors and that private property.'") see also ¶61 ("The bridge would remain closed 'under the authority of the North Dakota Governor and the Morton County Sheriff's Department' until there was an 'assurance no criminal activity will take place and federal law enforcement has been introduced into the protest camp to restore law and order.'").

[¶85]    The Plaintiffs have alleged sufficient facts, which must be taken as true at this stage, which plausibly show the closure of the area was based on view-point and/or content and therefore strict scrutiny would apply. The Court must next determine if the Plaintiffs have sufficiently alleged facts to show the Defendants' closure of the road may not withstand strict scrutiny.

(iii)    Strict Scrutiny

[¶86]    "Laws that compel speech or regulate it based on its content are subject to strict scrutiny." Telescope Media Grp. v. Lucero, 936 F.3d 740, 754 (8th Cir. 2019). "The strict scrutiny test requires the state to show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest." Republican Party of Minnesota v. White, 416 F.3d 738, 749 (8th Cir. 2005). "In general, strict scrutiny is best described as an end-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest." Id. at 750.

38

a. *Compelling State Interest*

[¶87]    "Precisely what constitutes a 'compelling interest' is not easily defined." Republican

Party of Minnesota, 416 F.3d at 749. "Attempts at definition generally use alternative, equally

superlative language: "interest[ ] of the highest order," "overriding state interest," "unusually

important interest." Id.

[¶88]    The Defendants maintain the area in question was a nonpublic forum and therefore they

only need to show the road closure was reasonable. Doc. No. 49, p. 35. Specifically, they assert

the road was closed "in order to advance the legitimate goals of preventing trespass and protecting

public safety." Doc. No. 49, p. 33. Relying upon extrinsic evidence, which the Court will not

consider at this stage of potential criminal activity of protestors, the State Defendants assert the

closure was required "to permit safe construction of the DAPL pipeline on private property, under

circumstances where some protestors had already shown through destructive conduct that they

presented a clear and present danger to the traveling public as well as to the safe completion of the

DAPL project." Doc. No. 49, p. 35. The Defendants assert this justification meets the

"reasonableness standard" of regulation of speech in what they advocate to be a nonpublic forum.

While the Defendants fail to raise a substantive argument as to a compelling government interest,

they do rely upon Griefen again to show the Court there found a significant government interest

to be "public health and safety and protection of property." Doc. No. 49, p. 35 (citing Griefen, 200

F.3d at 1260-61).

[¶89]    In contrast, the Plaintiffs assert the Defendants did not have a compelling interest in

closing the area in question for numerous reasons. Doc. No. 62, p.33. First, the Plaintiffs assert in

their Complaint, the Defendants attempted to "extort political concessions from the Standing Rock

Sioux Tribe," in that they "demanded of the Tribe" to "chang[e] its position vis-à-vis Water

Protectors in North Dakota and the existence of the camps under its jurisdiction." Doc. No. 44, ¶79. Specifically, the Plaintiffs allege the "strategic plan" to obtain political concessions from the Standing Rock Sioux Tribe was circulated to at least the State Highway Patrol, and it bore "the official insignia of North Dakota, North Dakota Department of Emergency Services, North Dakota State Patrol, and Morton County." Doc. No. 44, ¶82.  This strategic plan, as alleged by Plaintiffs, "lists several concessions explicitly including 'the Standing Rock Sioux Tribal Council would formally request law enforcement assistance from the federal and state government to aid in restricting access to the camps and publicly decree that all camps must be vacated by January 31, 2017, and no new occupation can be attempted." Id. The Amended Complaint asserts the Defendants "made public statements throughout the duration of the discriminatory road closure stating the road's re-opening was conditioned on, among other things, Defendants achieving their political objective of dismantling the camps located on Army Corps and tribally owned land." Doc. No. 44, ¶ 83. From these facts pled in the Amended Complaint, the Plaintiffs argue "the government's illegitimate purpose of extorting political concessions from the Standing Rock Sioux Tribe does not constitute a compelling government interest." Doc. No. 62, p. 33.

[¶90]     Next, the Plaintiffs assert the Defendants did not have a "compelling interest" in protecting a bridge that was not damaged. Doc. No. 62, p. 33. The Plaintiffs allege the Backwater Bridge was barricaded on October 28, with the Defendants asserting it would remain closed until "all damage to the structure is evaluated by bridge engineers." Doc. No. 44, ¶¶58, 59. The Plaintiffs allege the NDDOT could have conducted its investigation of the bridge on October 28, but delayed it for nearly two months even though "Plaintiffs and the Standing Rock Sioux Tribe reached out to the State and Local Defendants on numerous occasions between October 28 and December 22 to arrange the safe inspection of the bridge (and in any other way necessary facilitate its reopening),

but were rebuffed." Doc. No. 44, ¶60. The Plaintiffs assert that even though the NDDOT revealed on January 12 that the bridge was and had been structurally sound, "Defendants [except Dalrymple] continued to maintain the closure of the nine-mile stretch of Highway 1806 in question for 68 additional days" until "there was an assurance no criminal activity will take place and federal law enforcement has been introduced to the protest camp to restore law and order." Doc. No. 44, ¶61.

[¶91]	The Plaintiffs also assert the Defendants' alleged purpose of ensuring the completion of construction, that had already been finished, was not a compelling interest. Doc. No, 62, p. 33. The Plaintiffs allege for "the vast majority of the duration of this discriminatory road closure, there was no active construction." Doc. No. 44, ¶72. The Plaintiffs allege by early-November the construction of the DAPL where it intersects with Highway 1806 was already completed. Doc. No. 44, ¶72.

[¶92]	Lastly, the Plaintiffs assert the Defendants had no compelling interest in "quelling mayhem where there was none." Doc. No. 62, p. 33. While the Defendants attempt to introduce extrinsic evidence of criminal activity of potential protestors, the Plaintiffs' Complaint alleges that "[t]he vast majority of the speech, assembly, prayer, and travel in this area was completed in a peaceful and lawful manner," including "[t]housands of Water Protectors [who] prayed, marched, sang, waved placards, and chanted on thousands of occasions over the course of a nearly year-long period without any incident." Doc. No. 44, ¶49.

[¶93]	The Court finds the facts alleged in the Amended Complaint, taken as true, plausibly show the Defendants may not have had a compelling interest in closing the road.

b. *Narrowly Tailored*

[¶94]    "A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." Republican Party of Minnesota, 416 F.3d at 751. The Court considers "whether the scope of the restriction on [the Plaintiffs'] expressive activity is substantially broader than necessary to protect the [] interest." Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808 (1984).

[¶95]    The Defendants assert, "[d]ecisions made by public officials attempting to prevent criminal trespass and other activity disruptive to traffic and public safety did not have to be narrowly tailored to accommodate the protestors' speech or assembly in an area unintended for protest or speech," failing to provide a substantive analysis on how the closure was narrowly tailored in the event it was considered a public forum. Doc. No. 49, p. 33. However, the Defendants again rely upon Griefen (which found the closure order to be narrowly tailored) for the proposition that the closure in this case would meet the same. Doc. No. 49, p. 35. Griefen noted the closure order was:

> limited to the immediate construction area, and 150 feet on each side of the zone—which we conclude was imminently reasonable. The protestors were not ejected from the forest or even from the vicinity of the construction site, only from 150 feet to each side of the center of the work zone. Moreover, the restriction was not imposed until work was ready to begin, and it lasted for only 45 days, or until the project was completed.

Griefen, 200 F.3d at 1260-61.

[¶96]    In comparison to Griefen, the Plaintiffs' Complaint alleges facts which could show the closure in this case was not narrowly tailored. First the Plaintiffs assert "[c]losing nearly nine miles

of Highway 1806 to protect a possibly damaged [approximately] 100' bridge is plainly not narrowly tailored to the interest in question." Doc. No. 62, p. 16. Specifically, the Plaintiffs allege the location and length of time were not narrowly tailored.

[¶97]    The Plaintiffs allege included in this closed portion was the "public area immediately abutting Highway 1806" and "specific identified sacred and ceremonial sites, which were located several miles north of the backwater bridge" and were used as places of speech, prayer, and assembly. Doc. No. 44, ¶¶44,47-50. In addition, the Plaintiffs assert they have pled facts showing the length of time the area was closed for alleged bridge inspection was not narrowly tailored. As noted above, the Plaintiffs have alleged the Backwater Bridge could have been inspected as early as October 28, 2016, but the Defendants allegedly delayed that inspection. Doc. No. 44, ¶60, 61. The Plaintiffs allege on October 28, 2016, the inspection could have showed the bridge "was and had been structurally sound" and could have been reopened." Doc. No. 44, ¶60, 61. Also, the Plaintiffs assert even though the NDDOT revealed on January 12 the bridge was and had been structurally sound, "Defendants [except Dalrymple] continued to maintain the closure of the nine-mile stretch of Highway 1806 in question for 68 additional days" until "there was an assurance no criminal activity will take place and federal law enforcement has been introduced to the protest camp to restore law and order." Doc. No. 44, ¶61.

[¶98]    As to the DAPL construction, the Plaintiffs reiterate their allegation that for a majority of the closure there was no active construction, and the construction near the DAPL 1806 Highway intersection was completed in early November. Doc. No. 44, ¶72. The Plaintiffs also argue that due to the small size of the construction site "there was no need for Defendants to close nine miles of a public thoroughfare to protect a construction site no more than several hundred feet in breadth." Doc. No. 62, p. 18.

[¶99]     Courts have been given guidance on the physical and temporal scope of restrictions on speech, including what has been acceptable. <u>See</u> <u>Madsen v. Women's Health Ctr., Inc.</u>, 512 U.S. 753, 776, 114 S. Ct. 2516, 2530, 129 L. Ed. 2d 593 (1994) (stating "We uphold the noise restrictions and the 36–foot buffer zone around the clinic entrances and driveway because they burden no more speech than necessary to eliminate the unlawful conduct targeted by the state court's injunction.") <u>see</u> <u>also</u> <u>id.</u> ("We strike down as unconstitutional the 36–foot buffer zone as applied to the private property to the north and west of the clinic, the "images observable" provision, the 300–foot no-approach zone around the clinic, and the 300–foot buffer zone around the residences, because these provisions sweep more broadly than necessary to accomplish the permissible goals of the injunction."); <u>Kirkeby v. Furness</u>, 92 F.3d 655, 661 (8th Cir. 1996) (finding "The "200–foot zone is almost certainly too restrictive of the right to speak freely in public.") <u>see</u> <u>also</u> <u>id.</u> ("Although Fargo may pass an ordinance prohibiting protesters from maintaining a constant presence outside of three residences, [] we think it manifest that it cannot give the Board the authority to create a "First–Amendment–free zone" that is larger than two football fields.").

[¶100]    The Court agrees that the Plaintiffs have pled facts which could plausibly show "the size of the buffer zone here, about 47,000 feet, vastly exceeds the 150-foot zone upheld in <u>Griefen</u> and closing a road for five months that was under construction for no longer than two weeks" may not have been narrowly tailored.

[¶101]    The Court finds the Plaintiffs have alleged facts sufficient to show the Defendants' closure of the road may not withstand strict scrutiny if it is ultimately applied.[12]

---

[12] As a reminder, at this stage the Court is not making the final determination as to which standard is to be applied in this case. Because many of the findings required to ascertain which standard is

(iv)    Intermediate Scrutiny

[¶102]    Even if the Plaintiffs ultimately cannot prove the closure of the area was content-based or view-point based, they have still pled sufficient facts to show that the Defendants' actions may not meet intermediate scrutiny under a content-neutral time, place, and manner restriction.

[¶103]    "Content neutral time, place, or manner regulations by contrast are tested by intermediate scrutiny," meaning they "must be 'narrowly tailored to serve a significant governmental interest' and allow for 'ample alternative channels for communication.'" Phelps-Roper v. City of Manchester, Mo., 697 F.3d 678, 686 (8th Cir. 2012). The Court has already addressed above that Plaintiffs have alleged facts showing the closure of the area may not have been narrowly tailored, so the Court need not address that element again. Additionally, the Court has found the Plaintiffs have alleged facts showing the Defendants may not have had a compelling interest in closing the area and for the same reasons finds the Plaintiffs have alleged facts showing the Defendants may not have had a *significant* governmental interest. Therefore, the Court need only consider if the Plaintiffs have alleged facts sufficient to show the Defendants failed to leave ample alternative channels for communication open.

[¶104]    "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 790–91 (1988). "The intended audience is therefore important to determining if alternative options are adequate." Id. "An alternative is not adequate if it 'foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups.'" Weinberg v. City of Chicago, 310 F.3d 1029, 1041 (7th Cir. 2002) (citing Gresham v.

appropriate turn on factual determinations, the Court is only finding the Plaintiffs have alleged facts at this juncture which may support strict or intermediate scrutiny.

Peterson, 225 F.3d 899, 907 (7th Cir. 2000) and Bery v. City of New York, 97 F.3d 689, 698 (2d

Cir.1996) (holding that a total ban on sidewalk art does not leave open alternative means of

communication because alternative display in galleries or museums would not reach the same

audience).[13]

[¶105]    The Plaintiffs allege in the Amended Complaint the closure kept them "*miles* away (well

out of line-of-sight or earshot) from the construction workers, security guards, and sites that had

for months prior been a primary focus of Plaintiffs' First Amendment activity." Doc. No. 44, ¶71.

"This effectively left Plaintiffs without any other means of communicating with one of their

principal and desired audiences (construction workers and security officers) or in one of their most

symbolically important forums (Highway 1806's curtilage abutting the identified sacred and

ceremonial sites near to where the pipeline would and eventually did cross."). Id. The Defendants

closed a nine-mile stretch of the Highway, which included these sites. The Court does note the

closing of the nine-mile stretch of Highway 1806 did not impede the ongoing DAPL protest

occurring within a few miles of these DAPL construction. The construction workers, security

guards, and site of Plaintiffs' First Amendment activity continued to be within earshot of the DAPL

---

[13] The Weinberg Court also offered additional examples, citing:

> City of Ladue v. Gilleo, 512 U.S. 43, 56–57 (alternatives to posting signs on residential property such as posting signs on commercial property are inadequate because residents may wish to reach neighbors); Bay Area Peace Navy v. United States, 914 F.2d 1224, 1229 (9th Cir.1990) (seventy-five yard security zone prevented anti-war protestors' demonstration from reaching the intended audience, military leaders); Students Against Apartheid Coalition v. O'Neil, 660 F.Supp. 333, 339–40 (W.D.Va.1987) (school regulation prohibiting protest shanties on lawn of building where Board of Visitors meets is not rendered valid by permission to erect shanties in other places not visible to members of Board, who were the intended audience); Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago, 419 F.Supp. 667, 674 (N.D.Ill.1976) (permitting a parade route through black neighborhood not a sufficient alternative to a route through white neighborhood when white people were the intended audience).

Weinberg, 310 F.3d at 1041.

protestors. Nonetheless, the Plaintiffs have alleged enough facts to show there were no ample alternative means to convey their message to their intended audience.

[¶106]    In addition, alternative strategies for ensuring public safety and traffic were contemplated by the State and Local Defendants throughout the time period in question. Doc. No. 44, ¶85. Some of these strategies include:

> [M]aintaining a non-militarized police presence near demonstrators in public areas, arresting and detaining lawbreakers (but not those peacefully and lawfully gathered), maintaining slower speed limits on the roadways, implementing cautionary road signage and traffic safety checkpoints, implementing speed bumps and other similar traffic mitigation measures, and even non-discriminatorily closing short—several-hundred feet— stretches of the road to traffic for only the minutes or hours during which a large demonstration was occurring.

Doc. No. 44, ¶85.

[¶107]    The Plaintiffs assert if these alternatives had been used it would have decreased the cost of policing, substantially improved public safety, left open public forms for speech and free exercise, decreased burdens on intrastate and interstate travel, and decreased the burdens on commerce. Doc. No. 44, ¶85.

[¶108]    The State Defendants' Motion to Dismiss Count I based on a "time, place, and manner" basis fails because Plaintiffs' Complaint contains adequate allegations to support their claim the Defendants violated their right to speak. The Defendants' arguments contained in their Motion relate solely to their disagreement with Plaintiffs' factual and legal assertions. The Court will not reach the merits of the parties' dispute at this point.

(2).    <em><u>PRIOR RESTRAINT</u></em>

[¶109]    The Defendants also assert the Plaintiffs have failed to state a claim for relief as to Count I under a prior restraint analysis.

[¶110]    The prior restraint doctrine recognizes "the time-honored distinction between barring speech in the future and penalizing past speech." <u>SOB, Inc. v. Cty. of Benton</u>, 317 F.3d 856, 866

(8th Cir. 2003) (citing <u>Alexander v. United States</u>, 509 U.S. 544, 554 (1993)). "Generally, prior restraints are subject to the highest degree of scrutiny and are the form of regulation most difficult to sustain under the First Amendment." <u>Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.</u>, 200 F.3d 1128, 1134 (8th Cir. 1999). A Plaintiff may claim a prior restraint violation if the government prevented, or chilled, him or her from speaking before the speech occurs. <u>Cross v. Mokwa</u>, 547 F.3d 890, 896 (8th Cir. 2008).

[¶111]   The crux of the Defendants' argument that the closure was not a prior restraint on speech centers on what the Defendants assert was a need to prevent criminal activity and violent protests. <u>See</u> Doc. No. 49, p. 36. The Defendants place emphasis on <u>Cross v. Mokwa</u>, 547 F.3d 890, 898 (8th Cir. 2008), to support the notion the government can place prior restraints on violent protests. In <u>Cross</u>, the "St. Louis Police Department learned that prior [World Agricultural Forum] conferences in Boston, Washington, and other cities had attracted violent protests instigated by small anarchist groups that infiltrated peaceful protesters, and that Internet sites were exhorting out-of-town activists to travel to St. Louis to participate in a counter-conference called "Biodevastation 7." <u>Id.</u> The police learned these individuals would occupy vacant or condemned buildings, and in response, the police instituted a "Building Code Violation Enforcement Plan" to identify these buildings. <u>Id.</u> Subsequently, five individuals were found in a condemned building prior to the conference and arrested, further arguing their arrests were unlawful because the Enforcement Plan was a prior restraint on protester activities. <u>Id.</u> at 896.

[¶112]   The Eighth Circuit rejected the prior restraint claim, noting "[i]t is undisputed that protesting peaceably is protected speech[,] and "[v]iolent protest is not." <u>Id.</u> The Court specifically noted:

> Plaintiffs were not engaged in protected protest activity on the morning of May 16, 2003. They were unlawfully occupying a condemned building in which they had

> improperly stored personal property, some of which could have been used in the future to engage in unprotected violent actions. Plaintiffs claim, in general terms, that their protected right to protest was chilled by defendants' pre-protest prior restraint. But plaintiffs carefully avoid the question whether the police actions in question were aimed at deterring, and in fact chilled, only unprotected violent protest activity.

Id.

[¶113]   Relying upon Cross, the Defendants assert in this case, just as in Cross, violent protestors infiltrated camps, protest activity was unlawful, and the closure was aimed at preventing further unlawful conduct. Doc. No. 49, p. 37. However, these statements all point to extrinsic facts not pled in the Plaintiffs' Complaint. The Defendants also assert the Plaintiffs in this case crafted their Complaint to "avoid the question whether the government action in question were aimed at deterring, and in fact, chilled, only unprotected violent protest activity." Id. The Defendants make this assertion based upon their opinion that only unprotected violent protest activity was the reason the road was closed. However, this contradicts allegations made by the Plaintiffs in the Complaint, which point to other reasons for the closure. See e.g. Doc. No. 44, ¶79-84, 49-50 (stating the purposes of the road closure were to extort political concessions of the Standing Rock Sioux Tribe and also to chill constitutionally protected speech).

[¶114]   The Defendants also attempt to rely upon Griefen again for the notion the area in question was closed for valid reasons. Griefen gave its opinion of when the government has the ability to close areas to the public and therefore restrain speech before it occurs:

> We have no doubt that a government entity may close areas of public forests under construction and repair, as it could temporarily close for good reasons a forest during a forest fire, a washed-out road or bridge, a crime scene during an official investigation, a street engulfed in a riot or an unlawful assembly, a terrorist-bombed public square, or the plaza surrounding the Washington Monument while the Monument is undergoing refurbishing. We also have no doubt that areas of a national forest may be closed to the public for reasons pertaining to the normal management requirements of a national forest as well as to honor contracts, the execution of which is temporarily incompatible with expressive behavior. The

49

appellants' arguments amount to a claim that they be allowed to continue their activities during construction in the construction area. To articulate their proposition in this way is to reveal its lack of reason.

Id. at p. 1262.

[¶115]   However, the Griefen court stated closure, and therefore prior restraint, is appropriate if it is for a purpose that is "valid rather than a disguised impermissible purpose." The Plaintiffs here assert the closure was not valid, but rather a disguised impermissible purpose. See Doc. No. 62, p. 31. To support this assertion, Plaintiffs point to their Complaint where they alleged Defendants selectively allowed certain DAPL employees and local residents to use the road while not allowing others, including the Tribe and its supporters. See Doc. No. 44, ¶55. They also point to the facts in the Complaint alleging the Defendants were seeking political concessions from the Standing Rock Sioux Tribe in which the re-opening of the road was dependent upon the Tribe meeting those concessions. Doc. No. 44, ¶¶79-81. In addition, the Plaintiffs claim that based upon the Defendants' argument that those with "legitimate business" were allowed on the highway during the closure was not a legitimate reason because the Plaintiffs assert they claimed in their Complaint that the an "overwhelming majority of the impacted population (the Tribe and its supporters) had legitimate and lawful reasons to use the road – including, for many, business reasons," but were denied access to the road. Doc. No. 44, ¶77.

[¶116]   Because the Plaintiffs have alleged facts showing the Defendants may have instituted a prior restraint, the closure may be subjected to strict scrutiny. For the reasons stated above, the Plaintiffs have already shown the closure of the road may not meet strict scrutiny, so that analysis need not be done again here.

[¶117]   In addition, a prior restraint may be deemed per se unconstitutional if the public official is given unbridled discretion. See e.g. City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750,

50

755–59 (1988) (finding "licensing scheme giving government unlimited discretion is facially unconstitutional; mere existence of such discretion, combined with power of prior restraint, intimidates speakers into censoring themselves even if discretion and power are never actually abused). Therefore, whether an action constitutes prior restraint and in turn a violation of the First Amendment may turn upon who is restricting the speech and the discretion they are given to do so.

[¶118]   For example, prior restraint violations have been found when public officials with unlimited or wide discretion chill the speech. See e.g. Steele v. City of Bemidji, 257 F.3d 902, 907 (8th Cir. 2001) ("the permit schemes vest the City Council with too much discretion to discriminate against disfavored speech or unpopular speakers"); see also Shuttlesworth v. City of Birmingham, 394 U.S. 147, 149–50 (1969) (invalidating ordinance requiring city commission to issue permit unless in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience required that it be refused"); Ward v. Rock Against Racism, 491 U.S. 781, 795, n. 5 (1989) ("[T]he regulations we have found invalid as prior restraints have 'had this in common: they gave public officials the power to deny use of a forum in advance of actual expression'" (quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975) (emphasis added))).

[¶119]   Here, the Plaintiffs have alleged the Defendants allowed certain groups of individuals, including DAPL, its employees, and locals not explicitly supporting the Tribe, to use the road in question during the closure while at the same time forbidding the Tribe and its supporters from utilizing it. Doc. No. 44, ¶76. Specifically, they assert "[t]his policy was either controlled by guidelines that were specifically tailored to exclude the Tribe and its supporters, while impacting as few others as possible; or, in the alternative, it was controlled by guidelines or a system of exemptions that were so vague as to give officers nearly unlimited discretion in determining who

was permitted use of this forum." Id. The Plaintiffs also point out that if the Defendants' argument in their Motion that DAPL employees and certain local residents were able to use the road for "legitimate business purposes," this is a an example of discretion because they asserted in their Complaint the Tribe and its supporters had legitimate business reasons to use the road, as well, but were still forbidden from using the road. Doc. No. 44, ¶77.

[¶120]    Based on the contentions in the Amended Complaint alone, the Court finds the Plaintiffs have alleged sufficient facts to show the Defendants' closure of the road in question constituted a per se unconstitutional prior restraint.

## II.    Count II – Violation of Right to Free Exercise (First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983) (Against All Defendants)

[¶121]    Count II of the Plaintiffs' Complaint alleges a violation of their rights to free exercise. Specifically, they allege their "free exercise of religious practices, especially as they relate to sincerely held and meaningful indigenous religious beliefs, were substantially burdened when Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, or in any other capacities such as Governor or Sheriff, or under color law, completely and indefinitely closed an approximately nine-mile portion of Highway 1806 to Plaintiffs' travel starting on October 24, 2016." Doc. No. 44, ¶137. Further, they assert "Defendants prevented Plaintiffs from praying at, worshipping by, or even visiting identified sacred and ceremonial areas located alongside this public nine-mile stretch of Highway 1806." Id. They also allege the Defendants "refused to extend any exemptions to Plaintiffs who sought to exercise their religious beliefs in the public areas that had previously been serving as a significant local place of worship," "despite granting numerous exemptions to this road closure – including

to employees and associates of DAPL and its affiliates and to certain non-indigenous local residents." Doc. No. 44, ¶138.

[¶122]   "[The] Government significantly burdens the exercise of religion if it significantly constrains conduct or expression that manifests a central tenet of a person's religious beliefs, meaningfully curtails the ability to express adherence to a particular faith, or denies reasonable opportunities to engage in fundamental religious activities." Altman v. Minnesota Dep't of Corr., 251 F.3d 1199, 1204 (8th Cir. 2001). "The Free Exercise Clause requires only that [government action] be neutral and generally applicable; incidental burdens on religion are usually not enough to make out a free exercise claim." New Doe Child #1 v. United States, 901 F.3d 1015, 1025 (8th Cir. 2018), cert. denied sub nom. New Doe Child #1 v. United States, 139 S. Ct. 2699, 204 L. Ed. 2d 1092 (2019). (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993)). "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 546. "[D]enying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest "of the highest order." Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012, 2019, 198 L. Ed. 2d 551 (2017).

(1).   *NEUTRAL AND GENERALLY APPLICABLE*

[¶123]   "[Governmental action] is not neutral [] if its object or purpose is the 'suppression of religion or religious conduct.'" New Doe Child #1, 901 F.3d at 1025. "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members

of the decision-making body.'" Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n, 138 S. Ct. 1719, 1731 (2018). "These objective factors bear on the question of discriminatory object." Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 542. The Court may consider both circumstantial and direct evidence. Id.

[¶124]   Additionally, government action will not be considered generally applicable if it selectively imposes burdens only on a person's conduct that is motivated by religious belief. Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 542. Government action is also not generally applicable if it is underinclusive or overbroad. Id. at 546. "A law is underinclusive, and thus not generally applicable, when it fails to prohibit secular activity that endangers the same interests to a similar or greater degree than the prohibited religious conduct." First Baptist Church v. Kelly, No. 20-1102-JWB, 2020 WL 1910021, at *6 (D. Kan. Apr. 18, 2020).

[¶125]   As support for the notion that the road closure was not neutral and generally applicable, the Plaintiffs point to several facts pled in their Amended Complaint. First, they assert the closure was tailored to exclude the Tribe and its supporters, who were "predominantly indigenous, practitioners of indigenous religious beliefs, and anti-DAPL[.]" Doc. No. 44, ¶55. They assert, "the effect of any guidelines or exemptions here was to only exclude those who Defendants associated with the Tribe and its supporters; any broader impacts were incidental and marginal." Doc. No. 44, ¶77. The Plaintiffs have also asserted they were not allowed to use the closed area for expressive purposes, but other local residents not affiliated with the Tribe and its supporters were allowed to use the road for any purpose, "including, if they wished, for purposes related to expression." Doc. No. 44, ¶76.

[¶126]   Second, the Plaintiffs attempt to advance the argument that while the Defendants' closure of the road may not have been discriminatory on its face, the underlying, masked reasons were a

pretext for an improper animus toward their religious beliefs. For example, they point to facts in their Complaint that they argue support the argument that while the Defendants stated they had legitimate reasons for the closure, they actually did not have a nondiscriminatory purpose for the closure. See supra (discussing Plaintiffs' allegation in the Complaint which assert that there was no mayhem to quell (Doc. No. 44, ¶¶49, 50, 80-84, 123), there was no bridge damage beyond October 28, 2016 (Doc. No. 44, ¶¶60, 66-69), and there was no DAPL construction beyond early November (Doc. No. 44, ¶72)).

[¶127]   Along these same lines, the Plaintiffs point to their Complaint where they discuss that the Defendants asserted the bridge needed repair, but the Defendants continued to use the bridge themselves, and the closure of miles of road where the Plaintiffs could have engaged in constitutionally protected activity did not actually prevent access *onto* the bridge, only past it. See Doc. No. 44, ¶7 ("This barricade presented a physical boundary to any travel past the bridge on *or around* Highway 1806 (but it did not prevent travel onto the bridge itself). Defendants also enforced an absolute prohibition on travel for the Tribe and its supporters—including foot, horseback, and ATV travel—on Highway 1806, regularly arresting Water Protectors who approached the barricade on foot."); see also id. at ¶67 ("Moreover, Defendants used the bridge itself to maintain its barricade, placing numerous concrete blocks that added substantial sustained concentrated weight to the bridge that they claimed might be damaged—imposing more stress than an occasional passing car or ambulance would."). On this basis, the Plaintiffs argue their Complaint shows the closure was overbroad.

[¶128]   The Plaintiffs also assert that the Defendants' mischaracterization of their public religious observances as "riotous, violent, and/or dangerous" is a "widely understood" "indicator of prejudice" Doc. No. 62, p. 36; (citing R. Richard Banks et al, Discrimination and Implicit Bias

in a Racially Unequal Society, 94 Cal. L. Rev. 1169 (2006)). Specifically, the Plaintiffs allege, these mischaracterizations were "fueled by TigerSwan's intentionally misleading intelligence regarding Water Protector conduct," which "then served as a pretext for state and local officials to publicly misrepresent the effect of and to prosecute the practice of indigenous religious beliefs in the area." Doc. No. 44, ¶143. The Plaintiffs further allege the Defendants then aired the animosity towards indigenous religious practice throughout public statements. Id.

[¶129]   Finally, the Plaintiffs argue it was not just the closure of Highway 1806 that burdened the Plaintiffs' expressive rights. Doc. No. 44, ¶70. The Plaintiffs allege at the same time as the closure of Highway 1806, the Defendants implemented a "de facto cordon of the construction area and of the nearby sacred and ceremonial sites," preventing "any travel in the general vicinity." Doc. No. 44, ¶70. The Plaintiffs contend that on November 2, hundreds of protestors, including indigenous elders, "held a prayer ceremony across a river located approximately one mile from the pipeline construction site and apparently on the edge of Defendants' unstated, but strictly enforced, cordon of the area." Doc. No. 44, ¶70. After a few protestors entered the frigid river, the Plaintiffs assert "the Defendants reacted with significant force," which chilled expressive rights. Doc. No. 44, ¶70.

[¶130]   The Defendants argue that even though government action may have an incidental effect on burdening religion, it does not violate the Free Exercise Clause if it is unmotivated by religious animus. Id. (citing Emp't Div., Dep't of Human Res. Of Or. V. Smith, 494 U.S. 872, 878-79 (1990)). The Court agrees. The Plaintiffs' Complaint fails to offer any facts to suggest, or even provide a plausible inference, that the Defendants' purpose in closing the road was to suppress religious conduct. There are no facts in the Amended Complaint to support the notion.

[¶131]   For example, while the Plaintiffs assert the Defendants "broadcast their animosity towards indigenous religious practice through numerous public statements," a review of these statements in the Amended Complaint do not support that assertion nor does it provide an inference of it. The Defendants statements regarding the prerequisite that there be "law and order" to the area before the area would reopened does not show the Defendants had an animosity toward religion let alone provide an inference that the Defendants harbored an animosity towards indigenous religious practices. Doc. No. 44, ¶¶5, 80-83, 143. The contention is too attenuated. Likewise, the assertion that the Defendants mischaracterized protestors as "violent" or "dangerous" does not lend support that the Defendants closed the area in question to suppress the Plaintiffs' *religious* activities. Without more, the inference cannot be made because the Defendants could have closed the road for a number of reasons completely unrelated to suppressing specifically religious practices. The fact the Defendants might have known the Plaintiffs were using the area in question to engage in religious practices, such as hanging prayer ties or praying, does not strictly equate to the Defendants' closing the road out of religious animosity.

[¶132]   Many events were happening at the time period in question,[14] and without facts pled in the Amended Complaint to support the notion that the Defendants intent or object was to close the road to suppress the Plaintiffs' religious practices, the claim cannot survive. Instead, the facts as alleged, support the notion that road closure had an incidental burden on the Plaintiffs' religious

---

[14] The Defendants make the argument that the "undisputed facts show there were legitimate, objective reasons for the highway/bridge closures unrelated to any animus towards the plaintiffs' religious practices," pointing to extrinsic evidence of crimes occurring at the scene and quelling riots, among other facts not found in the Amended Complaint. Doc. No. 49, p. 40. Even without considering the Defendants' extrinsic evidence or argument that it had objective, non-discriminatory reasons for closing the road that were not related to religious suppression, the Plaintiffs have failed to provide sufficient facts showing the road closure by the Defendants' was not neutral or generally applicable.

practices. The Plaintiffs have failed to show the "careful drafting of otherwise facially neutral [action] essentially constituted a religious "gerrymander" that departed from principles of neutrality because it revealed that the [action] 'had as their object the suppression of religion.'" Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty., 450 F.3d 1295, 1309 (11th Cir. 2006).

(2). *EXCEPTIONS TO ACTIONS THAT ARE NEUTRAL AND GENERALLY APPLICABLE*

[¶133]   The Plaintiffs assert government action under the Free Exercise Clause can still be subject to strict scrutiny in two different ways even if the action or law was neutral and generally applicable. Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 876 (1990), clarified "the Court held that a neutral law of general applicability that incidentally impinges on religious practice will not be subject to attack under the free exercise clause." Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 472 (8th Cir. 1991). However, the Plaintiffs assert there are two instances when content-neutral and generally applicable actions will still be subjected to strict scrutiny: (1) when the government's action "directly regulates belief or religious-based conduct" and (2) when the government's action violates "the first amendment in conjunction with other constitutional provisions." Id. Strict Scrutiny is the appropriate standard for these "hybrid cases". Olsen v. Mukasey, 541 F.3d 827, 832 (8th Cir. 2008).

[¶134]   As to the first instance, the Plaintiffs argue the Defendants regulated religion because they created a system of "exemptions" from the closure to which the Plaintiffs were not given for their religious beliefs. Doc. No. 62, p. 37. The Supreme Court, although explicitly in discussing the unemployment realm, noted, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Smith, 494 U.S. at 884. The Plaintiffs point the Court to Bowen v. Roy, 476 U.S. 693 (1986) as

example of a case inappropriately granting exemptions in violation of this notion.[15] Relying on Smith and Bowen, for support, the Plaintiffs argue the Supreme Court has mandated "[i]f a state creates [a mechanism for individualized exemptions,] its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent." Bowen, 476 U.S. at 708

[¶135]   However, the Bowen Court noted its case, a case requiring a social security number in order to obtain benefits, was different than that of Sherbert and Thomas. Bowen, 476 U.S. at 708 ("In the enforcement of a facially neutral and uniformly applicable requirement for the administration of welfare programs reaching many millions of people, the Government is entitled to wide latitude. The Government should not be put to the strict test applied by the District Court; that standard required the Government to justify enforcement of the use of Social Security number requirement as the least restrictive means of accomplishing a compelling state interest."). The Court noted "Thomas and Sherbert may be viewed 'as a protection against unequal treatment rather than a grant of favored treatment for the members of the religious sect.'") Id. (citing United States v. Lee, 455 U.S., at 264, n. 3, 102 (STEVENS, J., concurring in judgment)).

[¶136]   In contrast, the Bowen Court noted that its case was more appropriately subjected to the test that "[a]bsent proof of an intent to discriminate against particular religious beliefs or against religion in general, the Government meets its burden when it demonstrates that a challenged

---

[15] While the Plaintiffs assert Bowen concerned a statute that created a system whereby employees who missed work were judged by a "without good cause standard" in order to obtain unemployment benefits, Bowen actually did not concern this issue. Doc. No. 62, p.37. The issue in Bowen centered on whether the Government was required under the Free Exercise Clause to allow the appellees' to ignore the statutory requirement of providing a social security number for their minor child in order to obtain welfare benefits because they asserted it violated their Native American religious beliefs to do so. 476 U.S. at 695-96. Nonetheless, Bowen did discuss the two cases analyzing the "good cause standard" for unemployment benefits to which the Plaintiffs refer, Sherbert v. Verner, 374 U.S. 398, 412 (1963) and Thomas v. Review Board of Indiana Employment Security Div., 450 U.S. 707, 717–718 (1981).

requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest." Id. The Bowen Court, ultimately applied this test, noting "[h]ere there is nothing whatever suggesting antagonism by Congress towards religion generally or towards any particular religious beliefs," explaining that no one was allowed an exemption. Id.

[¶137]   Attempting to analogize the "good cause standards" in Sherbert and Thomas, the Plaintiffs assert the Defendants in this case created a system of exemptions similar to the good cause standard. Doc. No. 62, p. 38. Specifically, the Plaintiffs assert the Defendants' good cause standard was based upon who had "legitimate business" to use the road, an assertion the Defendants made in their Memorandum in Support of the Motion to Dismiss. Id. (citing Doc. No. 49, p. 32). For support of this theory, the Plaintiffs again point to their Complaint where they state:

> Moreover, despite granting numerous exemptions to this road closure—including to employees and associates of DAPL and its affiliates and to certain non-indigenous local residents—Defendants refused to extend any exemptions to Plaintiffs who sought to exercise their religious beliefs in the public areas that had previously been serving as a significant local place of worship.

Doc. No. 44, ¶138.

[¶138]   The Plaintiffs also assert in their Amended Complaint "[t]his policy was either controlled by guidelines that were specifically tailored to exclude the Tribe and its supporters, while impacting as few others as possible; or, in the alternative, it was controlled by guidelines or a system of exemptions that were so vague as to give officers nearly unlimited discretion in determining who was permitted use of this forum." Id.

[¶139]   The Plaintiffs' claim again fails due to a lack of proof of intent to discriminate against religious beliefs. This case differs from Bowen, Thomas, and Sherbert. In those cases, individuals claimed they were refused exemptions from certain requirements *because of* their religious beliefs,

which placed them in a position of adhering to their religious practices or violating them in order to receive governmental aid. (<u>Bowen</u> - providing a social security number in order to obtain welfare benefits); (<u>Thomas</u> – voluntary termination of employment due to religious beliefs forbidding individual from creating materials for weapons should not be subjected to the requirement of showing termination was for "good cause in connection with the work" before obtaining unemployment compensation); and (<u>Sherbert</u> – individual's refusal to accept work requiring her to work on Saturdays, the Sabbath Day of her faith, should not disqualify her from unemployment benefits as someone who fails, without good cause, to accept suitable employment).

[¶140]    Here, the Plaintiffs assert they should have been excused from the requirement that no one use the road because they had previously used certain closed areas[16] as places of religious worship. While the Plaintiffs assert others were able to use the road, including DAPL employees, non-indigenous individuals, and others, "for expressive purposes if they wish," there is nothing in the Amended Complaint stating or providing an inference that the Defendants made those exemptions in an effort to exclude certain religious beliefs or religious beliefs at all. The Plaintiffs have failed to show they were not provided an exemption to use the road *because of* their religious beliefs or something within them.

[¶141]    There is nothing in the Amended Complaint to suggest the Defendants' intent was to stop the Plaintiffs from exercising their religious beliefs or making a choice that would violate them. The system of exemptions that are subject to strict scrutiny in <u>Sherbert</u> and <u>Thomas</u> were ones

---

[16] The County Defendants point out that the Plaintiffs allege these sacred or ceremonial sites were located "alongside this public nine-mile stretch of Highway 1806." Doc. No. 52, p. 8 (citing Doc. No. 44, ¶137). On this basis, the County Defendants argue the identified sacred and ceremonial sites were on private property to which the Plaintiffs did not allege they were given permission. <u>Id.</u> The Defendants argue "the government did not control access to the sacred and ceremonial sites at issue, and the opening of Highway 1806 and the Backwater Bridge would not have resulted in the Plaintiffs' access to the alleged sacred and ceremonial sites." <u>Id.</u>

placing the individuals in a position of either accepting governmental benefits or violating their religious beliefs. That is not the case here. The closure of the road did not place the individuals in such a quandary.

[¶142]    As the <u>Bowen</u> Court noted, "[a]bsent proof of an intent to discriminate against particular religious beliefs or against religion in general, the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest." <u>Bowen</u>, 476 U.S. at 707–08. The Plaintiffs have failed to show Defendants had an intent to discriminate against their religious beliefs or religion in general by closing the road. <u>See</u> <u>Cornerstone Bible Church v. City of Hastings</u>, 948 F.2d 464, 472 (8th Cir. 1991) ("There is no evidence that the City has an anti-religious purpose in enforcing the ordinance. Absent evidence of the City's intent to regulate religious worship, the ordinance is properly viewed as a neutral law of general applicability and under *Smith* summary judgment on this free exercise claim was appropriate.").

[¶143]    As to the Hybrid Free Exercise exception, the Plaintiffs assert they have alleged numerous facts throughout their Complaint which show the road closure "imposed a 'substantial burden' on their ability to worship by numerous 'sacred and ceremonial' sites that abutted the road." Doc. No. 62, p. 39. To substantiate this statement, the Plaintiffs point to facts in their Amended Complaint to assert the travel limitations "prevented Plaintiffs from exercising their First Amendment right to assemble, speak, and pray in the area in question, including but not limited to a nearly nine-mile stretch of a public road abutting numerous sacred and ceremonial sites, as well as portions of the public road near the pipeline's path. Doc. No. 44, ¶9. The Complaint alleges, "[g]iven that the decision on the Lake Oahe crossing (and, ultimately, the operation of the pipeline) had an uncertain outcome, Plaintiffs and the tribes had a compelling and vital First Amendment

need to be able to speak and assemble on the curtilage of the closed portion of the highway near the site of completed construction to express their ongoing opposition to the potential construction and operation of the pipeline." Doc. No. 44, ¶73. The Plaintiffs also allege "[a]ccess to the public land abutting the neighboring sacred sites was also vital to Plaintiffs' First Amendment right to physically pray at their traditional religious lands and to demonstrate by their physical presence both the sacredness of such lands to the Oceti Šakowiŋ and their continuing claim to such lands." Doc. No. 44, ¶74. As to the entwinement of rights, the Plaintiffs allege:

> Much of the religious exercise that was substantially burdened by the discriminatory road closure also had an accompanying significant expressive purpose or assembly component, as described in Count I and elsewhere in these allegations. Prayer flags or prayer ties, for example, are inherently symbolic and expressive in addition to playing a central role in indigenous land-based religious exercise. Similarly, much of the religious exercise that was substantially burdened, like prayer 'rides' and prayer 'runs,' also had an accompanying travel interest.

Doc. No. 44, ¶140.

[¶144]   Circuits are split on what a Plaintiff must show in order to bootstrap their otherwise unviable free exercise claim to another constitutional claim in order to invoke the hybrid rights doctrine. The Ninth and Tenth Circuits require a "colorable showing of infringement" of the companion claim. See Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 700 (10th Cir. 1998) ("Whatever the Smith hybrid-rights theory may ultimately mean, we believe that it at least requires a colorable showing of infringement of recognized and specific constitutional rights, rather than the mere invocation of a general right such as the right to control the education of one's child"). Other courts require that the companion claim be independently viable. Mahoney v. D.C., 662 F. Supp. 2d 74, 95 (D.D.C. 2009), aff'd sub nom. Mahoney v. Doe, 642 F.3d 1112 (D.C. Cir. 2011) ("Plaintiffs may not, however, raise a "hybrid claim," because they do not have an independently viable claim under the Speech Clause."). One district court has

63

rejected this "independently viable" standard instead requiring a genuine claim supported by evidence in the record. Hicks ex rel. Hicks v. Halifax Cty. Bd. of Educ., 93 F. Supp. 2d 649, 662 (E.D.N.C. 1999) ("Whether or not the second constitutional interest is independently viable is not at issue. It is the mere presence of the interest, as a genuine claim, supported by evidence in the record, that triggers the heightened scrutiny of the free exercise claim. While this court agrees with Justice Souter that allowing a plaintiff to obtain a heightened level of scrutiny merely by alleging a constitutional right other than free exercise may cause the purported exception to swallow the rule, plaintiffs in this case have presented more than a mere allegation."). The Eighth Circuit instead allows hybrid claims when the free-exercise claim is "connected with" the companion claim. See Telescope, 936 F.3d at 759 ("Because the Larsens' free-exercise claim is "[ ]connected with [their] communicative activity," in other words, the Larsens may use their "Free Exercise Clause concerns" to "reinforce[ ]" their free-speech claim."). Upon a review of cases, particularly those in the Eighth Circuit, analyzing the intertwinement of rights in these hybrid situations, it appears this case does not fit in the category of cases where the free exercise claim is connected with the companion claim.

[¶145]   For example, Cornerstone Bible Church v. City of Hastings, 948 F.2d 464 (8th Cir. 1991), involved a city zoning ordinance that restricted a church from relocating to the town's central business district. 948 F.2d at 464. While the zoning ordinance for the central business district itself does not explicitly reference churches, a resolution passed by the city in denying the church's request to use a business in the central business district noted that church activities were contrary to the business environment, and therefore, did not coincide with the objectives and policies surrounding the central business district zoning. Id. at 467. The church filed suit claiming violations of speech, equal protection of law, and a violation of free exercise. Id. Subjecting the

free speech claim to a time, place, and manner standard, the Court reversed the lower court's grant of summary judgment because "[t]he City has not provided factual support for the assumptions that underlie its exclusion of churches, and the alleged secondary effects of churches on commercial activity remain a disputed factual issue." Id. at 470. The Court also reversed the grant of summary judgment on the equal protection claim, noting "[t]he City has failed to support its exclusion of the Church with any justification beyond the conclusory statements in the affidavits of the city planners." Id. at 472.  As to the free exercise claim, the Court found the zoning ordinance itself was generally applicable and the City did not have an anti-religious purpose in enforcing the ordinance so the free exercise claim on its own failed. Id. However, the Court noted that its reversal of the summary judgment on the other claims "breathed life back into the [c]hurch's hybrid rights' claim" by requiring the lower court to consider the claim in light of the church's claim that its free speech and equal protection rights in conjunction with the free exercise rights were violated. Id.

[¶146]    Telescope Media Group v. Lucero, 936 F.3d 740 (8th Cir. 2019) involved two wedding videographers who declined services to same-sex individuals because it ran afoul of their beliefs. Id. at 747. The State of Minnesota, relying upon two provisions in the Minnesota Human Rights Act ("MHRA"), mandated that the videographers either make videos for both same-sex couple and opposite-sex couples, or no one at all. Id. at 748. The videographers sought an injunction against Minnesota, asserting enforcing the provisions against them would violate their rights to free speech, free-exercise, association, and equal-protection, among others. Id. at 749. The videographers argued their free-exercise rights were violated because "they will have to either show support for same-sex marriage, even though they object to it on religious grounds, or refrain from making wedding videos at all." Id. The Eighth Circuit noted the videographers free-exercise claim was not a typical free exercise claim because "[t]hose seeking relief under the Free Exercise

Clause of the First Amendment will ordinarily argue that their religion requires them to engage in conduct that the government forbids or forbids certain conduct that the government requires." Id. Here, the Eighth Circuit noted, the videographers were arguing "the MHRA burdened their religiously motivated *speech*, not their religious *conduct*," and on this basis, their claim falls into the "hybrid-situation[.]" Id. (emphasis added).

[¶147]    In these hybrid cases, even though the free exercise claim failed on its own, the free exercise claim was still based on the Government "significantly constrain[ing] conduct or expression that manifests a central tenet of a person's religious beliefs, meaningfully curtail[ing] the ability to express adherence to a particular faith, or den[ying] reasonable opportunities to engage in **fundamental religious activities**." Altman v. Minnesota Dep't of Corr., 251 F.3d 1199, 1204 (8th Cir. 2001) (emphasis added). In Telescope, the Government curtailed the individuals from adhering to their particular faith because it told the individuals to either endorse a certain speech their religion rejected or be denied from engaging in their livelihood at all. In Cornerstone, the church was targeted for exclusion based solely on its organized religious speech. See Cornerstone, 948 F.2d at 468 ("Thus, the religious content of the applicant's speech can determine whether the City permits it to locate in the C–3 zone."). In these hybrid-cases, religious speech was intimately connected with the free exercise claims in such a way that it was logical to allow them to move forward. The same cannot be said for this case.

[¶148]    The Plaintiffs allege tribal elders and spiritual leaders confirmed the "appropriateness and desirability of praying in the public area immediately abutting Highway 1806" and specific ancient burial and ceremonial sites in the area. They also allege "Indigenous religious practices do not treat places of worship as fungible, and so the intent and effect of Defendants actions, therefore, was to severely penalize— fully halting some—**conduct** prescribed by Plaintiffs' religious

beliefs." Doc. No. 44, ¶137. However, the Plaintiffs failed to allege facts showing exercising religious activities or religiously-motivated speech in the closed area was a central tenant of their religious beliefs, that closing the area prohibited meaningful ability to adhere to a particular faith, that performing religious exercise in the area was fundamental activity to their religion, or that they were denied reasonable opportunities to engage in these activities. Their allegations show an incidental burden on their religious *conduct* not their religious speech. Their free exercise claim, which as noted above fails on its own, is not so connected with their free speech claim as to justify allowing the free exercise claim to piggyback on the free speech claim moving forward.[17]

[¶149]   Additionally, by the Plaintiffs' own admission, the <u>Sherbert</u> test mandates the government must have a compelling interest that justifies *substantial* infringement on their ability to worship. <u>compare</u> Doc. No. 62, p. 39 <u>with</u> <u>Sherbert</u>, 374 U.S. at 406. In this case, the Plaintiffs' free exercise claim is based upon an incidental burden, and if anything, the closure burdened the Plaintiffs' religious *conduct*, not their religiously motivated *speech*.

[¶150]   The Plaintiffs have failed to plead facts in the Amended Complaint that support the closure was neither neutral nor generally applicable. They have also failed to state a plausible hybrid rights claim or exemption claim, therefore, strict scrutiny does not apply. Rather, rational basis is the standard for regulations that are neutral and generally applicable. <u>Doe v. Parson</u>, 960 F.3d 1115, 1119 (8th Cir. 2020) ("Doe makes no argument, however, that the informed-consent law is anything other than 'neutral' and 'generally applicable.' In these circumstances, it must only survive rational-basis review, which requires it to be "rationally related to a legitimate government

---

[17] Indeed, if this Court were to hold otherwise, this situation would be an example of the exception swallowing the rule. <u>See</u> Justice Souter's concurrence in <u>Church of the Lukumi</u>, 508 U.S. at 559 (explaining his concern with allowing any hybrid claim "[T]he distinction Smith draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the Smith rule").

interest."). The Defendants again argue the area in question was closed for legitimate reasons, including because "the bridge was a crime scene, the bridge was damaged and required repair, criminals were using the highway to trespass on private property and commit criminal acts, and it was unsafe for the public to continue to use the highway and  bridge." Doc. No. 49, pp. 40-41. These assertions again are not found on the face of the Amended Complaint.

[¶151]   Nonetheless, the burden rests on the Plaintiffs, not the Defendants, to bring forth facts at the motion-to-dismiss stage to make a plausible showing that the Defendants' actions in closing the area in question may not withstand rational basis. Gallagher v. City of Clayton, 699 F.3d 1013, 1020 (8th Cir. 2012). While the Plaintiffs provided facts in the Amended Complaint to suggest the Defendants' actions in closing the road may not meet strict or intermediate scrutiny for their free speech claims, they have failed to allege facts suggesting the road closure may not meet rational basis as it relates to their free exercise claim. Because the Plaintiffs have failed to meet this burden, and as a result of neither Smith exceptions applying in this case to heighten the standard to strict scrutiny, Claim II is dismissed.

### III.   Violation of Right to Travel (Fifth and Fourteenth Amendments to the and Privileges and Immunities Clause of the, U.S. Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 1985(3)) (Against All Defendants)

[¶152]   "The right to travel is a fundamental right." Hughes v. City of Cedar Rapids, Iowa, 840 F.3d 987, 995 (8th Cir. 2016) (citing United States v. Guest, 383 U.S. 745, 757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). "It has three different components: 1) the right of a citizen of one state to enter and leave another state, 2) the right to be a welcome visitor, not an unfriendly alien, when temporarily present in another state, and 3) for those travelers who become permanent residents, the right to be treated like other citizens of that state." Id.

(1).      *FUNDAMENTAL RIGHT TO INTRASTATE TRAVEL*

[¶153]    The first component protects the "right to go from one place to another." Hughes, 840

F.3d 995. The crux of the Defendants' argument is that neither the United States Supreme Court

nor the Eighth Circuit has explicitly recognized a "protection for purely intrastate travel." Id. at p.

44.

[¶154]    While the Eighth Circuit has addressed *intra*state restrictions in the context of the second

and third components of the right to travel through the Privileges and Immunities Clause, it has

not found an explicit fundamental right to intrastate travel through the first component. Hughes,

840 F.3d at 995. ("[A] purely intrastate restriction does not implicate the right of interstate travel,

even if it is applied intentionally against travelers from other States, unless it is applied

*discriminatorily* against them. For the Clause to apply, the discriminatory treatment must burden

out-of-state residents."). The United States Supreme Court has not either.

[¶155]    However, many lower courts housed in the Eighth Circuit, including the North Dakota

Supreme Court, have found a fundamental right to intrastate travel. See e.g. State v. Byzewski,

2010 ND 30, ¶ 7, 778 N.W.2d 551, 553 ("A protection order encroaches on an individual's

constitutional right to travel, including the right to travel within a state. While a person has a

constitutional right to intrastate travel, that right is not absolute and may be restricted."); State v.

Holbach, 2009 ND 37, ¶ 13, 763 N.W.2d 761, 765 ("An individual has a constitutional right to

intrastate travel, however, that right is not absolute and may be restricted.")' Behm v. City of Cedar

Rapids, 922 N.W.2d 524, 549 (Iowa 2019); ("[R]ights to interstate and intrastate travel are

fundamental and, if infringed, may give rise to strict scrutiny under equal protection and

substantive due process."); State v. Cuypers, 559 N.W.2d 435, 437 (Minn. Ct. App. 1997)

("Minnesota also recognizes the right to intrastate travel."); Hawk v. Fenner, 396 F. Supp. 1, 4

(D.S.D. 1975) ("The constitutional right to travel includes not only interstate but intrastate travel as well.").

[¶156]   In addition, courts in multiple circuits in the United States have found the same. See e.g. Rowitz v. McClain, 2019-Ohio-5438, ¶ 25, 138 N.E.3d 1241, 1254 ("Although the United States Supreme Court has not recognized a fundamental right to intrastate travel, Ohio has."); Deluca v. Merner, 322 F. Supp. 3d 201, 205 (D. Mass. 2018)("In Massachusetts, there is a fundamental right to "peacefully [ ] dwell within the limits of the [Commonwealth], [and] to move at will from place to place therein."); Thomas v. Haslam, 303 F. Supp. 3d 585, 613 (M.D. Tenn. 2018) ("The Sixth Circuit, moreover, has gone a step further and "has recognized a protected right to intrastate travel, i.e., 'a right to travel locally through public spaces and roadways.'"); Angus Partners LLC v. Walder, 52 F. Supp. 3d 546, 559 (S.D.N.Y. 2014) ("Courts have long recognized that the Constitution protects a right to travel within the United States, including for purely intrastate travel."); Catron v. City of St. Petersburg, 658 F.3d 1260, 1270 (11th Cir. 2011) (Under Florida law, in order to burden a Florida citizen's right to intrastate travel, the government's policy must be narrowly tailored to advance a compelling governmental interest.); In re Marriage of Guffin, 2009 MT 169, ¶ 11, 350 Mont. 489, 492, 209 P.3d 225, 228 ("The right to travel between states would mean little if a person did not also have the right to travel within a state after crossing its borders. We hold, therefore, that the right to travel guaranteed by the United States Constitution includes the right to travel within Montana."); State v. Sims, 152 Wash. App. 526, 531, 216 P.3d 470, 472 (2009), aff'd but criticized, 171 Wash. 2d 436, 256 P.3d 285 (2011) ("Banishment orders encroach on an individual's constitutional right to travel, which includes the right to travel within a state."); State v. Ruesch, 214 Wis. 2d 548, 558, 571 N.W.2d 898, 903 (Ct. App. 1997) ("The "right to travel intrastate is fundamental among the liberties preserved by the Wisconsin

Constitution. This right to travel includes the right to move freely about one's neighborhood, even in an automobile.").

[¶157]   While there is nothing to preclude at this time a finding that the Plaintiffs may possess a fundamental right to intrastate travel, the Plaintiffs must still allege facts showing it is plausible that the Defendants' closure of the road placed substantial burdens on their rights to travel, not merely minor ones. The Defendants assert "[a] temporary intrastate closure of a local highway does not substantially burden the fundamental constitutional right to travel." Doc. No. 49, p. 43. What is recognized, the Defendants assert, is that "the constitutional right to travel is not implicated by *minor* restrictions." Id. The Defendants are correct in this assertion.

[¶158]   Because travel is a fundamental right, "any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." Minnesota Senior Fed'n, Metro. Region v. United States, 273 F.3d 805, 809 (8th Cir. 2001). However, "travelers do not have a constitutional right to the most convenient form of travel." Cramer v. Skinner, 931 F.2d 1020, 1031 (5th Cir. 1991). "Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification." Id.

[¶159]   The Plaintiffs assert in the Amended Complaint their "fundamental right to travel was significantly and discriminatorily burdened" by the closure of the area in question. Doc. No. 44, ¶146. The Plaintiffs assert they were prevented from travelling by foot, bike, horse, or by any other means on a public right of way for five months straight. Id. To the Plaintiffs, the road closure made it "prohibitively difficult" for the Plaintiffs to travel for "cultural, political, and social activities, to obtain needed medical services or treatment, to shop, to get gas, to go to restaurants, or for other such reasons." Id. at ¶ 148.

[¶160]   In the Defendants' view, there were "multiple alternative routes" that existed for the Plaintiffs to utilize, so the restriction was minor. Doc. No. 49, p. 45. The Court agrees. As the Defendant's point out, using Highway 1806 to get from Bismarck/Mandan to Fort Yates is 63.5 miles and using Highway 6 is 68.7 miles, a difference of only 5.2 miles. Doc. No. 49, p. 45. In addition, they also point out that using Highway 1806 to get between Bismarck and Cannon Ball is 45.4 miles and using Highway 6 is 56.5 miles, a difference of just 11.1 miles. Doc. No. 49, p. 45. Again, "travelers do not have a constitutional right to the most convenient form of travel." Cramer, 931 F.2d at 1031. At most, the Plaintiffs have alleged a minor burden on their right to travel in the State of North Dakota. North Dakota is a rural State with thousands of miles of highways. Communities are often miles from each other. A detour of five or six miles from the nearest reasonable point to detour traffic is not a substantial burden in this State.

[¶161]   Assuming without deciding there is a fundamental right to intrastate travel, the Plaintiffs have nonetheless failed to allege a claim that their a purported right to travel under the Hughes first component was substantially burdened.

(2).        *PRIVILEGES AND IMMUNITIES*

[¶162]   The Plaintiffs also allege their rights to travel were violated under the second and third components of Hughes. The Privileges and Immunities Clause is the basis for the second and third components of the right to travel, "'bar[ring] discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.'" Hughes, 840 F.3d at 995. Again, an *intra*state restriction can be a violation of the Privileges and Immunities Clause if it is applied discriminatorily against travelers from other States." Hughes, 840 F.3d at 995; see also Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 277 (1993). "For the Clause to apply, the discriminatory treatment must burden **out-of-state**

**residents**." Id. (emphasis added). The Plaintiffs assert their rights to travel under the Privileges & Immunities Clause were violated in two specific respects: (A) the road closure was intended to, and did, discriminatorily burden visitors to North Dakota; and (B) the closure was intended to, and did, burden migration to North Dakota." Doc. No. 62, p. 46.

(i)    Burden on Visitors

[¶163]    Plaintiffs assert "[a]lthough, during the period in question, the majority of individuals at these camps were out-of-state visitors to the region, there remained at all times a strong contingent of North Dakota locals." Doc. No. 44, ¶42. "By September 2016, these camps reached a sustained population of approximately 7,000-10,000 individuals." Id. The Plaintiffs assert this road closure was "tailored [] to maximize its restrictive impacts on the predominantly non-resident population," pointing to their Amended Complaint wherein they assert North Dakota residents were allowed to use the road. Doc. No. 62, p. 47 (citing Doc. No. 44, ¶¶55,76-78,138,149-53). In addition, they note "[g]iven the location of the camps in relation to the road closure and to the nearest major shopping centers, hospitals, airport, etc. the burdens of this road closure were intended by Defendants to and, in fact, did disproportionately and discriminatorily fall on residents of these camps."). Doc. No. 44, ¶153.

[¶164]    The Plaintiffs also assert that when the Defendants initiated the road closure it not only prevented them from engaging in "constitutionally protected conduct" but it also "deterred others from joining or supporting Plaintiffs." Doc. No. 44, ¶75. Specifically, the Plaintiffs assert "the consequences impacted each Plaintiff, whose interest in associating with as many like-minded individuals as possibly was injured by the closure's deterrence of out-of-state visitors to the region." Doc. No. 62, p.

[¶165]    While these assertions in the Amended Complaint could form the basis of a violation of the fundamental right to travel, namely "the right to be a welcome visitor, not an unfriendly alien, when temporarily present in another state," the Court agrees with the Defendants that none of the four-named Plaintiffs have standing to bring this claim on their own behalf and therefore on the behalf of a putative class. Hughes, 840 F.3d at 995.

[¶166]    To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017). When there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Id.; see also Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264, and n. 9, (1977) ("[W]e have at least one individual plaintiff who has demonstrated standing .... Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit").

[¶167]    "The requirements for standing do not change in the class action context." In re SuperValu, Inc., 870 F.3d 763, 768 (8th Cir. 2017). "A putative class action can proceed as long as one named plaintiff has standing." Id. ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."). In this instance, none of the four named Plaintiffs have standing.

[¶168]    Cissy Thunderhawk is a resident of Mandan, North Dakota. Doc. No. 44, ¶86. Throughout the time period in question, she regularly travelled back and forth between Fort Yates, North Dakota and Bismarck/Mandan, North Dakota. Id. While the Plaintiffs assert Cissy

Thunderhawk was forced to close her restaurant, My Auntie's Place, in Fort Yates, North Dakota due customers' inability to visit her business, *her* right to travel was not substantially burdened. Doc. No. 44, ¶86. Her previous out-of-state customers could make the assertion they were "not treated like welcomed visitors, but rather unfriendly alien, when temporarily present" in the State. Hughes, 840 F.3d at 987. However, her right to travel to her business was not substantially burdened. Aside from not being temporarily in the state, there are no allegations to show the road closure was "applied discriminatorily against travelers from other States." Hughes, 840 F.3d at 995. She lacks standing.

[¶169]   Wašté Win Young is a member of the Standing Rock Sioux Tribe and at the time in question resided in Fort Yates, North Dakota and also at the camps. Doc. No. 44, ¶87. Wašté Win regularly travelled to Bismarck, North Dakota for medical appointments, shopping for her children, and on one occasion travelling out of Bismarck by airplane. Id. There are no allegations in the Amended Complaint to suggest Wašté Win was a visitor to the State of North Dakota. Here, she lacks standing.

[¶170]   Father John Floberg is a resident of Bismarck, North Dakota. Doc. No. 44, ¶89. He regularly travelled between Bismarck and Cannon Ball multiple times a week to minister to his congregation at the Episcopal Church in Cannon Ball, North Dakota. Id. Father John Floberg, the Episcopalian Priest for the St. James' Episcopal Church, was the "primary organizer of a gathering of five hundred clergy who traveled to Standing Rock, mostly from out-of-state, to participate in peaceful prayers and demonstrations of solidarity with the Tribe and its supporters south of the Backwater Bridge.' Doc. No. 44, ¶90. The Plaintiffs assert this religious gathering was burdened by the road closure because it made "attending materially more difficult for the vast majority of clergy who did or would have attended but for the closure[.]" Doc. No. 44, ¶90. In a similar fate

to Cissy Thunderhawk, Reverend John Floberg also lacks standing. Had he been one of the clergy members from another state who attempted to travel to North Dakota and was treated like an "unfriendly alien," he may have had standing. That is not the case here. Reverend John Floberg's right to travel was not burdened, and therefore, he lacks standing to bring a claim on his own behalf or that of the putative class for this claim.

[¶171]   As to José Zhagñay, the Court also finds he was not treated as unwelcomed visitor in violation of the right to travel. In fact, the Plaintiffs admit José Zhagñay travelled freely to North Dakota from New York two times, once in September and once in October of 2016. Doc. No. 44, ¶91. The Plaintiffs admit José Zhagñay "visited the curtilage alongside Highway 1806 to speak and join in prayer before the relevant stretch of road was closed." Doc. No. 44, ¶92. And importantly, the Plaintiffs admit, José "sought to and ultimately did establish legal residency in North Dakota, with his sole domicile in the camps." Doc. No. 44, ¶91. In addition, José Zhagñay was not prohibited from visiting North Dakota, nor was he treated like an "unfriendly alien" because one stretch of public road was closed. The Court finds none of the Plaintiffs have standing to assert a claim under the second component of Hughes because none of them were out-of-state-residents who were treated like unfriendly aliens rather than welcome visitors. Hughes, 840 F.3d at 995.

(ii)   Burden on Migration

[¶172]   The Plaintiffs also assert a violation of the third component of Hughes, the right "for those travelers who become permanent residents to be treated like other citizens of that state." Hughes, 840 F.3d at 995. "Whatever its origin, the right to migrate is firmly established and has been repeatedly recognized by our cases." Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 903, 106 S. Ct. 2317, 2320–21, 90 L. Ed. 2d 899 (1986). "A state law implicates the right to

travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses "'any classification which serves to penalize the exercise of that right.'" Id. (citations omitted).

[¶173]    The Plaintiffs make allegations that the road closure burdened "Plaintiffs in their attempt to relocate to and become permanent residents of the camps located alongside Highway 1806[.]" Doc. No. 44, ¶150. They assert "[t]his effect of the discriminatory closure was substantial: by making it more difficult to, for example, travel to, resupply, or seek medical care from these camps, the road closure deterred numerous Plaintiffs from making such an interstate or intrastate relocation." Doc. No. 44, ¶151. For standing purposes, at least one of the Plaintiffs must be included in this group of "numerous individuals" who was burdened or deterred from migrating to North Dakota. The Court finds none of the four-named Plaintiffs are included.

[¶174]    As noted above, Cissy Thunderhawk, Reverend John Floberg, and Waste Win, were all residents of North Dakota during the length of time in discussion. There are no facts to support the notion that they left North Dakota and sought to migrate back. The Plaintiffs attempt to use José Zhagñay's factual background to support standing on this claim. This attempt fails, however.

[¶175]    The facts as alleged in the Amended Complaint state that José Zhagñay did not *attempt* to relocate to North Dakota and become a permanent resident, he actually did. See Doc. No. 44, ¶17 ("Plaintiff José Zhagñay is and was a resident of New York who, **during the time in question, established legal residency in North Dakota due to his relocation to the camps alongside the Cannonball River** in support of the NoDAPL movement.") (emphasis added); ¶91 ("When he returned in October, José sought to and ultimately did establish legal residency in North Dakota, with his sole domicile in the camps"). José Zhagñay became a legal resident of North Dakota in October at the beginning of the road closure and stayed until December of 2016, two months into

the road closure. The road closure could not have deterred him from migrating to a place where he already established legal residency. The Court finds none of the Plaintiffs have standing to assert a claim under the third component of <u>Hughes</u> because none of them were out-of-state-residents who became permanent residents and were not treated like other citizens of the State. <u>Hughes</u>, 840 F.3d at 995.

[¶176]    Even if the Court were to find one of the Plaintiffs has standing to bring a claim that the right to travel through the visitor or migration components of <u>Hughes</u> was violated, they would still need to show that the closure substantially burdened their right to travel. As noted above, the Plaintiffs have failed to do so. A five or six mile detour is not much of a burden in North Dakota. The Court agrees with the Defendants' argument that alternative routes existed for the Plaintiffs to travel within the State and more specifically to get to and from their camps/homes to main cities. The Plaintiffs attempt to discount this argument by asserting these alternative routes were on worse maintained roads which added significant time in the winter weather months. Doc. No. 44, ¶ 65. While the Court is certainly sympathetic to travel in North Dakota winters, the Court must recognize, "travelers do not have a constitutional right to the most convenient form of travel." <u>Cramer</u>, 931 F.2d at 1031. These Plaintiffs simply experienced North Dakota's changing seasons: winter and road construction. At most, the Plaintiffs would have alleged a minor burden on their right to be treated as welcomed visitors and to be treated as other citizens after migration.

[¶177]    Because the Privileges and Immunities Clause, the second and third components under the <u>Hughes</u> right to travel test, concern the treatment of out-of-state individuals in comparison to in-state residents, none of the four-named Plaintiffs possess standing to assert the rights to migrate and visit were burdened. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." <u>Gill v. Whitford</u>, 138 S. Ct. 1916, 1933 (2018); <u>see</u> <u>also</u>

Cty. Court of Ulster Cty., N. Y. v. Allen, 442 U.S. 140, 154–55 (1979) ("A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.").

### IV.    Count IV - Improper Restriction on Commerce (Commerce Clause of the U.S. Constitution 42 U.S.C. § 1983) (Against All Defendants)

[¶178]    The Commerce Clause "grants Congress the power to regulate commerce between the states." LSP Transmission Holdings, LLC v. Sieben, 954 F.3d 1018, 1026 (8th Cir. 2020). "Implicit within the Commerce Clause is a negative or dormant feature that prevents individual states from regulating interstate commerce." Id. (citations omitted). In other words, "[t]he dormant Commerce Clause keeps states from enacting 'laws that discriminate against or unduly burden interstate commerce." Id.

[¶179]    "When analyzing allegations that a state or local law violates the Dormant Commerce Clause, [the Court] examine[s] the law for the presence of both overt and non-overt discrimination." Hampton Feedlot, Inc. v. Nixon, 249 F.3d 814, 818 (8th Cir. 2001). "First, if the law in question overtly discriminates against interstate commerce, [the Court] will strike the law unless the state or locality can demonstrate, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Id. "[Overt] discrimination may take one of three forms: The law may be discriminatory on its face or, even if it is facially neutral, the law may have a discriminatory purpose or a discriminatory effect." Id. "Under the dormant Commerce Clause, a law is discriminatory if it benefits in-state economic interests while also inordinately burdening out-of-state economic interests." Id.

(1). *DORMANT INTERSTATE COMMERCE CLAUSE*

(i) Overt Discrimination

[¶180]    "If a law fails any one of the three first-tier tests for facial discrimination, discriminatory purpose, or discriminatory effect, then the law survives only if the state "can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." N. Dakota Farm Bureau, Inc. v. Stenehjem, 333 F. Supp. 3d 900, 925 (D.N.D. 2018). Once strict scrutiny is triggered, "the burden falls on the State to justify [the measure] both in terms of the local benefits flowing from the statute and the unavailability of a nondiscriminatory alternative adequate to preserve the local interests at stake." SDDS, Inc. v. State of S.D., 47 F.3d 263, 271 (8th Cir. 1995)

[¶181]    "A regulation discriminates in effect if it favors in-state economic interests over out-of-state interests." IESI AR Corp. v. Nw. Arkansas Reg'l Solid Waste Mgmt. Dist., 433 F.3d 600, 605 (8th Cir. 2006). "In determining whether a regulation has a discriminatory purpose, courts consider both direct and indirect evidence." IESI AR Corp. v. Nw. Arkansas Reg'l Solid Waste Mgmt. Dist., 433 F.3d 600, 604 (8th Cir. 2006). This includes:

> 1) statements by lawmakers; 2) the sequence of events preceding the regulation's adoption, including irregularities in the procedures; 3) the state's consistent pattern of discriminating against, or disparately impacting, a particular class of persons; 4) the regulation's historical background, including whether it has been historically used to discriminate; and 5) the regulation's use of highly ineffective means to promote the legitimate interest asserted by the state.

IESI AR Corp. v. Nw. Arkansas Reg'l Solid Waste Mgmt. Dist., 433 F.3d 600, 604 (8th Cir. 2006).

[¶182]    The Plaintiffs' assert the Defendants' purpose and effect was discriminatory because the closing the area in question was to "punish the Standing Rock Sioux Tribe for its support of the NoDAPL movement and to improve the State's negotiation position with tribal leaders and elders vis-à-vis this movement." Doc. No. 44, ¶159. In their Amended Complaint, the Plaintiffs allege:

The intent and effect of Defendants' restriction on travel was to sanction and substantially burden travel and therefore commerce to/from the Standing Rock Reservation: as state and local officials themselves recognized just weeks before implementing the discriminatory closure, the thoroughfare in question is "imperative to the flow of commerce and emergency responders to and from [the] Standing Rock Indian Reservation.

Doc. No. 44, ¶158.

[¶183]   Specifically, the Plaintiffs assert the Defendants penalized the Tribe by impeding travel to Tribe's Casino and other businesses. Doc. No. 62, p. 53. The Plaintiffs allege the closure of the area in question did actually have a substantial effect on the Tribe's decisions surrounding the NoDAPL movement because businesses on the Reservation, such as Plaintiff Thunderhawk's business and the Casino, experienced significant economic losses. Doc. No. 44, ¶159. In addition, because the Tribe's economic resources, which consisted largely of the Casino's profits, are distributed widely throughout South Dakota communities, the Plaintiffs assert the "Defendants' efforts to economically injure the Tribe, therefore were intended to and did extend beyond North Dakota's borders and into South Dakota." Doc. No. 44, ¶160.

(ii)   <u>Non-Overt Discrimination or Undue Burden</u>

[¶184]   The Plaintiffs assert "[E]ven if a law does not overtly discriminate against interstate commerce, the law will be stricken if the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" <u>Id.</u> This is the *Pike* balancing test. <u>See</u> <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137 (1970). "That test requires balancing a legitimate local public interest against its incidental burden on interstate commerce." <u>LSP Transmission Holdings, LLC v. Sieben</u>, 954 F.3d 1018, 1030 (8th Cir. 2020). Essentially, "[t]hose challenging the legislative action have the burden of showing that the statute's burden on interstate commerce exceeds its local benefit." <u>Hampton Feedlot</u>, 249 F.3d at 818. They must also show "the unavailability of

nondiscriminatory alternatives adequate to preserve the local interests at stake." Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 353 (1977).

[¶185]   Plaintiffs argue their Complaint sets forth facts showing the burden on interstate commerce from the road closure was "clearly excessive in relation to the putative local benefits." Doc. No. 62, p. 52. Plaintiffs allege the closure of Highway 1806 was a severe burden because it is a "key north-south public right-of-way for residents of south-central North Dakota, north-central South Dakota, the Standing Rock Reservation, and the Cheyenne River Reservation," and "thousands of local residents" used the highway to visit family, shop, seek medical attention, and conduct other life activities. Doc. No. 44, ¶3. When the road closed, these individuals were forced to take "a detour on worse-maintained small roads that added significant time, stress, and danger to the trip and imposed additional costs on Plaintiffs in gas, car maintenance, etc." Doc. No. 44, ¶65. Additionally, during winter months, which these events spanned, the detour "added substantially more in travel time-often an hour or more-and, on numerous occasions, the detour was impassable even when Highway 1806 would not have been." Doc. No. 44, ¶65. The Plaintiffs assert "the road closure severely burdened – often fully preventing – travel and therefore commerce between north-central South Dakota and south-central North Dakota." Doc. No. 62, p. 53. In addition, the Plaintiffs assert:

> [B]y design, the impact of this closure on purely North Dakota businesses, including the Morton County hospitality industry, was relatively minimal. This was ensured through not only the placement of the closure, but in the disparate way in which it treated customers of on-Reservation and off-Reservation businesses: Defendants made efforts to focus the closure's impacts on the Tribe and its supporters (who, although regular customers of on-Reservation businesses, were relatively less likely to engage in commerce off of the Reservation); more frequent customers of Mandan- and Bismarck-area businesses, like residents of Fort Rice, were permitted to use most of the road—at least for traveling to and from these Mandan and Bismarck businesses.

Doc. No. 44, ¶161.

[¶186]   The Plaintiffs also argue the benefits of closing the bridge were slight. In support, they point to their Complaint wherein they allege their gatherings were peaceful and lawful, the bridge did not need repairing or could have been repaired sooner than it was, and the construction of the pipeline was complete in early November. Doc. No. 44, ¶¶ 49, 50, 61, 69, and 72. In addition, Plaintiffs assert their Complaint alleges facts showing "less discriminatory alternatives that would have better served any local need to preserve traffic or public safety, further showing that the road closure was a locally costly, ineffective, and unnecessary measure." Doc. No. 62, p. 53. These alternatives include:

> maintaining a non-militarized police presence near demonstrators in public areas, arresting and detaining lawbreakers (but not those peacefully and lawfully gathered), maintaining slower speed limits on the roadways, implementing cautionary road signage and traffic safety checkpoints, implementing speed bumps and other similar traffic mitigation measures, and even non-discriminatorily closing short—several-hundred feet— stretches of the road to traffic for only the minutes or hours during which a large demonstration was occurring.

Doc. No. 44, ¶85.

(iii)   <u>Standing</u>

[¶187]   The crux of the Defendants' argument for dismissal of the Plaintiffs' claim that the road closure was an improper restriction on the Dormant Commerce Clause is a lack of standing. The Defendants assert the Plaintiffs argument that the highway closure was discriminatory in purpose and effect, as it burdened commerce to and from the Standing Rock Reservation, fails because it does not identify as a threshold matter in-state and out-of-state competitors. Doc. No. 49, p. 49. <u>See</u> "[A]ny notion of discrimination assumes a comparison of substantially similar entities." <u>Gen. Motors Corp. v. Tracy</u>, 519 U.S. 278, 298 (1997). "A state statute violates the 'clear discrimination' standard when it constitutes 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" <u>Freedom Holdings, Inc. v. Spitzer</u>, 357 F.3d 205, 217 (2d Cir. 2004). "[S]tate regulations subject to Commerce Clause

83

scrutiny include those that disrupt travel and shipping due to a lack of uniformity in state laws, affect commerce beyond the borders of the defendant state, or have impacts that fall more heavily on out-of-state interests." <u>Nebraska Beef Producers Comm. v. Nebraska Brand Comm.</u>, 287 F. Supp. 3d 740, 752 (D. Neb. 2018).

[¶188]   The Plaintiffs assert their Complaint does in fact identify in-state and out-of-state competitors. Indeed, their Complaint alleges the highway closure economically injured the Standing Rock Tribe, including its communities in South Dakota, while at the same time had a minimal effect on the Morton County hospitality industry. Doc. No. 44, ¶161. Additionally, the Plaintiffs assert because the South Dakota border was only 35 miles south of the closure, commerce to/from South Dakota was disproportionately affected.[18]

[¶189]   Nonetheless, the issue for standing purposes continues past just the identification of in-state and out-of-state competitors. The question becomes whether any of the four Plaintiffs fit into the category of out-of-state competitors such that they seek to redress an injury they personally possess. Insofar as the Plaintiffs' argue the Tribe and/or its casino were financially harmed. As argued by the Defendants, neither is a party to this suit. Doc. No. 49, p. 47. Furthermore, none of the Plaintiffs are residents of South Dakota, and therefore, lack standing to assert commerce between North Dakota and South Dakota was impaired. The Court agrees. None of the four-named Plaintiffs have standing to assert a violation of the dormant commerce clause.

(2).   *INDIAN COMMERCE CLAUSE*

[¶190]   The Indian Commerce Clause is found in Article I, Section 8 of the Constitution. It grants Congress the power "[t]o regulate Commerce . . . with the Indian Tribes . . . ." U.S. Const. art. I, §

---

[18] As pointed out by the County Defendants, the secured area was on the opposite side of the Reservation from South Dakota. Doc. No. 52, p. 10.

8, cl. 3. The Plaintiffs assert they have pled a claim to relief under the Indian Commerce Clause, specifically under what they deem is the Dormant Indian Commerce Clause.

[¶191]   It remains unclear if the Supreme Court has recognized a dormant aspect to the Indian Commerce Clause. [19] The Supreme Court has discussed the Indian Commerce Clause in relation to the Interstate Commerce clause, noting it is "well established that the Interstate Commerce and Indian Commerce Clauses have very different applications." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989). The Supreme Court noted the differences, explaining "[i]n particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." Id. Moreover, the Court pointed out the Interstate Commerce Clause "is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." Id. at 200. The Court concluded that "the fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply [Interstate] Commerce Clause doctrine developed in the context of commerce 'among' States with mutually exclusive territorial jurisdiction to trade 'with' Indian tribes." Id.

[¶192]   The Supreme Court has refused to find the Indian Commerce clause "operates as a blanket prohibition on state laws that regulate Indian Commerce." Ward, 291 F.Supp.2d at 200

---

[19] Some lower courts have explicitly stated there is no dormant aspect to the Indian Commerce Clause. See Ward v. New York, 291 F. Supp. 2d 188, 199 (W.D.N.Y. 2003) ("Although another provision of the Constitution, the Interstate Commerce Clause, has a dormant or negative aspect, the Indian Commerce Clause does not.").

(citing <u>Washington v. Confederated Tribes of the Colville Indian Reservation</u>, 447 U.S. 134, 154–62 (1980); <u>Dep't of Taxation & Fin. of New York v. Milhelm Attea & Bros.</u>, 512 U.S. 61 (1994)).

[¶193]   As the <u>Ward</u> Court points out, however, while "the Indian Commerce Clause, standing alone, does not automatically prohibit state regulation of Indian Commerce," the clause "may have a more limited role to play in preventing undue discrimination against, or burdens, on Indian Commerce." 291 F.Supp.2d at 188 (citing <u>Colville</u>, 477 U.S. at 157 ("It can no longer be seriously argued that the Indian Commerce Clause, of its own force, automatically bars all state taxation of matters significantly touching the political and economic interests of the Tribes. That Clause may have a more limited role to play in preventing undue discrimination against, or burdens on, Indian commerce. But Washington's taxes are applied in a nondiscriminatory manner to all transactions within the State.")).

[¶194]   In the present case, the Plaintiffs assert the Defendants penalized the Tribe by impeding travel to Tribe's Casino and other businesses. Doc. No. 62, p. 53. The Plaintiffs allege the closure of the area in question did actually then have a substantial effect on the Tribe's decisions surrounding the NoDAPL movement thereafter because businesses on the Reservation, such as Plaintiff Thunderhawk's business and the Casino, experienced significant economic losses. Doc. No. 44, ¶159. In addition, the Plaintiffs assert:

> [B]y design, the impact of this closure on purely North Dakota businesses, including the Morton County hospitality industry, was relatively minimal. This was ensured through not only the placement of the closure, but in the disparate way in which it treated customers of on-Reservation and off-Reservation businesses: Defendants made efforts to focus the closure's impacts on the Tribe and its supporters (who, although regular customers of on-Reservation businesses, were relatively less likely to engage in commerce off of the Reservation); more frequent customers of Mandan- and Bismarck-area businesses, like residents of Fort Rice, were permitted to use most of the road—at least for traveling to and from these Mandan and Bismarck businesses.

Doc. No. 44, ¶161.

[¶195]    The Defendants again assert that even if this claim is recognized, none of the four named Plaintiffs have standing. The Defendants assert "[t]he only allegations of economic harm in the amended complaint are to in-state interests, that is, a tribal casino located within North Dakota, as well as a business owned by one of the four individually-named plaintiffs that is also located within North Dakota." Doc. No. 49, p. 51. The Defendants further assert "[n]either the tribe itself not the casino are plaintiffs, and none of the four named plaintiffs are out-of-state enterprises allegedly disadvantaged by a highway closure that favored in-state entities." Id. The Court agrees.

[¶196]    The Indian Commerce Clause regulates commerce with Indian tribes. While Plaintiff Thunderhawk claims her business was harmed, there is no precedent to hold that the Indian Commerce Clause applies to individual tribal members.  Insofar as the basis of the Plaintiffs' claim is that the Standing Rock Sioux Tribe and its Casino were burdened, they must be the parties to vindicate those claims. They are not parties to this suit, and therefore, there is no standing for any of the four-named Plaintiffs to assert a claim for a violation of the Dormant Indian Commerce Clause.

### V.    Count V – Retaliation (First, Fifth, And Fourteenth Amendments to the U.S. Constitution, Privileges and Immunities Clause, Commerce Clause 42 U.S.C. § 1983) (Against All Defendants)

[¶197]    Plaintiffs assert they were "prevented from engaging in constitutionally protected activity, including First, Fifth, and Fourteenth Amendment activity, and Commerce between the states and tribes, when Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers and state officials, or under color of law, completely closed a nine-mile portion of Highway 1806 to Plaintiffs." Doc. No. 44, ¶167. Specifically, "Defendants prevented Plaintiffs from speaking, assembling, praying, or traveling anywhere on this public nine-mile stretch of Highway 1806— an area that includes known and identified sites sacred and

ceremonial to Plaintiffs, and which serves as an important thoroughfare for business and safety." Doc. No. 44, ¶167. "Defendants' adverse actions were substantially motivated as a response to Plaintiffs' exercise of constitutionally protected conduct." Doc. No. 44, ¶167. "Indeed, in meetings with the Tribe and its supporters and in public statements Governor Burgum and Sheriff Kirchmeier conditioned the re-opening of the road on the cessation of constitutionally protected conduct in the area, such as speech occurring on tribally owned land, directing, among others, Grant Levi and Michael Gerhart Jr. to ensuring this." Doc. No. 44, ¶168.

[¶198]    "It is well-settled that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . on the basis of his constitutionally protected speech." Osborne v. Grussing, 477 F.3d 1002, 1005 (8th Cir. 2007). To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that it engaged in a protected activity, (2) that the defendants responded with adverse action that would "chill a person of ordinary from continuing in the activity," and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity." L.L. Nelson Enterprises, Inc. v. Cty. of St. Louis, Mo., 673 F.3d 799, 807–08 (8th Cir. 2012).

[¶199]    The Defendants assert it is undisputed that "trespass and numerous other criminal acts took place prior to the closures," "violent criminals set fire to three vehicles to the bridge," "bridge was damaged and needed to be inspected and repaired," "the bridge was a crime scene" and "the closed stretch of highway corresponds with the detour required by the bridge closure." Doc. No. 49, p. 53. The Defendants assert "[t]hese undisputed facts show that legitimate, non-retaliatory reasons were the actual "but for" causes of the highway and bridge closures." Doc. No. 49, p. 53. These assertions, however, are in fact disputed. These facts do not appear in the Plaintiffs' Complaint, which in fact, alleges the opposite of these assertions. Again, at this juncture, the Court

looks to the Plaintiffs' Complaint and determine if they have alleged facts, which must be taken as true, which state a plausible claim for retaliation.

[¶200]   The Plaintiffs' Complaint establishes that prior to the road closure, the Plaintiffs participated in a range of constitutionally protected activity including praying and speaking. Doc. No. 44, ¶¶ 3, 40-41, 44, 49-50. As noted above, the Court finds the Plaintiffs' have alleged facts sufficient to show a violation of their Freedom of Speech. This alone, however, does not ensure a viable claim for retaliation.

[¶201]   The Plaintiffs' Complaint also alleged facts to establish the Defendants responded with adverse action that would chill a person of ordinary firmness from continuing the activity. "The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." Garcia v. City of Trenton, 348 F.3d 726, 728 (8th Cir. 2003). "The test is an objective one, not subjective." Id. "The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." Id. "When applying the ordinary firmness test, courts should be 'mindful' that the 'effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.'" Taylor v. Haugaard, 360 F. Supp. 3d 923, 931 (D.S.D. 2019).

[¶202]   The Plaintiffs assert they have pled facts showing Defendants took actions which may chill an individual from engaging in constitutional activity. They assert, individuals were deterred from using the highway for any reason by the Defendants threatening to fine "any individuals bringing food, building materials, or portable bathrooms to the main camp." Doc. No. 44, ¶78. The Plaintiffs assert, "[i]n conjunction with Defendants' closure of the quickest and safest route to the

nearest major hospital in Bismarck and to the nearest source of many life-saving supplies, this [sever winter weather] increased the risk of serious bodily injury and death to those gathered by the Cannonball River, as well as those who resided on the nearby Reservation." Doc. No. 44, ¶78.

[¶203]   The Court however does not find these facts rise to the level of deterring a protestor of ordinary firmness from continuing to engage in speech. While the Plaintiffs' assert the closure increased the risk of serious bodily injury and death to those gathering near the Cannon Ball River, the road closure did not stop individuals from taking alternative routes to get to the camps to continue to gather and engage in constitutionally protected speech there. In fact, constitutional activity continued at these camps despite the road closure. So, an ordinary person would not have been deterred from continuing engage in protected speech just because the most convenient route to get there was closed.

[¶204]   Plaintiffs must additionally prove causation. "To prevail in an action for First Amendment retaliation, 'plaintiff must show a causal connection between a defendant's retaliatory animus and [plaintiff's] subsequent injury.'" Baribeau v. City of Minneapolis, 596 F.3d 465, 481 (8th Cir. 2010). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in" the decision[.]" Id. "Furthermore, the plaintiff must show that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was "singled out" for adverse treatment because of his exercise of constitutional rights." Kilpatrick v. King, 499 F.3d 759, 767 (8th Cir. 2007).

[¶205]   The Defendants argue the Plaintiffs cannot prove "the alleged constitutional motive i.e., retaliation was the cause in fact of their alleged constitutional injuries." Doc. No. 49, p. 53. They further assert "[i]f, however, the result (the highway/bridge closures) would have occurred

notwithstanding the state defendants' alleged retaliatory motive, the plaintiffs cannot establish the "but for" causation required to proceed with their retaliation claim." Id.

[¶206]   The Plaintiffs have asserted they have "pled numerous facts showing that the road closure would not have been closed for as long or for so many miles (if at all) but for the Defendants' retaliatory aim." Doc. No. 62, p. 58. The Plaintiffs allege that the NDDOT could have conducted its investigation of the Bridge on October 28, but delayed it for nearly two months even though "Plaintiffs and the Standing Rock Sioux Tribe reached out to the State and Local Defendants on numerous occasions between October 28 and December 22 to arrange the safe inspection of the bridge (and in any other way necessary facilitate its reopening), but were rebuffed." Doc. No. 44, ¶60. The Plaintiffs assert that even though the NDDOT revealed on January 12 that the bridge was and had been structurally sound, "Defendants [except Dalrymple] continued to maintain the closure of the nine-mile stretch of Highway 1806 in question for 68 additional days" until "there was an assurance no criminal activity will take place and federal law enforcement has been introduced to the protest camp to restore law and order." Doc. No. 44, ¶61.

[¶207]   Next, the Plaintiffs assert the Defendants' alleged purpose of ensuring the completion of construction that had already been finished also points to retaliation. Doc. No, 62, p. 33. The Plaintiffs allege that for "the vast majority of the duration of this discriminatory road closure, there was no active construction." Doc. No. 44, ¶72. The Plaintiffs allege by early-November the construction of the DAPL where it intersects with Highway 1806 was already completed. Doc. No. ¶72. Lastly, the Plaintiffs assert the Defendants label protestors as having created mayhem, but there was none. Doc. No. 62, p. 33. While the Defendants attempt to introduce extrinsic evidence of criminal activity of potential protestors, the Plaintiffs' Complaint alleges that "[t]he vast majority of the speech, assembly, prayer, and travel in this area was completed in a peaceful

and lawful manner," including "[t]housands of Water Protectors [who] prayed, marched, sang, waved placards, and chanted on thousands of occasions over the course of a nearly year-long period without any incident." Doc. No. 44, ¶49.

[¶208]   The Defendants counter the Plaintiffs have not pled facts showing the "state officials closed the highway and bridge just because plaintiffs were exercising lawful constitutional rights." Doc. No. 49, p. 53. In fact, they assert, and the Court agrees, this theory fails because as the Plaintiffs themselves admit in their Complaint, "the lawful exercise of constitutional rights took place for several months before the highway and bridge closures became necessary." Doc. No. 49, p. 53 (citing Doc. No. 44, ¶44). Indeed, the Plaintiffs' Complaint states that from April 2016 through October 2016, protestors regularly used Highway 1806's wide curtilage to engage in constitutionally protected speech without disrupting or impeding traffic. Doc. No. 44, ¶44. They assert they hung prayer ties and signs for passing motorists, and they assembled in groups to speak and pray, among other activities. Id. What is missing, therefore, are any facts showing that the cause of the road closure was due to any of these lawful activities.

[¶209]   The Plaintiffs have failed to plead facts showing the closure of the road was in retaliation for exercising their First Amendment rights. Claim V will be dismissed, as it fails to state a claim for relief.

**VI.**   **Count VI – Unconstitutional Policies, Customs, or Practices (First, Fifth & Fourteenth Amendments to and the Commerce Clause and Privileges and Immunities Clause of the U.S. Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 1985(3)) (Against All Defendants)**

[¶210]   The State Defendants assert that "while a suit alleging an unconstitutional policy, custom, or practice against a local government may state a viable claim under Monell, there is no analogous Monell claim against a state itself, or against state officials sued in their individual capacities." Doc. No. 49, p. 56. The Plaintiffs clarified in their Response in Opposition that they only assert

municipal liability against municipal defendants, and not State Defendants," requesting the Court to interpret Count VI to only those Defendants who can be liable for municipal claims. Doc. No. 62, p. 58. The Court will therefore not apply this count to State Defendants. The Court will instead determine if the Plaintiffs have pled facts to show the County Defendants could be liable under this claim.

[¶211]   "A municipality may be liable under § 1983 when an official municipal policy or custom caused a violation of a plaintiff's substantive due process rights." Russell v. Hennepin Cty., 420 F.3d 841, 846 (8th Cir. 2005)." "Municipal officials who have final policymaking authority may, by their actions, subject the government to Section 1983 liability.'" Id. (citing Angarita v. St. Louis County, 981 F.2d 1537, 1546 (8th Cir.1992)). "Before a municipality can be held liable, however, there must be an unconstitutional act by a municipal employee." Id.

[¶212]   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." Malone v. Hinman, 847 F.3d 949, 955 (8th Cir. 2017) (citations omitted). "Policy and custom are not the same thing." Id. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Id. "[T]he plaintiff must prove that the policy was the "moving force" behind a constitutional violation." Schaffer v. Beringer, 842 F.3d 585, 596 (8th Cir. 2016). In the alternative, "a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating:

> 1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials **after notice to the officials of that misconduct**; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Id. (emphasis added)

[¶213]    As the Court will explain below, the Plaintiffs have failed to allege facts sufficient to show the Defendants had the requisite notice of alleged unconstitutional misconduct by subordinates so as to allege an unofficial custom or a failure to train or supervise theory. Therefore, the Court will assess whether the Plaintiffs have alleged facts showing the municipality had an "official policy" which caused the alleged their constitutional violations.

[¶214]    The Plaintiffs assert Sheriff Kirchmeier, "together with the assistance of state officials [] made and implemented Morton County's policy decision to close off the road and bridge in whole and in part to the Tribe and its supporters." Doc. No. 44, ¶103. Therefore, the Plaintiffs' assertion is that the "policy" involved here is the closure of the area in question. The Plaintiffs assert Sheriff Kirchmeier, the State Defendants, and "other such officials" maintained this policy when they:

a)    Implemented [except Burgum] an absolute prohibition on all travel by the Tribe and its supporters on Highway 1806 over an approximately nine-mile stretch running from the Backwater Bridge to Fort Rice;

b)    Maintained this absolute prohibition on all travel by the Tribe and its supporters with a reinforced concrete and concertina wire barricade located immediately North of the Backwater Bridge;

c)    Defended this absolute prohibition on all travel by the Tribe and its supporters by arresting people who approached the closed portion of the road—even on foot—for trespassing;

d)    Defended this absolute travel prohibition with significant force on several occasions, including on November 20 [except Burgum on this date].

Doc. No. 44, ¶104(a)-(d).

[¶215]    While the Plaintiffs assert Sheriff Kirchmeier is "the policy-making authority for Morton County, as it relates to the maintenance of policies, customs, or practices, and training, supervision, or discipline of [his] and Morton County's law enforcement officers and employees," they fail to allege he is the "municipal official who has final authority" to close a portion of a rural highway to only the Tribe and its supporters, the "official policy" they allege was in place. The Eighth

Circuit has noted there is a difference between final policymakers and final decisionmakers. Bolderson v. City of Wentzville, Missouri, 840 F.3d 982, 985 (8th Cir. 2016). The Eighth Circuit noted, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Id. Rather, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Manning v. Dakota Cty. Sch. Dist. No. 22-0011, 279 Neb. 740, 749, 782 N.W.2d 1, 9–10 (2010).

[¶216]   Because the Plaintiffs have failed to put forth facts in the Amended Complaint to show Sheriff Kirchmeier was the official who possessed the final authority regarding the closure of the road, Claim VI fails to state a claim and will be dismissed.

**VII.   Count VII – Violations Resulting from Training, Supervision, or Discipline (First, Fifth, & Fourteenth Amendments to and the Commerce Clause and Privileges and Immunities Clause of the U.S. Constitution; 42 U.S.C. § 1983) (Against All Defendants)**

[¶217]   The Plaintiffs assert "Defendants, acting under color of state law, maintain inadequate training, supervision, or discipline permitting or deliberately indifferent to the policies, practices, or customs and were the moving force behind the violation of Plaintiffs' First, Fifth, and Fourteenth Amendment and Commerce Clause rights, secured by the U.S. Constitution." Doc. No. 44, ¶177. The Plaintiffs have sued the State Defendants in their individual capacities. Doc. No. 44, ¶¶20-23.

[¶218]   "To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014). "While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor

may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." Id. "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in "creating, applying, or interpreting a policy" that gives rise to unconstitutional conditions." Id.

[¶219]   The State Defendants may therefore be liable under § 1983 if they "(1) had "notice of a pattern of unconstitutional acts committed by subordinates"; (2) [were] deliberately indifferent to or tacitly authorized those acts; and (3) failed to take "sufficient remedial action"; (4) proximately caus[ed] injury to the Plaintiffs." Livers v. Schenck, 700 F.3d 340, 355–56 (8th Cir. 2012) (quoting Jane Doe A. v. Special Sch. Dist. of St. Louis Cnty, 901 F.2d 642, 645 (8th Cir.1990)). The Complaint fails to allege facts to support a plausible finding of each element.

[¶220]   The Plaintiffs have failed to allege facts to support the assertion that each Defendant had notice of a pattern of unconstitutional acts committed by subordinates. While the Plaintiffs assert "Sheriff Kirchmeier [and Doug Burgum, Jack Dalrymple, Grant Levi, Michael Gerhart Jr., or other such officials] were on notice of the inadequate policies, customs, or practices carried out by their law enforcement officers and employees through multiple sources," they fail to substantiate this allegation with factual support. Doc. No. 44, ¶107. The allegations that each Defendant should be found to have been on notice because of "news/media reports, past incidents of misconduct to others, multiple harms that occurred to the Plaintiffs, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, releases from the ACLU about the unconstitutionality of road closures of this nature in this context, and a notice sent from the Water Protector Legal Collective to state and local officials" are likewise insufficient to establish each Defendant had notice. Doc. No. 44, ¶107.

[¶221]    The allegations are too generalized to support a finding that each Defendant had notice. For example, simply asserting that because the DAPL movement was in the news each Defendant had notice of unconstitutional violations poses problems. The Plaintiffs do not divulge what was in these news articles and how their substance gave notice to the Defendants. They also do not put forth facts suggesting that each Defendant reviewed them. The same is true for the ACLU release and the notice from the Water Protector Legal Collective. The Plaintiffs assert the notice was sent to "state and local officials," without identifying which officials or whether each Defendant in this case reviewed them. Additionally, simply stating that "misconduct" occurred without specifying what and if each Defendant was aware of such misconduct fails to establish notice. The allegations here are too attenuated to plausibly show each Defendant possessed the requisite notice to be liable under § 1983. See Doe v. Gooden, 214 F.3d 952, 956 (8th Cir. 2000) ("With regard to the allegations of sexual abuse, nowhere do the plaintiffs claim that Gooden and Jackson had actual notice of any sexual abuse by Lovell prior to his verbal suspension and removal from the classroom on January 15, 1996. Rather, the plaintiffs allege that Gooden and Jackson _should have known_ that Lovell "constituted a potential danger[.]") (emphasis added) see also Marsh v. Phelps Cty., 902 F.3d 745, 756 (8th Cir. 2018) ("Assuming without deciding that 'turning a blind eye' could ever constitute actual notice" of wrongdoing sufficient to support a constitutional claim, being aware that Campana violated jail policy, without more, by accompanying female inmates in their cells "falls far short of notice of a pattern of conduct that violated" Marsh's constitutional rights.")

[¶222]    Without a showing of notice of a pattern of unconstitutional acts by subordinates, the Plaintiffs also fail to allege facts sufficient to meet the remaining elements. If the Defendants did not have the requisite notice of these alleged unconstitutional acts, they could not have been deliberately indifferent to the Plaintiffs nor could they have tacitly authorized those acts. "In order

to show deliberate indifference or tacit authorization," the Plaintiffs "must allege and ultimately prove [the State and County Defendants] "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." Id. The same rings true for the Defendants failing to take remedial action or proximately causing the Plaintiffs' injuries. Because the Plaintiffs have failed to allege facts sufficient to show a violation under Count VII against the State and County Defendants, it will be dismissed.

### VIII.   Qualified Immunity

[¶223]   "Qualified immunity shields government officials from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would know." Ferguson v. Short, 840 F.3d 508, 510 (8th Cir. 2016). "The determination of whether qualified immunity is applicable in given circumstances is one of 'objective reasonableness.' Herts v. Smith, 345 F.3d 581, 585 (8th Cir. 2003). The issue is not "whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." Id. (citing Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002)). The defendant bears the burden of proof on this affirmative defense. Id.

[¶224]   A two-step inquiry is undertaken to determine if qualified immunity is invoked: "(1) [whether] the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) [whether] the right was clearly established at the time of the deprivation." Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012).

[¶225]   As to the first step, the Court finds the Plaintiffs have alleged facts showing violations of their constitutional right to speech (Count I). See Supra, ¶¶108, 120. It is the second prong, whether the law was clearly established so that a reasonable official would know he or she was violating the constitutional rights of another, that appears to be the biggest contention between the parties.

[¶226]    "For the purposes of step two, "clearly established" means "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 137 S. Ct. 548, 551 (2017) (citations omitted). "We ... look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit." Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002).

[¶227]    The Defendants assert the Plaintiffs "failed to identify a case where an [official] acting under similar circumstances . . . was held to have violated the [Constitution]," and on this basis, they cannot overcome the Defendants' qualified immunity defense. Doc. No. 49, p. 59. Specifically, they assert in order to prevail on the second prong, Plaintiffs must provide cases where "officials were held to have violated the First Amendment or other constitutional rights by closing a location even though it was a crime scene, closing a damaged bridge for inspection and repair, closing a highway to prevent violent crimes from occurring on private property, or attempting to quell a riot." Doc. No. 49, p. 60. None of the factual scenarios as articulated by the Defendants, however, appear on the face of the Amended Complaint. See Vandevender v. Sass, No. 19-1230, 2020 WL 4374977, at *1 (8th Cir. July 31, 2020) ("Numerous Eighth Circuit cases have held that defendants are entitled to dismissal under Rule 12(b)(6) if they show 'they are entitled to qualified immunity *on the face of the complaint*.") (emphasis added). While the Defendants again argue the Court should be forced to consider extrinsic evidence of potential criminal activity of protestors, the law is clear that the Court must accept the Plaintiffs' facts as true at this motion-to-dismiss stage. St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002) ("While there may be a dispute as to whether the alleged facts are the actual facts, in

reviewing the grant of a motion to dismiss, we are required to accept the allegations in the complaint as true.").

[¶228]    The case examples provided by the Defendants also suffer a similar fate, as those cases relied upon extrinsic evidence in determining the officials were afforded qualified immunity. This Court will not consider such evidence at this time. See e.g. Wood v. Moss, 572 U.S. 744, 759-64 (2014) ("We agree with the agents, however, that the map itself . . . undermines the protesters' allegations of viewpoint discrimination as the sole reason for the agents' directions. The map corroborates that, because of their location, the protestors posed a potential security risk to the President, while supporters, because of their location, did not."); Cross v. Mokwa, 547 F.3d at 896 (discussing evidence that violent protestors had infiltrated peaceful protests); Bernini v. City of St. Paul, 665 F.3d 997, 1003 (8th Cir. 2012) ("Based on undisputed evidence, the officers in this case reasonably could have concluded that the group at the Shepard–Jackson intersection had committed a crime and that the group was acting as a unit").

[¶229]    Indeed, this case is an example of why "qualified immunity is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." Walker v. Schult, 717 F.3d 119, 130 (2d Cir. 2013) As the United States Supreme Court has noted, "when qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify" and "the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." Pearson v. Callahan, 555 U.S. 223, 238–39, 129 S. Ct. 808, 819, 172 L. Ed. 2d 565 (2009).

## E.    CONCLUSION

[¶230]    Based upon the above, the State and County Defendants' Motions to Dismiss [Doc. Nos. 48, 51] are **DENIED, IN PART**, as to the following: Count I – Violation of Right to Speak and

Assemble, **AND GRANTED, IN PART**, as to the following: Count II – Violation of Right to Free Exercise; Count III – Violation of Right to Travel; Count IV – Improper Restriction on Commerce; Count V – Retaliation; Count VI – Unconstitutional Policies, Customs, or Practices; Count VII – Violations Resulting From Training, Supervision, Or Discipline. The Court also refrains from making a determination on the State and County Defendants' asserted Qualified Immunity Defense at this stage. Counts II through VII of the Amended Complaint are, therefore, dismissed with prejudice.

[¶231]   TigerSwan's Motion for Summary Judgment, or in the alternative, Motion to Dismiss [Doc. No. 81], construed as a 12(c) Motion for Judgment on the Pleadings, is hereby **DENIED**.

[¶232]   Because the Court has not considered extrinsic evidence for purposes of this Motion, the Court **FINDS AS MOOT** the Plaintiffs' Motions to Strike the State and County Defendants' respective Memorandums in Support of Motion to Dismiss the Amended Complaint [Doc. Nos. 63, 64]. In addition, because this Order resolves the State and County Defendants' Motions to Dismiss the Amended Complaint, the State and County Defendants' Motions to Dismiss the originally-filed Complaint are **FOUND AS MOOT** [Doc. Nos. 28, 31].

[¶233]   **IT IS SO ORDERED.**

DATED September 1, 2020.

Daniel M. Traynor, District Judge
United States District Court

101